# Exhibit 1

<div align="center">

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

</div>

| | |
|---|---|
| JOSEPH PEERY, on behalf of himself and all persons similarly situated,<br><br>        Plaintiffs,<br><br>  v.<br><br>CHICAGO HOUSING AUTHORITY,<br><br>        Defendant. | **Case No.: 13-cv-5819**<br><br>**The Hon. Sharon Johnson Coleman** |

<div align="center">

**CHICAGO HOUSING AUTHORITY'S ANSWERS**
**TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

</div>

Pursuant to Federal Rules of Civil Procedure 26 and 33, Defendant Chicago Housing Authority ("CHA") responds to Plaintiff Joseph Peery's First Set of Interrogatories as follows:

<div align="center">

**GENERAL OBJECTIONS**

</div>

Each of these objections is applicable to each of Mr. Peery's Interrogatories and is incorporated into each and every one of CHA's responses as though fully set forth therein, and is in addition to any specific objections stated for a particular interrogatory.

   1.  CHA reiterates and preserves its objection to answering these interrogatories at this very early stage in the litigation pursuant to Rule 33(a)(2) of the Federal Rules of Civil Procedure on the grounds that discovery has not even begun (with the exception of the Court granting limited interrogatories to Plaintiff), and no pretrial conference has been held. CHA cannot adequately and properly answer these contention interrogatories until later in this litigation when it has the benefit of the Court's ruling on its motion to dismiss Plaintiff's complaint, and, if the complaint survives, has formulated its answers to the allegations and been allowed to conduct discovery. Rule 33(a)(2) of the Federal Rules of Civil Procedure expressly

allows the Court to order that contention interrogatories "need not be answered until designated discovery is complete, or until a pretrial conference or some other time."

2.      CHA objects to these interrogatories on the grounds that they are overly broad, unduly burdensome, and beyond the scope of permissible contention interrogatories.

3.      CHA objects to these interrogatories on the grounds that the term "government interest" is vague and undefined throughout the interrogatories.

4.      CHA objects to these interrogatories to the extent that they seek information or documentation protected by the attorney-client privilege, the attorney work-product immunity, and/or any other applicable privilege or immunity.

5.      CHA objects to these interrogatories to the extent they seek information: (a) not reasonably calculated to lead to the discovery of admissible evidence; (b) which is unreasonably cumulative or duplicative, or obtainable from some other source that is more convenient, less burdensome, or less expensive; or (c) which Mr. Peery has had opportunity to obtain from other sources.

6.      CHA objects to these interrogatories to the extent that they call for legal conclusions.

7.      CHA objects to the production of information and documents that are in the public domain and, therefore, are equally accessible to Mr. Peery.

## INTERROGATORIES

1.      Please state each and every government interest that defendant asserts in this litigation is advanced by suspicionless drug testing of public housing residents in mixed-income housing developments.

**ANSWER:**      CHA objects to this interrogatory on the ground that it is argumentative in that it assumes that a "government interest" and, hence, "governmental conduct" or "governmental action," is involved in this litigation. As stated in CHA's motion to dismiss, the drug testing that

Plaintiff complains of is imposed by a private landlord, Holsten Management Company ("HMC"), and is found in a provision of Plaintiff's lease with HMC. CHA is not a party to this lease and the complained-of testing does not involve any "government action." CHA also objects to this interrogatory on the grounds that it seeks information protected by the attorney-client privilege and attorney work product doctrine. Further, CHA objects to this interrogatory to the extent it suggests that the challenged testing policy does not apply to all tenants, whether or not they receive CHA assistance, and to the extent its characterization of certain tenants as "public housing residents" implies legal conclusions about the nature of their tenancy or relationship to CHA. Subject to and without waiving these objections, CHA states that if the testing at issue were found to involve "governmental action," the "special needs" the policy advances include: (1) public safety at Parkside, given the history of safety problems in the surrounding community; (2) promotion of a drug-free Parkside, given the history of drug problems in the surrounding community; (3) protection of the youth residing at Parkside, given the history of harm to youth in the surrounding community; and (4) the special and compelling social, economic, and community development goals served by the historic and unprecedented transformation of Cabrini Green as part of an initiative in which CHA acquiesced in the private developers and resident desires for drug screening in order to promote investment in and acceptance of Parkside, a mixed-income community that provides CHA beneficiaries with the choice of applying their benefits to live in a diverse community that offers a variety of new housing and other amenities.

2. Please state each and every fact on which defendant relies in this litigation in asserting the existence of the government interests identified in Interrogatory 1, including the identity of any supporting documents or persons with knowledge.

3

**ANSWER:** CHA objects to this interrogatory on the ground that it is argumentative in that it assumes a "government interest" and, hence, "governmental conduct" or "governmental action" is involved in this litigation. As stated in CHA's motion to dismiss, the drug testing that Plaintiff complains of is imposed by a private landlord, Holsten Management Company ("HMC"), and is found in a provision of Plaintiff's lease with HMC. CHA is not a party to this lease, and the complained-of testing does not involve any "government action." Further, CHA objects to this interrogatory on the grounds that it seeks information protected by the attorney-client privilege and attorney work product doctrine. CHA also objects to this interrogatory in that CHA is not yet required to file an answer in this litigation, given that its motion to dismiss is still pending. Its motion to dismiss may be granted, or Plaintiffs may be required to replead in an amended complaint. As such, CHA has not yet decided on which facts it intends to rely in this litigation. Lastly, CHA objects to this interrogatory because it seeks or implies legal conclusions. Subject to and without waiving these objections, CHA states that if the testing at issue were found to involve "governmental action," CHA would rely on any admissible or otherwise judicially cognizable facts or evidence regarding (1) the history of safety problems in the surrounding community; (2) the history of drug problems in the surrounding community; (3) the history of harm to youth in the surrounding community; (4) developer and resident demand for tenants who receive CHA benefits to abide by generally-applicable tenancy requirements, including drug screening, as a condition of investing in Parkside; and (5) CHA and public interest in partnering with or encouraging private developers to invest in Parkside that will provide interested CHA beneficiaries with housing choices that allow them to integrate into a mixed-income housing community with a more diverse range of tenants and amenities than were available at Cabrini Green or are available at traditional public housing communities. Persons with knowledge

4

include, but are not limited to, current and former residents at Cabrini Green, current and former residents of Parkside, social service agencies, HMC, Cabrini-Green Local Advisory Council Community Development Corporation, CHA, and local business owners.

3.      Please state each and every fact on which defendant relies in this litigation in asserting that the government's interests identified in Interrogatory 1 are advanced by such drug testing, including the identity of any supporting documents or persons with knowledge.

**ANSWER:**    CHA objects to this interrogatory on the ground that it is argumentative in that it assumes a "government interest" and, hence, "governmental conduct" or "governmental action" is involved in this litigation. As stated in CHA's motion to dismiss, the drug testing that Plaintiff complains of is imposed by a private landlord, Holsten Management Company ("HMC"), and is found in a provision of Plaintiff's lease with HMC. CHA is not a party to this lease, and the complained-of testing does not involve any "government action." Further, CHA objects to this interrogatory on the grounds that it seeks information protected by the attorney-client privilege and attorney work product doctrine. Moreover, CHA objects to this interrogatory in that CHA has not yet been required to file an answer in this litigation, given that its motion to dismiss is still pending. Its motion to dismiss may be granted, or Plaintiffs could be required to replead in an amended complaint. As such, CHA has not yet decided on which facts it intends to rely in this litigation. Lastly, CHA objects to this interrogatory because it seeks a legal conclusion. Subject to and without waiving these objections, CHA states that if the testing at issue were found to involve "governmental action," CHA would rely on any admissible or otherwise judicially cognizable facts or evidence regarding (1) the history of safety problems in the surrounding community; (2) the history of drug problems in the surrounding community; (3) the history of harm to youth in the surrounding community; (4) the lack of drug-related issues at Parkside as compared to the surrounding community before Parkside; (5) developer and resident

demand for tenants who receive CHA benefits to abide by generally-applicable tenancy requirements, including drug screening, as a condition of investing in Parkside; and (6) CHA and public interest in partnering with or encouraging private developers to invest in Parkside in order to provide interested CHA beneficiaries with housing choices that allow them to integrate into a mixed-income housing community with a more diverse range of tenants and amenities than were available at Cabrini Green or are available at traditional public housing communities. Persons with knowledge include, but are not limited to, current and former residents at Cabrini Green, current and former residents at Parkside, social service agencies, HMC, Cabrini-Green Local Advisory Council Community Development Corporation, CHA, and local business owners.

4.   Please state each and every defense that defendant asserts in this litigation, other than the asserted advancement of government interests addressed by Interrogatories 1 through 3.

**ANSWER:**   CHA objects to this interrogatory on the ground that it is overbroad. Further, CHA objects to this interrogatory on the grounds that it seeks information protected by the attorney-client privilege and attorney work product doctrine. Moreover, CHA objects to this interrogatory in that CHA has not yet been required to file an answer in this litigation, given that its motion to dismiss is still pending. Its motion to dismiss may be granted, or Plaintiffs could be required to replead in an amended complaint. As such, CHA has not yet decided on which defenses it intends to rely in this litigation. Lastly, CHA objects to this interrogatory to the extent it seeks legal conclusions. Subject to and without waiving these objections, CHA may assert defenses, including, but not limited to, lack of standing, ripeness, waiver, laches, estoppel, lack of government action, special needs, and reasonable circumstances.

5.   Please state each and every fact on which defendant relies in this litigation in asserting the defenses identified in Interrogatory 4, including the identity of any supporting documents or persons with knowledge.

**ANSWER:** CHA objects to this interrogatory on the ground that it is overbroad and unduly burdensome. Further, CHA objects to this interrogatory on the grounds that it seeks information protected by the attorney-client privilege and attorney work product doctrine. Moreover, CHA objects to this interrogatory in that CHA has not yet been required to file an answer in this litigation, given that its motion to dismiss is still pending. Its motion to dismiss may be granted, or Plaintiffs could be required to replead in an amended complaint. As such, CHA has not yet decided on which defenses it intends to rely in this litigation. Lastly, CHA objects to this interrogatory to the extent it seeks legal conclusions. Subject to and without waiving these objections, CHA states it may rely on any facts or admissible or otherwise judicially cognizable evidence relevant to the defenses CHA timely asserts in this litigation, including, but not limited to, lack of standing, ripeness, waiver, laches, estoppel, lack of government action, special needs, and reasonable circumstances. Such facts and evidence would include, but would not be limited to, facts and evidence of Mr. Peery's personal experience with the challenged testing policy, facts and evidence regarding the scope and manner of the testing policy's application and administration, facts and evidence concerning tenants' notice of and consent to the testing, facts and evidence concerning CHA, resident, and private developer involvement in requesting, reviewing or approving the testing policy, facts and evidence concerning HMC's adoption of the testing policy, facts and evidence concerning the relationship between the testing policy and resident and developer requests or support for the policy, and facts and evidence concerning special public safety or community development concerns or goals in the Cabrini Green or Parkside communities and surrounding neighborhoods.

6. Please state each and every fact concerning the pending motion for class certification that defendant disputes.

7

**ANSWER:** CHA objects to this interrogatory on the ground that it is overbroad and unduly burdensome. Further, CHA objects to this interrogatory on the grounds that it seeks information protected by the attorney-client privilege and attorney work product doctrine. Moreover, CHA objects to this interrogatory in that CHA has not yet been required to file an answer in this litigation, given that its motion to dismiss is still pending. Its motion to dismiss may be granted. As such, CHA has not yet decided on its strategy for responding to a motion for class certification. Lastly, CHA objects to this interrogatory to the extent it seeks legal conclusions. Subject to and without waiving these objections, CHA disputes all of Mr. Peery's asserted bases for class certification.

7.    Please state each and every basis on which defendant relies in this litigation in disputing the facts identified in Interrogatory 6.

**ANSWER:** CHA objects to this interrogatory on the ground that it is overbroad and unduly burdensome. Further, CHA objects to this interrogatory on the grounds that it seeks information protected by the attorney-client privilege and attorney work product doctrine. Moreover, CHA objects to this interrogatory in that CHA has not yet been required to file an answer in this litigation, given that its motion to dismiss is still pending. Its motion to dismiss may be granted. As such, CHA has not yet decided on its strategy for responding to a motion for class certification. Lastly, CHA objects to this interrogatory to the extent it seeks legal conclusions. Subject to and without waiving these objections, CHA states that it may rely on any admissible or otherwise judicially cognizable facts or evidence regarding Mr. Peery's ability fairly and adequately to represent the interests of the purported class, whether his claims are typical of the purported class members, and whether his claims raise questions of law and fact are not common to the purported class.

8

Dated: October 25, 2013

Respectfully submitted,

CHICAGO HOUSING AUTHORITY

By: _____
One of its Attorneys

Samuel Mendenhall #6207315
Kimball R. Anderson #49980
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
Tel: (312) 558-5600
Fax: (312) 558-5700
smendenhall@winston.com
Attorneys for Defendant
Chicago Housing Authority

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2013, I caused to be served a true copy of Chicago

Housing Authority's Answers to Plaintiff's First Set of Interrogatories by email to:

Adam D. Schwartz – aschwartz@aclu-il.org

_____

Samuel Mendenhall

# Exhibit 2

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOSEPH PEERY, on behalf of himself and all persons similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>CHICAGO HOUSING AUTHORITY and HOLSTEN MANAGEMENT CORPORATION,<br><br>        Defendants. | Case No.: 13-cv-5819<br><br>The Hon. Sharon Johnson Coleman |

**CHICAGO HOUSING AUTHORITY'S
RULE 26(a)(1) INITIAL DISCLOSURES**

   Pursuant to Rule 26 of the Federal Rules of Civil Procedure, Defendant Chicago Housing Authority ("CHA"), without waiving any claim of privilege, work product protection, or other basis for nondisclosure, provides the following written statement of initial discovery disclosures.

**Disclosures**

   A.  Pursuant to Rule 26(a)(1)(A)(i) of the Federal Rules of Civil Procedure, CHA identifies the following individuals or companies, with addresses and telephone numbers where known, who may have discoverable information that may be used by CHA to support its claims or defenses.

   (1)  Sharnette Brown
       Chicago Housing Authority
       60 E. Van Buren St.
       Chicago, IL 60605

   Ms. Brown may have discoverable information relating to the development of Parkside of Old Town, Holsten Management Corporation ("HMC") drug testing policy for admission and

lease renewal at Parkside, the availability of other CHA housing for residents who do not consent or wish to submit to HMC's voluntary drug testing, and other information relating to the same.

(2)     Holsten Management Corporation
1020 West Montrose Ave.
Chicago, IL 60613

HMC may have discoverable information relating to the development of Parkside of Old Town, HMC's status as a private entity and not a state actor, HMC's drug testing policy for admission and lease renewal at Parkside, the origins of this policy, residents' preference for the policy, and other information relating to the same.

(3)     Chicago Police Department
1160 N. Larrabee Street
Chicago, IL 60610

The Chicago Police Department may have discoverable information relating to drug activity in and around the area before and after the development of Parkside. The Police Department may also have information relating to the impact Parkside has had on overall crime reduction, improved safety, and other community benefits.

B.     Pursuant to Rule 26(a)(1)(A)(ii) of the Federal Rules of Civil Procedure, CHA provides the following descriptions of documents, data compilations, and/or tangible things in its possession, custody or control that CHA may use to support its claims or defenses.

(1)     Joseph Peery Lease with HMC

(2)     HMC Lease Rider # 7, "Lease Renewal Drug Testing"

(3)     HMC Lease Rider # 3, "Lease Addendum for Drug-Free Housing"

(4)     HMC's October 14, 2013 letter to Mr. Peery re HMC's drug testing policy

(5)     Parkside of Old Town Lease

(6)     Tenant Selection Plan Parkside of Old Town

2

    (7)       CHA Plan for Transformation

    (8)       CHA Minimum Tenant Selection Plan for Mixed-Income/Mixed-Finance
Communities

    (9)       CHA Relocation Rights Contract

    (10)     CHA Admissions and Continued Occupancy Policy

    (11)     CHA Plan Forward

    CHA will make available for inspection and copying all non-privileged and work product documents listed above that are not publicly available, have not been previously produced, or are not already in the possession, custody or control of Plaintiffs.

    C.       Pursuant to Rule 26(a)(1)(A)(iii) of the Federal Rules of Civil Procedure, CHA is not seeking any damages in this action.

    D.       Pursuant to Rule 26(a)(1)(A)(iv) of the Federal Rules of Civil Procedure, CHA states that it does not carry insurance that would satisfy all or part of a possible judgment entered in this action.

Dated:  January 10, 2014          Respectfully submitted,

                          CHICAGO HOUSING AUTHORITY

              By:    _____
                          One of Its Attorneys

Samuel Mendenhall #6207315
Kimball R. Anderson #49980
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
Tel: (312) 558-5600
Fax: (312) 558-5700
smendenhall@winston.com
Attorneys for Defendant
Chicago Housing Authority

## CERTIFICATE OF SERVICE

I hereby certify that on January 10, 2014, I served CHA's Rule 26(a)(1) Initial Disclosures upon:

Adam Schwartz
ACLU
180 N. Michigan Ave. Suite 2300
Chicago, IL 60601

Eric Schmitt
Sidley Austin LLP
One South Dearborn St.
Chicago, IL 60603

Thomas Johnson
Johnson, Jones, Snelling, Gilbert & Davis
36 S. Wabash, Suite 1310
Chicago, IL 60603

by electronic mail and U.S. mail postage prepaid.

# Exhibit 3

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JOSEPH PEERY, on behalf of himself and all persons similarly situated, <br><br>           Plaintiffs, <br><br>     v. <br><br> CHICAGO HOUSING AUTHORITY and HOLSTEN MANAGEMENT CORPORATION, <br><br>           Defendants. | Case No.: 13-cv-5819 <br><br> The Hon. Sharon Johnson Coleman |

## CHICAGO HOUSING AUTHORITY'S RESPONSES
## TO PLAINTIFFS' SECOND SET OF INTERROGATORIES

Defendant Chicago Housing Authority ("CHA"), by its attorneys, responds to Plaintiff's

Second Set of Interrogatories as follows:

### GENERAL OBJECTIONS

Each of these objections is applicable to each of Mr. Peery's interrogatories and is

incorporated into each and every one of CHA's responses as though fully set forth therein, and is

in addition to any specific objections stated for a particular interrogatory.

1.      CHA objects to these interrogatories as they exceed the number allowed under

Rule 33 of the Federal Rules of Civil Procedure. In particular, Rule 33(a)(1) provides, "Unless

otherwise stipulated or ordered by the court, a party may serve on any other party **no more than**

**25 written interrogatories, including all discrete subparts**." (emphasis added). On September

10, 2013, Plaintiff served Plaintiff's First Set of Interrogatories to CHA. This set contained

seven (7) interrogatories which the CHA answered in full. On December 20, 2013, Plaintiff

served Plaintiff's Second Set of Interrogatories to CHA. This second set contains far more than

18 interrogatories, including discrete subparts. This exceeds the 25-interrogatory limit allowed under the rules.

2.    CHA objects to these interrogatories to the extent they seek information related to class discovery or any other discovery beyond the scope of discovery ordered by the Court. In particular, on December 13, 2013, the Court limited this round of discovery to issues relating to Plaintiff's motion for preliminary injunction. *See* 12-13-13 Minute Entry. No discovery was allowed relating to class certification and the Plaintiff's motion for class certification was entered and continued to May 1, 2014. *Id.*

3.    CHA objects to these interrogatories on the grounds that they are overly broad and/or unduly burdensome.

4.    CHA objects to these interrogatories to the extent that they seek information or documentation protected by the attorney-client privilege, the attorney work-product immunity, and/or any other applicable privilege or immunity.

5.    CHA objects to these interrogatories to the extent they seek information: (a) not reasonably calculated to lead to the discovery of admissible evidence; (b) which is unreasonably cumulative or duplicative, or obtainable from some other source that is more convenient, less burdensome, or less expensive; or (c) which Mr. Peery has had opportunity to obtain from other sources.

6.    CHA objects to these interrogatories to the extent that they call for legal conclusions.

7.    CHA objects to the production of information and documents that are in the public domain and, therefore, are equally accessible to Mr. Peery.

2

## INTERROGATORIES

### I.    The mixed-income developments

1.    Please identify each and every mixed-income development, and for each such development, please state:

(a)    When people started living in the development.

(b)    The number of people who live in the development:

   (i)    in total;

   (ii)    in units owned by an occupant;

   (iii)    in units rented by an occupant at market price;

   (iv)    in rental units reserved for CHA renters; and

   (v)    in other units rented below market price.

(c)    Any and all of the developments developers.

(d)    Any and all of the developments owners.

(e)    Any and all of the developments managers.

(f)    Whether the CHA has adopted a resolution regarding drug testing of any residents, and if so, when the CHA adopted this resolution.

(g)    Whether the development manager conducts drug testing of any residents, and if so, when the development manager began doing so.

**ANSWER:**    CHA objects to this interrogatory as beyond the scope of the discovery allowed by the Court.  More specifically, on December 13, 2013, the Court postponed class discovery and entered and continued the class certification motion.  The only discovery allowed is that relating to the preliminary injunction.  CHA also objects to this interrogatory on the grounds that

it is overly broad and unduly burdensome. Subject to, and without waiving this objection, CHA responds with respect to Parkside:

(a)    No knowledge. Parkside is a privately-owned development and CHA does not have this information.

(b)

    (i)    No knowledge. Parkside is a privately-owned development and CHA does not have this information.

    (ii)    No knowledge. Parkside is a privately-owned development and CHA does not have this information.

    (iii)    No knowledge. Parkside is a privately-owned development and CHA does not have this information.

    (iv)    CHA states that there are 107 CHA assisted/subsidized units at Parkside of Old Town.

    (v)    No knowledge. Parkside is a privately-owned development and CHA does not have this information.

(c)    Please see documents produced by CHA in response to Peery's second request for documents.

(d)    Please see documents produced by CHA in response to Peery's second request for documents.

(e)    Please see documents produced by CHA in response to Peery's second request for documents.

(f)     No. CHA has not adopted a resolution regarding drug testing of any residents. CHA, through its board of commissioners, did approve the tenant selection plan and lease presented to it by the developers of Parkside.

(g)     Holsten Management Corporation ("HMC") conducts drug testing at Parkside. CHA does not know when HMC first began conducting the testing.

## II.     The CHA's role

2.     For each and every working group at each and every mixed-income development with drug testing, please:

(a)     Describe the goals and functions of the working group.

(b)     State all members of the working group.

(c)     State all occasions when the working group took any action, including making any recommendation to the CHA board, that was opposed by the CHA representative to the working group.

**ANSWER:**     CHA objects to this interrogatory as beyond the scope of the discovery allowed by the Court. More specifically, on December 13, 2013, the Court postponed class discovery and entered and continued the class certification motion. The only discovery allowed is that relating to the preliminary injunction. CHA also objects to this interrogatory on the grounds that it is overly broad and unduly burdensome. Subject to, and without waiving this objection, CHA responds with respect to Parkside:

(a)     the Working Group applicable to the Parkside of Old Town development and the redevelopment of the public housing development known as "Cabrini-Green" is the Near North Working Group. The Near North Working Group was convened pursuant to the Cabrini-Green Consent Decree. (*Cabrini-Green Local Advisory*

5

*Council vs. Chicago Housing Authority et al.* 96 C 6949). Pursuant to the Cabrini-Green Consent Decree, "A Working Group shall be formed to provide ongoing overall direction for the NNRI, for the purpose of monitoring and reviewing development activities in connection with the NNRI, including the preparation and issuance of requests for proposals ("RFPs") and other bids; changes in design of the NNRI, the selection of developers for City- or CHA-owned land as defined in Section II.D below, the letting of development, construction and other contracts for City- or CHA- owned land, the creation of jobs; any proposed development of privately owned land to include public housing units at a unit income mix other than the unit income mix-specified in Section II.D below for City- or CHA-owned land; the provisions of employment training for Cabrini-Green residents; the status of construction activities; and the provision of social services." P. 4

(b)     Pursuant to the Cabrini-Green Consent Decree, "The following institutions will be represented on the Working Group: the LAC, the CHA, the City, counsel for Gautreaux plaintiffs, and the Receiver." The current configuration of the Near North Working Group includes a representative from the applicable Alderman's office, who does not have a vote on the working group.

(c)     To the best of CHA's knowledge, there has been no such recommendation. Investigation continues.

3.     For each and every mixed-income development with drug testing, please state with specificity the role of the CHA in:

(a)     Creating the working group.

6

(b)     Selecting the developer.

(c)     Creating the redevelopment plan.

(d)     Obtaining HUD approval.

(e)     Spending the CHA's own funds.

(f)     Securing other funds and financing.

(g)     Demolishing old buildings.

(h)     Helping displaced tenants relocate.

(i)     Improving infrastructure, such as utilities, streets, and park.

(j)     Completing real estate transactions.

(k)     Approving the new residences as fit for occupancy.

(l)     Referring the developers to displaced CHA tenants who want to live in the new development.

(m)     Owning the land below the development.

(n)     Ensuring that the development is operated in compliance with applicable federal laws.

(o)     Creating site-specific tenant selection criteria for the development.

(p)     Any and all other aspects of the development.

**ANSWER:**     CHA objects to this interrogatory as beyond the scope of the discovery allowed by the Court. More specifically, on December 13, 2013, the Court postponed class discovery and entered and continued the class certification motion. The only discovery allowed is that relating to the preliminary injunction. CHA also objects to this interrogatory on the grounds that it is overly broad and unduly burdensome. Subject to, and without waiving this objection, CHA responds with respect to Parkside:

7

(a)   With respect to Parkside of Old Town, The Near North Working Group was created and convened pursuant to the Cabrini-Green Consent Decree.

(b)   The Near North Working Group ranks and selects a developer for City- or CHA-owned land within in the NNRI and under the Consent Decree.

(c)   Depending on the type of developer procurement, via RFP or RFQ (Request for Proposals), the Near North Working Group may have varying input in the creation of a redevelopment plan for a given site within the NNRI and under the Consent Decree.

(d)   The CHA submits mixed-income/mixed-finance development proposals to HUD. To that end, the CHA attempts to comply with HUD requests for information, documentation, etc.

(e)   CHA objects that "[s]pending of CHA's own funds" is vague and undefined in this context. The CHA generally allocates its funds within the prescribed rules and regulations applicable to the CHA and given expenditures.

(f)   CHA objects that "[s]ecuring other funds and financing" is vague and undefined in this context. Generally, the developers work to secure additional non-public housing funds and financing. The CHA may work to secure additional funds and financing for mixed-income development projects.

(g)   The CHA follows HUD regulations, rules and processes with respect to the closure and demolition of CHA-owned buildings.

(h)   Under the CHA's current Relocation Rights Contract ("RRC"), the CHA follows the processes set forth under the RRC to provide assistance and relocation to eligible CHA leaseholders/households relocated under the Plan for

8

Transformation. At Cabrini-Green, there is a set of former leaseholders/households who do not fall within the provisions of the RRC. Generally, these leaseholders/households were not CHA leaseholders on 10/1/1999, the date specific to the RRC. Families relocated from buildings at the Cabrini-Extension North are defined under the Consent Decree as "displaced families." Such families were given the following relocation options: 1) a rehabilitated unit in the Cabrini-Green development that complies with HUD's Housing Quality Standards and applicable building code requirements and within the HOPE VI Planning Area; 2) a newly constructed public housing unit or affordable unit constructed under Sections II and III of the Decree; 3) a Section 8 voucher together with mobility assistance; or 4) a scattered site to the extent such a unit is not claimed by a Horner family pursuant to the Horner consent decree. Options 2 and 4 are considered permanent relocation choices. (Consent Decree, p. 16)

(i) The CHA does not generally control or directly improve infrastructure, such as utilities, street and parks.

(j) CHA objects that "real estate transaction" is vague and undefined. Subject to and without waiving this objection, CHA states that CHA completes its necessary tasks related to its real estate transactions.

(k) The CHA does not grant a certificate of use and occupancy.

(l) With respect to Parkside of Old Town, the CHA provides lists generated from the Cabrini Lottery List, created under the Cabrini-Green Consent Decree, to HMC.

9

Once such list is exhausted, CHA provides additional lists under the RRC, transfer lists and waiting lists.

(m)     CHA objects that "owning the land below the development" is vague and undefined. CHA further states please see documents produced by CHA in response to Peery's second request for documents.

(n)     The owners of Parkside of Old Town is required under the Regulatory & Operating Agreement to ensure that the development is operated in compliance with applicable federal laws.

(o)     The owners of Parkside of Old Town created its site-specific tenant selection criteria for the development. The members of the Near North Working Group, including the CHA and the Cabrini-Green Local Advisory Council, provided comments as to Parkside's site-specific tenant selection criteria.

(p)     CHA objects to this request as vague and undefined as it does not ask for any specific information.

4.     Please state each and every fact, including the identity of any supporting documents or persons with knowledge, relating or referring to the CHA's contention:

(a)     That CHA acquiesced in the private developers and resident desires for drug screening in order to promote investment in and acceptance of Parkside[.] *See* CHA's answers of October 25, 2013, to the ACLU's first set of interrogatories, at page 3.

(b)     That the Cabrini Green Local Advisory Development Corporation, which is the resident owned development corporation, approved this requirement [*i.e.,* drug

10

testing]. *See* transcript of proceedings of November 4, 2013, at page 10, lines 11-14.

**ANSWER:**

    (a)    CHA states that the developers of Parkside, Parkside Nine Phase I, L.P., desired drug screening of all renters at Parkside, whether or not the renters were market rate, affordable rate, or public housing assisted/subsidized renters. Additionally, various residents of Cabrini-Green also expressed their desire for drug screening at various times during the development of Parkside.

    (b)    Parkside Nine Phase I, L.P., the developer of Parkside which desired the drug screening, is/was comprised of the following partners: Holsten Real Estate Development Corporation, Kimball Hill Urban Centers, and the Cabrini-Green Local Advisory Council Community Development Corporation. Additionally, counsel for the Cabrini-Green Local Advisory Council, which owns and/or controls the Cabrini-Green Local Advisory Council Community Development Corporation, reviewed and commented on the tenant selection plan and the lease.

**III.**    **The drug testing**

    5.    For each mixed-income development with drug testing, please state with specificity all drug testing protocols, including:

    (a)    Where the specimen is gathered, and by whom.

    (b)    Where the specimen is analyzed, and by whom.

    (c)    What drugs are subject to testing.

    (d)    All persons notified of a positive result.

    (e)    All consequences of a positive result.

(f)    All measures to ensure confidentiality of the tested persons.

(g)    All protocols for people at risk of false positives due to their use of lawful medicine, including: whether such people must disclose their use of such medicine; and if so: to whom they disclose it; how it is disclosed; how that information is used; and how that information is confidentially maintained.

(h)    Notice to the CHA of any aspect of the manner that drug testing was conducted, including: objections to drug testing by persons subject to drug testing; the results of drug testing; and what happens to persons who test positive.

**ANSWER:**    CHA objects to this interrogatory as beyond the scope of the discovery allowed by the Court. More specifically, on December 13, 2013, the Court postponed class discovery and entered and continued the class certification motion. The only discovery allowed is that relating to the preliminary injunction. CHA also objects to this interrogatory on the grounds that it is overly broad and unduly burdensome. Subject to, and without waiving this objection, CHA responds with respect to Parkside:

(a)    CHA has no knowledge regarding the information requested in this interrogatory as it is the responsibility of the private developer and/or property manager.

(b)    CHA has no knowledge regarding the information requested in this interrogatory as it is the responsibility of the private developer and/or property manager.

(c)    CHA has no knowledge regarding the information requested in this interrogatory as it is the responsibility of the private developer and/or property manager.

(d)    CHA has no knowledge regarding the information requested in this interrogatory as it is the responsibility of the private developer and/or property manager.

(e)     CHA has no knowledge regarding the information requested in this interrogatory as it is the responsibility of the private developer and/or property manager.

(f)     The private developer or property manager requiring the drug test is responsible for creating and implementing confidentiality requirements for all drug testing.

(g)     CHA has no knowledge regarding the information requested in this interrogatory as it is the responsibility of the private developer and/or property manager.

(h)     The private developer and/or property manager informs the CHA when a CHA applicant tests positive for an illegal drug subject to the developers drug testing protocol at the time of initial screening.  At that time, the private developer and/or property manager if it chooses to deny a CHA applicant based on a positive test, must then follows the guidelines set forth in the tenant selection plan.  With respect to continued occupancy, the developer and/or property manager may or may not inform CHA of a positive test result.

6.     The CHA's FY 2011 Admissions and Continued Occupancy Policy states (at Part II-F-3-a-iii on pages 23 and 24) that [applicants who do not meet the site-specific criteria ... [w]ill have their name removed from the CHA community-wide wait list if failure to meet the site-specific criteria was based on negative results to the sites drug-test requirement[.] Regarding this policy, please state:

(a)     What is the result of being removed from the community-wide wait list?

(b)     Does this policy apply to applicants to mixed-income developments who refuse to take a drug test?

(c)     Does this policy apply to current residents of mixed-income developments seeking continued occupancy who fail a drug test?

13

    (d)      Does this policy apply to current residents of mixed-income developments seeking continued occupancy who refuse to take a drug test?

**ANSWER:**    CHA objects to this interrogatory as beyond the scope of the discovery allowed by the Court. More specifically, on December 13, 2013, the Court postponed class discovery and entered and continued the class certification motion. The only discovery allowed is that relating to the preliminary injunction. CHA also objects to this interrogatory on the grounds of relevancy, and that it is overly broad and unduly burdensome. Subject to, and without waiving this objection, CHA responds with respect to Parkside:

    (a)      Mr. Peery did not come from the community wide waiting list. He was part of the Cabrini Lottery and RRC lists. Generally, applicants have a right to directly appeal the property's decision per the provisions of the applicable tenant selection plan ("TSP"). If the applicant is not satisfied with the appeal outcome, the applicant has an appeal with the CHA Occupancy Department within 10 business of the property's final denial. The Occupancy Department's function at that time is to confirm that the denial was properly carried out per the TSP. It is inferred, not stated, that removed individuals may reapply when the wait list is reopened.

    (b)      CHA is not aware of any applicants to Parkside who refused to take the required testing.

    (c)      No. This policy references initial application admission and wait list maintenance.

    (d)      No. This policy references initial application admission and wait list maintenance

    7.      Please state, for each year at each mixed-income development with drug testing:

    (a)      The number of adult applicants to CHA apartments who were drug tested as a condition of admission.

14

    (b)      The number of such persons who tested positive.

    (c)      The number of adult residents of CHA apartments who were drug tested as a condition of continued occupancy.

    (d)      The number of such persons who tested positive.

**ANSWER:**    CHA objects to this interrogatory as beyond the scope of the discovery allowed by the Court. More specifically, on December 13, 2013, the Court postponed class discovery and entered and continued the class certification motion. The only discovery allowed is that relating to the preliminary injunction. CHA also objects to this interrogatory on the grounds that it is overly broad and unduly burdensome. Subject to, and without waiving this objection, CHA responds with respect to Parkside:

    (a)      CHA has no knowledge regarding the information requested in this interrogatory as this information is compiled by the private developer and/or property manager of each property. Defendant HMC is the property manager for Parkside, the development where Mr. Peery resides.

    (b)      CHA has no knowledge regarding the information requested in this interrogatory as this information is compiled by the private developer and/or property manager of each property. Defendant HMC is the property manager for Parkside, the development where Mr. Peery resides.

    (c)      CHA has no knowledge regarding the information requested in this interrogatory as this information is compiled by the private developer and/or property manager of each property. Defendant HMC is the property manager for Parkside, the development where Mr. Peery resides.

(d)     CHA has no knowledge regarding the information requested in this interrogatory as this information is compiled by the private developer and/or property manager of each property. Defendant HMC is the property manager for Parkside, the development where Mr. Peery resides.

## IV.    Reasons for the drug testing

8.     Please state each and every fact, including the identity of any supporting documents or persons with knowledge, relating or referring to the CHA's contention that special needs advanced by the drug testing include:

(a)     [P]ublic safety at Parkside, given the history of safety problems in the surrounding community[.] *See* CHA's answers of October 25, 2013, to the ACLU's first set of interrogatories, at page 3.

(b)     [P]romotion of a drug-free Parkside, given the history of drug problems in the surrounding community[.] *See* CHA's answers of October 25, 2013, to the ACLU's first set of interrogatories, at page 3.

(c)     [P]rotection of the youth residing at Parkside, given the history of harm to youth in the surrounding community[.] *See* CHA's answers of October 25, 2013, to the ACLU's first set of interrogatories, at page 3.

(e)     [T]he special and compelling social, economic, and community development goals served by the historic and unprecedented transformation of Cabrini Green[.] *See* CHA's answers of October 25, 2013, to the ACLU's first set of interrogatories, at page 3.

**ANSWER:**

(a)    The history of safety problems in the surrounding community is documented by the Chicago Police Department. This information is a matter of public record and equally accessible to Plaintiff and CHA. CHA will identify any records it obtains relating to this interrogatory.

(b)    The history of drug problems in the surrounding community is documented by the Chicago Police Department. This information is a matter of public record and equally accessible to Plaintiff and the CHA. CHA will identify any records it obtains relating to this interrogatory.

(c)    The history of harm to youth in the surrounding community is documented by the Chicago Police Department. CHA will identify any records it obtains relating to this interrogatory.

(d)    The special and compelling social, economic, and community development goals served by the historic and unprecedented transformation of Cabrini Green include:

   *   helping to ensure that Cabrini-Green does not again become home to extreme concentrations of poverty by attracting a mix of incomes;

   *   removing physically obsolete family housing plagued with crime and drugs;

   *   providing quality housing opportunities to very low and low-income households in mixed-income settings;

   *   provide greater housing choices;

   *   contribute to the improvement of the neighborhood and community;

   *   encourage business development opportunities for minorities and disadvantaged firms; and

17

* encourage job opportunities for residents, resident owned businesses, and other low-income workers.

9.      Please state each and every fact, including the identity of any supporting documents or persons with knowledge, relating or referring to the CHA's contention that:

(a)     There is developer and resident demand for tenants who receive CHA benefits to abide by generally-applicable tenancy requirements, including drug screening, as a condition of investing in Parkside[.] *See* CHA's answers of October 25, 2013, to the ACLU's first set of interrogatories, at page 4.

(b)     There is a lack of drug-related issues at Parkside as compared to the surrounding community before Parkside[.] *See* CHA's answers of October 25, 2013, to the ACLU's first set of interrogatories, at page 5.

(c)     Drug testing has advanced a lack of drug-related issues at Parkside as compared to the surrounding community before Parkside[.] *See* CHA's answers of October 25, 2013, to the ACLU's first set of interrogatories, at page 5.

**ANSWER:**

(a)     At Parkside, the developers and residents are key stakeholders in the community. The LAC, as part of the development process and part of the Near North Working Group, reviewed and commented on the Parkside TSP and lease, which governs all tenants at Parkside. Part of the tenant selection plan and lease includes a drug screening policy, that applies to all tenants, whether they are market rate, affordable rate, or public housing/subsidized tenants. The developers and residents, including CHA residents, expect all tenants to abide by generally-applicable tenancy requirements.

18

    (b)      Prior to the Plan for Transformation and the creation of Parkside, the surrounding community faced a greater challenge of drug-related issues than the community currently faces since Parkside. This information is documented by the Chicago Police Department and is a matter of public record and equally accessible to Plaintiff and the CHA. CHA will identify any records it obtains relating to this interrogatory.

    (c)      Since the creation of Parkside, there are fewer drug-related issues in the surrounding community as compared to the surrounding community before Parkside. This information is documented by the Chicago Police Department and is a matter of public record and equally accessible to Plaintiff and the CHA. CHA will identify any records it obtains relating to this interrogatory.

10.    If the CHA contends that drug testing at mixed-income developments advances any special needs or interests beyond those identified in paragraphs 8 and 9 above, please state each and every one of those special needs or interests.

**ANSWER:**    None at this time. Investigation continues.

11.    Please state each and every additional fact, including the identity of any supporting documents or persons with knowledge, beyond those responsive to requests 8 through 10 above, that relates or refers to the existence of any special need for drug testing at the mixed-income developments, or shows that drug testing advances any special need.

**ANSWER:**    CHA objects to this interrogatory as overly broad and unduly burdensome as it purports to require CHA to "state each and every additional fact" regarding a broad subject

matter area. Subject to and without waiving these objections, CHA states none at this time. Investigation continues.

12. Please identify all public housing authorities known to the CHA that require drug testing as a condition of admission or continued occupancy.

**ANSWER:** CHA objects to this interrogatory on the grounds of relevancy and its unlimited geographical and potential worldwide scope. CHA also objects on the grounds that the term "public housing authorities" is undefined and may have different meaning at city, county, state and/or federal levels. Subject to and without waiving these objections, CHA states that it has no knowledge one way or the other whether there are "public housing authorities" that require drug testing as a condition of admission or continued occupancy.

13. Please identify all private residential landlords known to the CHA that require drug testing as a condition of admission or continued occupancy in rental property.

**ANSWER:** CHA objects to this interrogatory on the grounds of relevancy and its unlimited geographical and potential worldwide scope. CHA also objects that it is vague and the term "private residential landlords" is undefined. Subject to and without waiving this objection, other than the private landlords at issue in this litigation, CHA has no knowledge one way or the other regarding which "private residential landlords" require or do not require drug testing as a condition of admission or continued occupancy in rental property.

14. Please state why, at mixed-income developments with drug testing, apartment owners are exempt from the drug testing.

20

**ANSWER:** CHA states that it has no knowledge one way or the other as to why at mixed-income developments with drug testing, apartment owners are exempt from the drug testing. This is a decision made by the developer and/or ownership entity, not CHA.

15. Please state whether the CHA asserts that CHA renters at mixed-income housing developments are more likely to use drugs than apartment owners in the same development.

**ANSWER:** CHA does not make this assertion.

Dated: January 24, 2014

Respectfully submitted,

CHICAGO HOUSING AUTHORITY

By: _____

One of Its Attorneys

Samuel Mendenhall #6207315
Kimball R. Anderson #49980
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
Tel: (312) 558-5600
Fax: (312) 558-5700
smendenhall@winston.com
Attorneys for Defendant
Chicago Housing Authority

21

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2014, I served a copy of CHA's Answers to

Plaintiff's Second Set of Interrogatories to CHA upon:

Adam Schwartz
ACLU
180 N. Michigan Ave. Suite 2300
Chicago, IL 60601

Eric Schmitt
Sidley Austin LLP
One South Dearborn St.
Chicago, IL 60603

Thomas Johnson
Johnson, Jones, Snelling, Gilbert & Davis
36 S. Wabash, Suite 1310
Chicago, IL 60603

by electronic mail and U.S. mail postage prepaid.

22

# Exhibit 4

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| JOSEPH PEERY, on behalf of himself and all persons similarly situated, | |
| Plaintiffs, | Case No.: 13-cv-5819 |
| v. | The Hon. Sharon Johnson Coleman |
| CHICAGO HOUSING AUTHORITY and HOLSTEN MANAGEMENT CORPORATION, | |
| Defendants. | |

## DEFENDANT CHICAGO HOUSING AUTHORITY'S RESPONSE TO PLAINTIFF'S SECOND SET OF DOCUMENT REQUESTS TO CHA

Pursuant to Federal Rules of Civil Procedure 26 and 34, Defendant Chicago Housing Authority ("CHA"), by and through its undersigned attorneys, hereby submits its Response to Plaintiff's Second Set of Document Requests to CHA as follows:

### GENERAL OBJECTIONS

Each of these objections is applicable to each of Plaintiff's Requests and is incorporated into each and every one of CHA's Responses as though fully set forth therein, and is in addition to any specific objections stated for a particular request.

1.      CHA objects to Plaintiff's Requests to the extent that they seek information related to class discovery or any other discovery beyond the scope of discovery ordered by the Court. In particular, on December 13, 2013, the Court limited this round of discovery to issues relating to Plaintiff's motion for preliminary injunction. *See* 12-13-13 Minute Entry. No discovery was allowed relating to class certification and the Plaintiff's motion for class certification was entered and continued to May 1, 2014. *Id.*

2.     CHA incorporates herein its General Objections set forth in its Responses and Objections to Plaintiff Plaintiff's First Set of Interrogatories.

3.     CHA objects to Plaintiff's Requests to the extent they seek information that is protected by the attorney-client privilege, the attorney work-product immunity, and/or any other applicable privilege or immunity.

4.     CHA objects to the Instructions and Definitions that accompany Plaintiff's Request to the extent that they are overly broad, improper, incorrect, undefined, vague and/or unambiguous.

5.     CHA objects to Plaintiff's Requests to the extent that they seek the production of documents and things that are in the public domain, and therefore, are equally accessible to Plaintiff.

6.     CHA objects to Plaintiff's Requests to the extent that they call for a legal conclusion.

7.     CHA objects to Plaintiff's Requests to the extent they seek information: (a) not reasonably calculated to lead to the discovery of admissible evidence; (b) which is unreasonably cumulative or duplicative; or (c) obtainable from some other source that is more convenient, less burdensome or less expensive or which Plaintiff has had ample opportunity to obtain from other sources.

8.     CHA's Responses to these Requests do not constitute acquiescence or agreement with respect to any definition proposed by Plaintiff.

9.     CHA's Responses to make available requested documents do not constitute representations that any such documents exist or are in CHA's possession, custody, or control.

10.     CHA reserves the right to supplement and/or amend its Responses as necessary.

2

## DOCUMENT REQUESTS

**I.**     **The CHA's role**

    1.     The following CHA documents:

    (a)     The current Admissions and Continued Occupancy Policy.

    (b)     The current standard three-party lease between the CHA, residents, and building managers.

    (c)     The current Relocation Rights Contract.

    (d)     The current Minimum Tenant Selection Plan for Mixed-Income/Mixed-Finance Communities.

    (e)     Plan Forward.

    (f)     Moving to Work Annual Report for FY 2008.

    (g)     Moving to Work Annual Report for FY 2012.

**ANSWER:**

    (a)     CHA will produce for inspection and copying, documents responsive to this request.

    (b)     CHA objects to this request on the grounds of relevancy as the only three-party lease that exists between the CHA, residents, and building mangers is designed for and intended to be used only at traditional 100% CHA-owned public housing developments and other CHA-owned residential properties. Subject to this objection, CHA will produce for inspection and copying, documents, if any, responsive to this request.

    (c)     CHA will produce for inspection and copying, documents, if any, responsive to this request.

3

(d)     CHA will produce for inspection and copying, documents, if any, responsive to this request.

(e)     CHA will produce for inspection and copying, documents, if any, responsive to this request.

(f)     CHA will produce for inspection and copying, documents, if any, responsive to this request.

(g)     CHA will produce for inspection and copying, documents, if any, responsive to this request.

2.     Any and all CHA policy and training documents that relate or refer to the adoption of site-specific tenant selection criteria at mixed-income developments.

**ANSWER:**     CHA will produce for inspection and copying, documents, if any, responsive to this request.

3.     For each and every mixed-income development with drug testing:

(a)     Any and all agreements between the CHA and any development owner(s), developer(s), or manager(s) regarding the development, including any and all regulatory agreements, operating agreements, management agreements, master developer agreements, ground leases, and annual contribution contracts.

(b)     The current tenant selection plan.

(c)     The current standard lease.

(d)     The public notice of this tenant selection plan and standard lease.

(e)     Any and all public comments regarding this tenant selection plan and standard lease, including any response grid maintained by the CHA.

4

(f)     The resolution adopted by the CHA board regarding this tenant selection plan and standard lease.

(g)     The CHA minutes of the CHA board meeting adopting this resolution.

(h)     Any and all working group documents that relate or refer to drug testing.

(i)     Any and all documents that relate or refer to any involvement of the Local Advisory Councils, including any LAC development corporations, in the creation of the drug testing.

(j)     Any and all other documents that relate or refer to the creation of the drug testing policy.

**ANSWER:**     CHA objects to this request as it seeks information related to class discovery and is beyond the scope of the discovery allowed by the Court. More specifically, on December 13, 2013, the Court limited this round of discovery to issues relating to Plaintiff's motion for a preliminary injunction. *See* 12-13-13 Minute Entry. No discovery was allowed relating to class certification and the Plaintiff's motion for class certification was entered and continued to May 1, 2014. *Id.* CHA also objects to this request on the grounds that it is overly broad and unduly burdensome. Subject to, and without waiving this objection, CHA responds with respect to Parkside:

(a)     CHA will produce for inspection and copying, documents, if any, responsive to this request.

(b)     CHA will produce for inspection and copying, documents, if any, responsive to this request.

(c)     CHA will produce for inspection and copying, documents, if any, responsive to this request.

5

(d)      CHA will produce for inspection and copying, documents, if any, responsive to this request.

(e)      CHA will produce for inspection and copying, documents, if any, responsive to this request.

(f)      CHA will produce for inspection and copying, documents, if any, responsive to this request.

(g)      CHA will produce for inspection and copying, documents, if any, responsive to this request.

(h)      CHA objects to this request on the grounds that it is vague and overbroad. CHA will produce for inspection and copying, documents, if any, responsive to this request.

(i)      CHA objects to this request on the grounds that it is vague and overbroad. CHA will produce for inspection and copying, documents, if any, responsive to this request.

(j)      CHA objects to this request on the grounds that it is vague, overbroad and does not seek any specific documents.

4.      For each and every mixed-income development with drug testing, any and all documents that relate or refer to the role of the CHA in:

(a)      Creating the working group.

(b)      Selecting the developer.

(c)      Creating the redevelopment plan.

(d)      Obtaining HUD approval.

(e)      Spending the CHA's own funds.

6

(f)     Securing other funds and financing.

(g)     Demolishing old buildings.

(h)     Helping displaced tenants relocate.

(i)     Improving infrastructure, such as utilities, streets, and parks.

(j)     Completing real estate transactions.

(k)     Approving the new residences as fit for occupancy.

(1)     Referring the developers to displaced CHA tenants who want to live in the new development.

(m)     Owning the land below the development.

(n)     Ensuring that the development is operated in compliance with applicable federal laws.

(o)     Creating site-specific tenant selection criteria for the development.

(p)     Any and all other aspects of the development.

**ANSWER:**     CHA objects to this request as it seeks information related to class discovery and is beyond the scope of the discovery allowed by the Court. More specifically, on December 13, 2013, the Court limited this round of discovery to issues relating to Plaintiff's motion for a preliminary injunction. *See* 12-13-13 Minute Entry. No discovery was allowed relating to class certification and the Plaintiff's motion for class certification was entered and continued to May 1, 2014. *Id.* CHA also objects to this request on the grounds that it is overly broad and unduly burdensome. Subject to, and without waiving this objection, CHA responds with respect to Parkside:

(a)     CHA will produce for inspection and copying, documents, if any, responsive to this request

7

(b)      CHA object on the grounds that "selecting the developer is vague and overbroad. CHA will produce for inspection and copying, documents, if any, responsive to this request.

(c)      CHA objects to this request on the grounds that "creating the redevelopment plan" is undefined, vague and overbroad. CHA will produce for inspection and copying, documents, if any, responsive to this request.

(d)      CHA objects to this request on the ground that "[o]btaining HUD approval" is vague and undefined.

(e)      CHA objects to this request on the grounds that "[s]pending the CHA's own funds" is vague and undefined.

(f)      CHA objects to this request on the grounds that "[s]ecuring other funds and financing is vague and undefined.

(g)      CHA objects to this request on the grounds that "demolishing old buildings" is vague and undefined. CHA will produce for inspection and copying, documents, if any, responsive to this request.

(h)      CHA will produce for inspection and copying, documents, if any, responsive to this request.

(i)      CHA will produce for inspection and copying, documents, if any, responsive to this request.

(j)      CHA objects to this request on the grounds that "real estate transactions" is vague and undefined.

(k)      CHA will produce for inspection and copying, documents, if any, responsive to this request.

(l) CHA will produce for inspection and copying, documents, if any, responsive to this request.

(m) CHA will produce for inspection and copying, documents, if any, responsive to this request.

(n) CHA will produce for inspection and copying, documents, if any, responsive to this request.

(o) CHA will produce for inspection and copying, documents, if any, responsive to this request.

(p) CHA objects to this request on the grounds that it is vague, overbroad and does not seek any specific documents.

5. Any and all documents exchanged between the CHA and the U.S. Department of Housing and Urban Development relating or referring to drug testing at any mixed-income development.

**ANSWER:** CHA will produce for inspection and copying, documents, if any, responsive to this request.

6. Each and every document that relates or refers to the CHA's contention (in its answers of October 25, 2013, to the ACLU's first set of interrogatories, at page 3) that "CHA acquiesced in the private developers and resident desires for drug screening in order to promote investment in and acceptance of Parkside[.]"

**ANSWER:** CHA will produce for inspection and copying, documents, if any, responsive to this request.

## II.   The drug testing

7.     For each and every mixed-income development with drug testing, any and all documents that relate or refer to the manner that drug testing is conducted, including:

(a)     Any and all policy or training documents.

(b)     Any and all agreements with people or organizations who conduct the drug testing.

(c)     Any and all documents that relate or refer to:

   (i)     Who is and is not subject to drug testing.

   (ii)     Where the specimen is gathered, and by whom.

   (iii)     Where the specimen is analyzed, and by whom.

   (iv)     What drugs are subject to testing.

   (v)     All persons notified of a positive result.

   (vi)     All consequences of a positive result.

   (vii)     All measures to ensure confidentiality of the tested persons.

   (viii)     All protocols for people at risk of false positives due to their use of lawful medicine, including: whether such people must disclose their use of such medicine; and if so: to whom they disclose it; how it is disclosed; how that information is used; and how that information is confidentially maintained.

   (ix)     Notice to the CHA of any aspect of the manner that drug testing was conducted, including: objections to drug testing by persons subject to drug testing; the results of drug testing; and what happens to persons who test positive.

10

**ANSWER:**    CHA objects to this request as it seeks information related to class discovery and is beyond the scope of the discovery allowed by the Court.  More specifically, on December 13, 2013, the Court limited this round of discovery to issues relating to Plaintiff's motion for a preliminary injunction.  *See* 12-13-13 Minute Entry.  No discovery was allowed relating to class certification and the Plaintiff's motion for class certification was entered and continued to May 1, 2014.  *Id.*  CHA also objects to this request on the grounds that it is overly broad and unduly burdensome.  Subject to, and without waiving this objection, CHA responds with respect to Parkside:

(a)    CHA will produce for inspection and copying, documents, if any, responsive to this request.

(b)    CHA will produce for inspection and copying, documents, if any, responsive to this request.

(c)

  (i)    CHA will produce for inspection and copying, documents, if any, responsive to this request.

  (ii)    CHA will produce for inspection and copying, documents, if any, responsive to this request.

  (iii)    CHA will produce for inspection and copying, documents, if any, responsive to this request.

  (iv)    CHA will produce for inspection and copying, documents, if any, responsive to this request.

  (v)    CHA will produce for inspection and copying, documents, if any, responsive to this request.

11

(vi)     CHA will produce for inspection and copying, documents, if any, responsive to this request.

(vii)    CHA will produce for inspection and copying, documents, if any, responsive to this request.

(viii)   CHA will produce for inspection and copying, documents, if any, responsive to this request.

(ix)     CHA will produce for inspection and copying, documents, if any, responsive to this request.

## III.     The reasons for the drug testing

8.     Each and every document that relates or refers to the CHA's contention that "special needs" advanced by the drug testing include:

(a)     "[P]ublic safety at Parkside, given the history of safety problems in the surrounding community[.]" See CHA's answers of October 25, 2013, to the ACLU's first set of interrogatories, at page 3.

(b)     "[P]romotion of a drug-free Parkside, given the history of drug problems in the surrounding community[.]" See CHA's answers of October 25, 2013, to the ACLU's first set of interrogatories, at page 3.

(c)     "[P]rotection of the youth residing at Parkside, given the history of harm to youth in the surrounding community[.]" See CHA's answers of October 25, 2013, to the ACLU's first set of interrogatories, at page 3.

(d)     "[T]he special and compelling social, economic, and community development goals served by the historic and unprecedented transformation of Cabrini

12

Green[.]" See CHA's answers of October 25, 2013, to the ACLU's first set of interrogatories, at page 3.

**ANSWER:**

    (a)    CHA will produce for inspection and copying, documents, if any, responsive to this request.

    (b)    CHA will produce for inspection and copying, documents, if any, responsive to this request.

    (c)    CHA will produce for inspection and copying, documents, if any, responsive to this request.

    (d)    CHA will produce for inspection and copying, documents, if any, responsive to this request.

9.    Each and every document that relates or refers to the CHA's contention that:

    (a)    There is "developer and resident demand for tenants who receive CHA benefits to abide by generally-applicable tenancy requirements, including drug screening, as a condition of investing in Parkside[.]" See CHA's answers of October 25, 2013, to the ACLU's first set of interrogatories, at page 4.

    (b)    There is a "lack of drug-related issues at Parkside as compared to the surrounding community before Parkside[.]" See CHA's answers of October 25, 2013, to the ACLU's first set of interrogatories, at page 5.

    (c)    Drug testing has advanced a "lack of drug-related issues at Parkside as compared to the surrounding community before Parkside[.]" See CHA's answers of October 25, 2013, to the ACLU's first set of interrogatories, at page 5.

13

**ANSWER:**

      (a)    CHA will produce for inspection and copying, documents, if any, responsive to this request.

      (b)    CHA will produce for inspection and copying, documents, if any, responsive to this request.

      (c)    CHA will produce for inspection and copying, documents, if any, responsive to this request.

9.    Each and every document, beyond those responsive to requests 8 and 9 above, that the CHA asserts relates or refers to the existence of any special need for drug testing at the mixed-income developments, or shows that drug testing advances any special need.

**ANSWER:**    CHA will produce for inspection and copying, documents, if any, responsive to this request.

## IV.   **Miscellaneous**

10.    Any and all documents that relate or refer to Joseph Peery.

**ANSWER:**  CHA objects to this request on the grounds that it is vague, overly broad and unduly burdensome. Subject to and without waiving this request, CHA will produce for inspection and copying, documents, if any, responsive to this request.

11.    Any and all documents that the CHA relied upon in answering plaintiff's interrogatories and admission requests served simultaneously with these document requests, or that the CHA identified in those answers.

**ANSWER:**    CHA will produce for inspection and copying, documents, if any, responsive to this request.

14

Dated:  January 24, 2014

Respectfully submitted,

CHICAGO HOUSING AUTHORITY

By: _____

One of Its Attorneys

Samuel Mendenhall #6207315
Kimball R. Anderson #49980
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
Tel: (312) 558-5600
Fax: (312) 558-5700
smendenhall@winston.com
Attorneys for Defendant
Chicago Housing Authority

15

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2014, I served a copy of Chicago Housing Authority's Responses to Plaintiff's Second Set of Document Requests to CHA upon:

Adam Schwartz
ACLU
180 N. Michigan Ave. Suite 2300
Chicago, IL 60601

Eric Schmitt
Sidley Austin LLP
One South Dearborn St.
Chicago, IL 60603

Thomas Johnson
Johnson, Jones, Snelling, Gilbert & Davis
36 S. Wabash, Suite 1310
Chicago, IL 60603

16

# Exhibit 5



THE
ROGER
BALDWIN
FOUNDATION
OF ACLU,
INC.

SUITE 2300
180 NORTH MICHIGAN AVENUE
CHICAGO, ILLINOIS 60601-1287
(312) 201-9740
FAX (312) 201-9760
WWW.ACLU-IL.ORG

January 31, 2014

*__Via Email and First Class Mail__*

Samuel Mendenhall
WINSTON & STRAWN
35 W. Wacker Dr.
Chicago, IL 60601
smendenhall@winston.com

Re: *Peery v. CHA:* Discovery Issues

Dear Sam:

I write regarding the CHA's responses on January 24 to plaintiff's discovery requests served on December 20.

**Interrogatory #1: the mixed-income developments**

Plaintiff's interrogatory #1 sought basic information from the CHA regarding all of the mixed-income developments. The CHA has refused to provide any responsive information to plaintiff about the mixed-income developments other than Parkside, on the supposed grounds that this information is beyond the scope of the district court's discovery order of December 13, 2013. In fact, that order allows "discovery relevant to the preliminary injunction." *See* Dkt. #74. The basic information plaintiff seeks regarding all of the mixed-income developments is relevant to the preliminary injunction.

For example, CHA has taken the position that plaintiff has consented to the drug testing at issue because he has "other public housing options that he could have selected that do not require drug screening". *See* Dkt. #79 at p. 7. Likewise, HMC has taken the position that plaintiff has consented because he "could have retained his CHA subsidy and lived at any one of a number of other dwellings in the Cabrini neighborhood and elsewhere, including mixed income developments and private housing, which did not drug test." See Dkt. #82 at p. 10. To explore these arguments, plaintiff needs to know which mixed-income developments have drug testing, and which don't, and how many CHA units are available in these respective developments. Thus, for each mixed-income development, interrogatory #1(b)(iv) seeks the number of CHA units, and interrogatories #1(f) and #1(g) seek whether or not these units have drug testing.

1

Also, the CHA has taken the position that drug testing has advanced "the lack of drug-related issues at Parkside as compared to the surrounding community before Parkside." *See* CHA's answers to plaintiff's first set of interrogatories at #3 on p. 5. To explore any chronological correlation between drug testing and the reduction of drug-related issues, plaintiff needs to know when drug testing began at the various mixed-income developments. Thus, for each mixed-income development, interrogatories #1(f) and #1(g) seek whether each mixed-income development has drug testing, and if so, when it began.

In the interest of an amicable resolution , and without waiving his right to a complete answer to interrogatory #1, plaintiff requests that the CHA answer, as to all mixed-income developments, sub-parts (b)(iv), (f), and (g).

As to sub-parts (f) and (g), plaintiff asks the CHA to state whether or not CHA residents at each mixed-income development are subject to drug testing, and when this testing began. The CHA's answer to these sub-parts as to Parkside did not provide this information. In the event there is any ambiguity here, plaintiff herein clarifies the intended scope of these sub-parts. The CHA surely has this information; indeed, in 2011, it provided this information to the ACLU pursuant to a FOIA request.

### Interrogatory #3: the CHA's role at the mixed-income developments

Plaintiff's interrogatory #3(c) asked the CHA to state with specificity, for each mixed-income development, its role in creating the redevelopment plans for the mixed-income developments. The CHA answers only that this "depends" on the type of developer procurement, and that working group "may have varying input." In the interest of an amicable resolution, and without waiving his right to a complete answer to interrogatory #3(c) as to all mixed-income developments, plaintiff requests that the CHA expand its interrogatory answer to state with specificity the role of the CHA and of the Near North Working Group in creating the redevelopment plan for Parkside.

Plaintiff's interrogatory #3(e) asked the CHA to state with specificity, for each mixed-income development, its role in spending its own funds. The CHA objects that this request is vague, and states only that it "generally allocates its funds within the prescribed rules and regulations applicable to the CHA and given expenditures." Relatedly, plaintiff's interrogatory #3(f) asked the CHA to state with specificity, for each mixed-income development, its role in securing other funds and financing. The CHA objects that this request is vague, and states only that it "may work to secure additional funds and financing for mixed-income development projects." Plaintiff disputes the CHA's assertion that these requests are vague. In the interest of an amicable resolution, and without waiving his right to a complete answer to interrogatories #3(e) and #3(f) as to all mixed-income developments, plaintiff requests that the CHA expand its interrogatory answer to state with specificity the role of the CHA, in developing Parkside, in spending its own funds, and in securing other funds and financing.

Plaintiff's interrogatory #3(g) asked the CHA to state with specificity, for each mixed-income development, its role in demolishing old buildings. The CHA answers only that it follows various rules. In the interest of an amicable resolution, and without waiving his right to a

complete answer to interrogatory #3(g) as to all mixed-income developments, plaintiff requests that the CHA expand its interrogatory answer to state with specificity the role of the CHA, in developing Parkside, in demolishing old buildings.

Plaintiff's interrogatory #3(i) asked the CHA to state with specificity, for each mixed-income development, its role in improving infrastructure, such as utilities, streets, and parks. The CHA answers only that it "does not generally control or directly improve infrastructure, such as utilities, streets, or parks." In the interest of an amicable resolution, and without waiving his right to a complete answer to interrogatory #3(i) as to all mixed-income developments, plaintiff requests that the CHA expand its interrogatory answer to state with specificity the role of the CHA, in developing Parkside, in improving infrastructure. This narrowed interrogatory addresses the CHA's role at Parkside, and not its role in "general[]"; it extends to any CHA role, and not just "direct[] improve[ment]"; and it extends to any infrastructure, and not just the stated examples.

Plaintiff's interrogatory #3(k) asked the CHA to state with specificity, for each mixed-income development, its role in approving residences as fit for occupancy. The CHA answers only that "the CHA does not grant a certificate of use and occupancy." In the interest of an amicable resolution, and without waiving his right to a complete answer to interrogatory #3(g) as to all mixed-income developments, plaintiff requests that the CHA expand its interrogatory answer to state with specificity the role of the CHA, in developing Parkside, in approving residences as fit for occupancy. This interrogatory addresses any CHA involvement in approving residences as fit for occupancy, and is not limited to whether the CHA "grant[s] a certificate."

Plaintiff's interrogatory #3(m) asked the CHA to state with specificity, for each mixed-income development, its role in owning the land below the development. The CHA asserts that this request is vague, and answers only by referral to unspecified produced documents. Plaintiff disputes that this interrogatory is vague. Also, given the CHA's knowledge of this subject, the most efficient discovery method would be for the CHA to answer this interrogatory. In the interest of an amicable resolution, and without waiving his right to a complete answer to interrogatory #3(m) as to all mixed-income developments, plaintiff requests that the CHA expand its interrogatory answer to state with specificity the role of the CHA in owning the land below Parkside.

**Interrogatory #5: the drug testing protocols**

Plaintiff's interrogatory #5(f) asked the CHA to state with specificity all drug testing protocols regarding measures to ensure confidentiality of the tested persons. The CHA answers only that "[t]he private developer or property manager requiring the drug testing is responsible for creating and implementing confidentiality requirements for all drug testing." Plaintiff requests that the CHA expand its interrogatory answer to state with specificity the *source* of the developer or manager's "responsibility" to ensure confidentiality.

Plaintiff's interrogatory #5(h) asked the CHA to state with specificity all drug testing protocols regarding notice to the CHA of the testing. The CHA answers, in relevant part here: "With respect to continued occupancy, the developer and/or property manager may or may not

3

inform CHA of a positive result." Plaintiff requests that the CHA expand its interrogatory answer to state the specific circumstances under which developers and property managers will or will not inform the CHA of positive test results.

**Interrogatory #8 and document request #8: reasons for the drug testing**

Plaintiff's interrogatory #8 asked the CHA to identify, and his document request #8 asked the CHA to disclose, all documents that relate or refer to the CHA's contention that drug testing advances certain CHA special needs. The CHA's formal responses state that the CHA will produce any responsive documents, and identify any records it obtains. To date, the CHA has not produced or identified any such documents. Please promptly do so, if they exist.

**Document request #3: the mixed-income developments**

Plaintiff's document request #3(a) sought, for each mixed-income development, any and all agreements between the CHA and the developers, owners, and managers of the developments. The CHA has produced such documents for Parkside, but not for other mixed-income developments. In the interest of an amicable resolution, and without waiving his right to a complete answer to document request #3(a) as to all mixed-income developments, plaintiff requests that the CHA disclose such documents regarding Oakwood Shores. These documents are highly relevant in the related *Stubenfield* lawsuit.

* * *

Please advise me of your position on the foregoing discovery issues by February 4. If you have any questions, please do not hesitate to call me at (312) 201-9740, extension 316.

Sincerely,

Adam Schwartz

cc:     Samantha Liskow (via email at Samantha@loevy.com)

4

# Exhibit 6

Kaitlin Towner

| | |
|---|---|
| **From:** | Mendenhall, Samuel <SMendenh@winston.com> |
| **Sent:** | Friday, February 07, 2014 6:29 AM |
| **To:** | Karen Sheley |
| **Cc:** | Adam Schwartz; Kaitlin Towner |
| **Subject:** | RE: Peery v. CHA - Discovery Issues |

Karen,

Your email misstates our conversation in several material respects. Given that we have a deposition later this morning, I will use my time preparing for that instead of responding to the numerous inaccuracies in your email. The CHA will respond to Adam's letter by Feb. 11.

Sam

**From:** Karen Sheley [mailto:ksheley@ACLU-il.org]
**Sent:** Thursday, February 06, 2014 6:45 PM
**To:** Mendenhall, Samuel
**Cc:** Adam Schwartz; Kaitlin Towner
**Subject:** RE: Peery v. CHA - Discovery Issues

Dear Sam,

Thank you for speaking with me this afternoon in regard to the CHA's responses on January 24 to plaintiff's discovery requests served on December 20. This e-mail serves as confirmation of that conversation. I asked you to tell me which information sought in Adam's letter of January 31 would be disclosed by the CHA, and whether the CHA would disclose that information by February 11. You declined to answer these questions, except to state that the CHA would not provide further information in response to interrogatory #3(m), and that the CHA would "stand by its answer" to document request #3 (which I understand means that the CHA will not disclose further documents). You stated that later today, you would discuss this matter with your client. Please let me know by tomorrow morning whether the CHA will disclose by February 11 the other information sought in Adam's letter of January 31.

Thank you,

Karen

Karen Sheley
Staff Attorney
ACLU of Illinois

This message and any files or text attached to it are intended only for the recipients named above, and contain information that may be confidential or privileged. If you are not an intended recipient, you must not read, copy, use or disclose this communication. Please also notify the sender by replying to this message, and then delete all copies of it from your system. Thank you.

**From:** Mendenhall, Samuel [mailto:SMendenh@winston.com]
**Sent:** Thursday, February 06, 2014 3:01 PM
**To:** Karen Sheley
**Cc:** Adam Schwartz; Kaitlin Towner
**Subject:** RE: Peery v. CHA - Discovery Issues

Karen,

The record speaks for itself regarding your two prior motions to compel.  Proceed as you deem appropriate, just understand the consequences of another ill-founded and baseless motion.

Sam

---

**From:** Karen Sheley [mailto:ksheley@ACLU-il.org]
**Sent:** Thursday, February 06, 2014 12:19 PM
**To:** Mendenhall, Samuel
**Cc:** Adam Schwartz; Kaitlin Towner
**Subject:** RE: Peery v. CHA - Discovery Issues

Dear Sam,

I'll speak with you at 4.  We strongly disagree with your characterization of our previous discovery motions and shall continue to seek the court's assistance when our client's interests so require and will, as always, do so in conformity with all applicable rules.

Thanks,

Karen

---

**From:** Mendenhall, Samuel [mailto:SMendenh@winston.com]
**Sent:** Wednesday, February 05, 2014 4:39 PM
**To:** Karen Sheley
**Cc:** Adam Schwartz; Kaitlin Towner
**Subject:** RE: Peery v. CHA - Discovery Issues

Karen,

I am available at 4 p.m. tomorrow to discuss the issue.  However, let me be clear about something.  If my client has to defend another baseless and unfounded motion to compel, we will move for sanctions as well as strongly consider reporting this issue to the Illinois Attorney Registration and Disciplinary Commission.  You firm has previously filed two legally baseless and unfounded motions to compel against my client in this case, both of which were flat out denied.  In fact, with respect to the last motion, Magistrate Judge Keys held that it was your client Mr. Peery who violated the Federal Rules, not CHA.  Simply put, a third legally baseless motion will not be tolerated.

Sam

---

**From:** Karen Sheley [mailto:ksheley@ACLU-il.org]
**Sent:** Wednesday, February 05, 2014 3:54 PM
**To:** Mendenhall, Samuel
**Cc:** Adam Schwartz; Kaitlin Towner
**Subject:** RE: Peery v. CHA - Discovery Issues

Dear Sam,

I write to request that we set a time tomorrow to meet and confer on this issue.  We sent the attached letter on Friday, January 31, requesting a response by yesterday, February 4.  Your response of this morning does not state which interrogatories the CHA will respond to or to what extent it will address the deficiencies in its answers.

I am available to speak with you anytime tomorrow.  Please let me know what the best time is to discuss this issue. My telephone number is 312-201-9740 ext. 325.

Thanks,

Karen

---

**From:** Adam Schwartz
**Sent:** Wednesday, February 05, 2014 12:53 PM
**To:** Harvey Grossman; Karen Sheley; Adam Schwartz; Kaitlin Towner
**Subject:** FW: Peery v. CHA - Discovery Issues

---

**From:** Mendenhall, Samuel [mailto:SMendenh@winston.com]
**Sent:** Wednesday, February 05, 2014 12:37 PM
**To:** Adam Schwartz
**Subject:** RE: Peery v. CHA - Discovery Issues

Adam,

This email responds to your letter dated January 31, 2014, wherein you raised various issues regarding CHA's discovery responses. Please be advised that CHA stands by its original discovery responses as they are in full compliance with all applicable Federal Rules of Civil Procedure. In fact, as you are well aware, as Magistrate Judge Keys pointed out, it was Mr. Peery's interrogatories that failed to comply with the Federal Rules. Nonetheless, in the spirit of cooperation and in an effort to satisfactorily resolve this discovery dispute, CHA is reviewing the items listed in your letter and will supplement its previous answers where appropriate. CHA's supplementation is not, and should not be construed, as an admission of any deficiency in its prior answers.

Thank you.

Sam

---

**From:** Chris Romer [mailto:cromer@ACLU-il.org]
**Sent:** Friday, January 31, 2014 4:15 PM
**To:** Mendenhall, Samuel
**Cc:** samantha@loevy.com; Karen Sheley; Adam Schwartz; Lindsay Miller; Harvey Grossman; Kaitlin Towner
**Subject:** Peery v. CHA - Discovery Issues

Dear Mr. Mendenhall:

At the request of Adam Schwartz, please find his attached letter. A hardcopy will follow by US Mail.

Yours,
Chris

**Chris Romer**
Legal Assistant
ACLU of Illinois
180 N. Michigan Ave., Ste. 2300, Chicago, IL 60601
■ 312.201.9740 x322 ■ cromer@aclu-il.org
www.aclu-il.org



# Exhibit 7



North America   Europe   Asia

35 W. Wacker Drive
Chicago, IL 60601
T +1 312 558 5600
F +1 312 558 5700

February 11, 2014

**SAMUEL MENDENHALL**
Partner
(312) 558-5600
SMendenh@winston.com

<u>**VIA EMAIL & US MAIL**</u>

Adam Schwartz
ACLU
180 N. Michigan Avenue
Suite 2300
Chicago, IL 60601

Re: CHA's Response to Mr. Perry's January 31, 2014 Letter

Dear Adam:

This letter responds to your letter dated January 31, 2014, wherein you raised various issues regarding CHA's discovery responses. Please be advised that CHA stands by its original discovery responses as they are in full compliance with all applicable Federal Rules of Civil Procedure. In fact, as you are well aware, Magistrate Judge Keys held in his January 24 order that it was your client, Mr. Peery, that failed to comply with the Federal Rules. Nonetheless, in the spirit of cooperation and in an effort to satisfactorily resolve this discovery dispute, CHA reviewed the items listed in your letter and now provides the following additional information. Please be advised that this additional information is not, and should not be construed, as an admission of any deficiency in CHA's prior responses. CHA expressly denies any such deficiency.

**<u>Interrogatory # 1: the mixed income developments</u>**

1(b)(iv). Your claim that you need class-wide discovery regarding all CHA mixed-income communities despite the Court's express denial of this discovery is without merit. CHA's consent defense is not based on the number of units available at any particular mixed-income community. Instead, it is based on the simple reality that Mr. Peery chose/accepted housing at Parkside, knowing full well it required all renters, including CHA renters, to submit to drug testing upon application and annual renewal. Mr. Peery voluntarily moved to Parkside and submitted to this testing four times without any objection.

Moreover, Mr. Peery continues to consent in that he has never requested a transfer from Parkside to a residence that does not have drug testing. If Mr. Peery no longer consents to the testing and wants to move to a residence that does not have testing, he can initiate the process by requesting a resident-initiated transfer as set out in the CHA's FY 2011 Admissions and

Adam Schwartz
February 11, 2014
Page 2

Continued Occupancy Policy ("ACOP"). Instead of following this pre-existing procedure, he chose to file this expensive and totally unnecessary litigation against CHA.

1(f). With respect to Parkside, the CHA has already provided a copy of the CHA Board Resolution approving the Tenant Selection Plan and form Lease to be used at that site.

1(g). As we previously informed you, Holsten Management Corporation ("HMC") conducts drug testing of all renters—market rate, affordable housing, and public housing. CHA does not know the exact date this testing began as it has no involvement with this testing. Peter Holsten, HMC's president, testified extensively at his deposition last week about this testing and is a far better source than CHA.

## Interrogatory # 3: the CHA's role at the mixed-income developments

3(c). The CHA issued a Request for Proposals (RFP) for redevelopment of the Cabrini-Green Extension North site pursuant to the Cabrini-Green Consent Decree, after members of the Near North Working Group vetted and provided input with respect to the RFP. Potential developers were required to submit redevelopment plans for the site as part of their overall response to the RFP solicitation. Holsten Development Corporation ("HDC") was the Selected Developer. Pursuant to provisions in the Cabrini-Green Consent Decree, the Cabrini Local Advisory Council became a partner with the Selected Developer. After selection of HDC, the members of the Near North Working Group provided additional input and comments about HDC's redevelopment plan. Neither the CHA nor the Near North Working Group created the redevelopment plan for Parkside.

3(e). The CHA has previously provided you copies of the various "Mixed-Finance Amendment to Consolidated Annual Contributions Contract" for Parkside. These Contracts set forth the funds expended by the CHA.

3(f). The CHA worked with the City of Chicago to identify public funding and financing for the private investors to be used for the development of Parkside (e.g., tax credits, HOME/CDBG).

3(g). The CHA filed demolition applications with HUD for the following buildings: 1150-60 N. Sedgwick Street; 1158 N. Cleveland Avenue; 500-502 W. Oak Street; 1015-17 N. Larrabee Street; 1121 N. Larrabee Street; and 1159-61 N. Larrabee Street. HUD approved the applications and the buildings were demolished by CHA.

3(i). The CHA does not complete infrastructure improvement with respect to utilities, streets and parks. HDC worked with the appropriate City of Chicago agencies or departments to coordinate and complete actual infrastructure improvement at Parkside.

Adam Schwartz
February 11, 2014
Page 3

3(k). The CHA does not issue certificates of occupancy or make declarations that a unit is fit for occupancy. That role belongs to the appropriate City of Chicago agency. With respect to Parkside, the Habitat Company, as Receiver for the CHA, confirmed receipt of certificates of occupancy for the public housing assisted units.

3(m). The CHA has previously provided Mr. Peery with copies of all applicable ground leases at Parkside.

**Interrogatory #5: the drug testing protocols**

5(f). The CHA is not responsible for creation of drug testing protocols at Parkside. This was done by Parkside's property manager, HMC. Peter Holsten, HMC's president, testified extensively at his deposition concerning this topic. CHA does not have any additional information to add as it has no involvement with the testing.

5(h). With respect to continued occupancy at Parkside, HMC does not inform CHA of the results of any drug testing. *See* HMC's answers to Plaintiff's First Set of Interrogatories, Ans. 4.

**Interrogatory # 8 and document request #8: reasons for the drug testing**

CHA currently does not have any documents responsive to this request. CHA will produce any such documents when/if it obtains them.

**Document request #3: the mixed-income developments**

CHA will respond to any request for documents concerning the *Stubenfield* litigation from the *Stubenfield* plaintiffs in accordance with the Federal Rules of Civil Procedure.

Sincerely,

Samuel Mendenhall

SM/JJ
cc: Tom Johnson (via email)

CHI:2811042.2

# Exhibit 8

Kaitlin Towner

| | |
|---|---|
| **From:** | Mendenhall, Samuel <SMendenh@winston.com> |
| **Sent:** | Wednesday, February 12, 2014 5:45 PM |
| **To:** | Chris Romer |
| **Cc:** | Adam Schwartz; tjohnson@jjsgd.com; eric.schmitt@sidley.com |
| **Subject:** | RE: Peery v. CHA - Third Amended Notice of Deposition to CHA |
| **Attachments:** | CHA's Objections to Peery's 30(b)(6) Notice.pdf |

Please see the attached.

---

**From:** Chris Romer [mailto:cromer@ACLU-il.org]
**Sent:** Tuesday, February 11, 2014 4:47 PM
**To:** Mendenhall, Samuel; Anderson, Kimball R.; Papez, Elizabeth P.; tjohnson@jjsgd.com; samantha@loevy.com; sjones@fslegal.com
**Cc:** Adam Schwartz; Karen Sheley; Lindsay Miller; Ingrid Bergstrom; Kaitlin Towner; katherine.cooper@sidley.com
**Subject:** Peery v. CHA - Third Amended Notice of Deposition to CHA

Dear Counsel:

Attached, please find Plaintiff's Third Amended Notice of Rule 30(b)(6) Deposition to CHA. Although the details have already been discussed and confirmed, we wanted to make sure a formal notice of deposition was produced. Also, for those who have not yet responded to Karen, please let her or me know who plans to attend so we can make arrangements with the security desk at Sidley.

Thank you,
Chris

**Chris Romer**
Legal Assistant
ACLU of Illinois
180 N. Michigan Ave., Ste. 2300, Chicago, IL 60601
■ 312.201.9740 x322 ■ cromer@aclu-il.org
www.aclu-il.org  f  t



The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author. *********************************************************************** Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

# Exhibit 9

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOSEPH PEERY, on behalf of himself and all persons similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>CHICAGO HOUSING AUTHORITY and HOLSTEN MANAGEMENT CORPORATION,<br><br>      Defendants. | Case No.: 13-cv-5819<br><br>The Hon. Sharon Johnson Coleman |

### CHICAGO HOUSING AUTHORITY'S OBJECTIONS
### TO PLAINTIFF'S RULE 30(b)(6) DEPOSITION NOTICE TO CHA

Pursuant to Federal Rules of Civil Procedure 26 and 30, Defendant Chicago Housing Authority ("CHA"), by and through its undersigned attorneys, hereby objects to the following Designated Subject Matter Topics ("Designated Topics") in Plaintiff's Rule 30(b)(6) deposition notice:

### GENERAL OBJECTIONS

1.      CHA objects to the Designated Topics to the extent that they seek testimony and/or information related to class discovery or any other discovery beyond the scope of discovery ordered by the Court. In particular, on December 13, 2013, the Court limited discovery to issues relating to Plaintiff's motion for preliminary injunction. *See* 12-13-13 Minute Entry. No discovery was allowed relating to class certification or any other area. *Id.*

2.      CHA objects to the Designated Topics to the extent that they seek testimony and/or information not relevant to the preliminary injunction. More specifically, the preliminary injunction hearing relates to the constitutionality of the drug testing at issue in this case and whether Mr. Peery individually is entitled to a preliminary injunction regarding the same.

3.    CHA objects to the Designated Topics to the extent that they seek testimony and/or information previously provided by CHA to Mr. Peery.

4.    CHA objects to the Designated Topics to the extent that they are overly broad and/or unduly burdensome.

5.    CHA objects to the Designated Topics to the extent they seek testimony and/or information: (a) not reasonably calculated to lead to the discovery of evidence admissible at the preliminary injunction; (b) which is unreasonably cumulative or duplicative, or obtained from some other source or party that is more convenient, less burdensome, or less expensive, or (c) which Mr. Peery has had opportunity to obtain from other sources.

6.    The above listed objections are not exhaustive and CHA does not waive any other objections available to it under the Federal Rules. CHA specifically preserves all such other objections.

**DESIGNATED TOPICS OBJECTED TO IN MR. PERRY'S RULE 30(B)(6) NOTICE**

1.    The CHA's Plan for Transformation, including demolition and construction of developments, displacement of CHA residents, and the Relocation Rights Contract.

**RESPONSE:** CHA incorporates its General Objections Nos. 1-5. Subject to and without waving these objections, CHA will produce a 30(b)(6) witness to testify as to these topics with respect to Parkside only.

2.    The creation and implementation of site-specific tenant selection criteria at mixed-income developments.

**RESPONSE:** CHA incorporates its General Objections Nos. 1, 3, 4, and 5. Subject to and without waving these objections, CHA will produce a 30(b)(6) witness to testify as to these topics with respect to Parkside only.

3.    At each and every mixed-income development with drug testing:

(a)    The creation and implementation of drug testing.

2

**RESPONSE:** CHA incorporates its General Objections Nos. 1, 3, 4, and 5. Subject to and without waving these objections, CHA will produce a 30(b)(6) witness to testify as to these topics with respect to Parkside only.

        (b)     The working groups, including their powers, functions, and members.

**RESPONSE:** CHA incorporates its General Objections Nos. 1, 3, 4, and 5. Subject to and without waving these objections, CHA will produce a 30(b)(6) witness to testify as to these topics with respect to Parkside only.

        (c)     The role of the CHA at the development, including: creating the working group, selecting the developer, creating the redevelopment plan, obtaining HUD approval, spending the CHA's own funds, securing other funds and financing, demolishing old buildings, helping displaced tenants relocate, improving infrastructure (such as utilities, streets, and parks), completing real estate transactions, approving the new residences as fit for occupancy, referring the developers to displaced CHA tenants who want to live in the new development, owning the land below the development, and ensuring that the development complies with federal laws.

**RESPONSE:** CHA incorporates its General Objections Nos. 1-5. Subject to and without waving these objections, CHA will produce a 30(b)(6) witness to testify as to these topics only to the extent it is shown they relate to the constitutionality of the drug testing at issue for the preliminary injunction proceeding.

        (d)     Any involvement of the Local Advisory Councils, including any LAC development corporations, in the creation of the drug testing.

**RESPONSE:** CHA incorporates its General Objections Nos. 1, 3, 4, and 5. Subject to and without waving these objections, CHA will produce a 30(b)(6) witness to testify as to this topic with respect to Parkside only.

(e)     All drug testing protocols, including: who is and is not tested; where the specimen is gathered, and by whom; where the specimen is analyzed, and by whom; what drugs are subject to testing; all persons notified of a positive result; all consequences of a positive result; all measures to ensure confidentiality of the tested persons; all protocols for people at risk of false positives due to their use of lawful medicine; and all notice to the CHA of any aspect of drug testing.

**RESPONSE:** CHA incorporates its General Objections Nos. 1, 3, 4, and 5. CHA has no knowledge of these topics, except as to notice to CHA. Subject to and without waving these objections, CHA will produce a 30(b)(6) witness to testify as to the notice to the CHA with respect to Parkside only.

(f)     By year, the number of applicants to CHA units who take the drug test, the number of current residents of such units who take it, and the number of each who test positive.

**RESPONSE:** CHA incorporates its General Objections Nos. 1, 3, 4, and 5. Subject to and without waiving these objections, CHA will produce a 30(b)(6) witness to testify on these topics with respect to Parkside.

(g)     What would happen if a person seeking admission or continued occupancy to a CHA unit refused to submit to drug testing.

**RESPONSE:** CHA incorporates its General Objections Nos. 1, 3, 4, and 5. Subject to and without waving these objections, CHA will produce a 30(b)(6) witness to testify as to this topic with respect to Mr. Peery only and his tenancy at Parkside.

4.     The three-party lease between the CHA, the CHA renter, and the development's manager, including the provision (at Section 16-b-33 at pages 16-17) allowing the CHA to evict CHA residents for drug use.

**RESPONSE:** CHA incorporates its General Objections Nos. 1-5. CHA denies that any such three-party lease exists at Parkside. Subject to and without waving these objections, CHA will produce a 30(b)(6) witness to testify as to this topic with respect to Parkside only.

5.     The portion of the CHA's FY 2011 Admissions and Continued Occupancy Policy stating (at Part II-F-3-a-iii on pages 23 and 24) that "[applicants who do not meet the site- specific criteria . . . [w]ill have their name removed from the CHA community-wide wait list if failure to meet the site-specific criteria was based on negative results to the site's drug-test requirement[.]" Regarding this policy: the result of being removed from the community-wide wait list; whether this policy applies to applicants who refuse to take the test; and whether it applies to current residents who fail or refuse to take it.

**RESPONSE:** CHA incorporates its General Objections Nos. 1-5. The quoted language above clearly indicates it applies only to "applicants," not current residents like Mr. Peery. Subject to and without waving these objections, CHA will produce a 30(b)(6) witness to testify as to this topic with respect to Mr. Peery only and at Parkside only.

11.     All public housing authorities and private residential landlords known to the CHA that require drug testing as a condition of admission or continued occupancy.

**RESPONSE:** CHA incorporates its General Objections Nos. 1, 2, 3, and 5. Subject to and without waiving these objections, CHA will produce a 30(b)(6) witness on this topic.

12.     Why, at mixed-income developments with drug testing, apartment owners are exempt from the drug testing.

**RESPONSE:** CHA incorporates its General Objections Nos. 1-5. CHA has no knowledge on this topic.

13.     Methods available to the CHA to advance its interests, other than drug testing, including eviction of residents whose on-premises drug use endangers or disrupts a development or its residents.

**RESPONSE:** CHA incorporates its General Objections Nos. 1, 2, 4 and 5. Subject to and without waving these objections, CHA will produce a Rule 30(b)(6) witness on this topic with respect to Parkside only.

      14.    Mr. Peery's rental history with the CHA and HMC.

**RESPONSE:** CHA incorporates General Objection No. 5. Subject to and without waving these objections, CHA will produce a 30(b)(6) witness to testify regarding Mr. Peery's rental history with CHA.

Dated: February 12, 2014              Respectfully submitted,

                               CHICAGO HOUSING AUTHORITY

                               By:                             

                                       One of Its Attorneys

Samuel Mendenhall #6207315
Kimball R. Anderson #49980
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
Tel: (312) 558-5600
Fax: (312) 558-5700
smendenhall@winston.com
Attorneys for Defendant
Chicago Housing Authority

## CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2014, I served a copy of Chicago Housing

Authority's Objections to Plaintiff's Rule 30(b)(6) Deposition Notice to CHA via email upon:

Adam Schwartz
ACLU
180 N. Michigan Ave. Suite 2300
Chicago, IL 60601

Eric Schmitt
Sidley Austin LLP
One South Dearborn St.
Chicago, IL 60603

Thomas Johnson
Johnson, Jones, Snelling, Gilbert & Davis
36 S. Wabash, Suite 1310
Chicago, IL 60603

7

# Exhibit 10

Kaitlin Towner

| | |
|---|---|
| **From:** | Mendenhall, Samuel <SMendenh@winston.com> |
| **Sent:** | Monday, February 17, 2014 6:56 PM |
| **To:** | Adam Schwartz; TJohnson@jjsgd.com; Jeff Gilbert; Samantha Liskow (samantha@loevy.com) (samantha@loevy.com); rachel@loevy.com; sjones@fslegal.com |
| **Cc:** | Karen Sheley |
| **Subject:** | RE: Peery/Stubenfield - disclosure of witness names |

Counsel,

Per Magistrate Judge Keys' order, to the extent of CHA's knowledge as of today, we plan on calling Sharnette Brown at the preliminary injunction hearing. Also, per Magistrate Judge Keys' order, we will supplement this disclosure "as soon as [CHA's] intentions change."

On a related front, CHA is working to identify a 30(b)(6) witness for the Stubenfield litigation re Oakwood Shores. I will disclose this witness immediately once his/her identity is known.

Thank you.

Sam

---

**From:** Adam Schwartz [mailto:aschwartz@ACLU-il.org]
**Sent:** Monday, February 17, 2014 5:06 PM
**To:** Mendenhall, Samuel; TJohnson@jjsgd.com; Jeff Gilbert; Samantha Liskow (samantha@loevy.com) (samantha@loevy.com); rachel@loevy.com; sjones@fslegal.com
**Cc:** Adam Schwartz; Karen Sheley
**Subject:** Peery/Stubenfield - disclosure of witness names

Dear counsel:

Per Magistrate Judge Keys' order of January 24 (Dkt. #89), plaintiff Peery herein discloses the names of two expert witnesses that he intends to call at the preliminary injunction hearing. Plaintiff will call these two witnesses to respond to defendants' showing that there is a "special need" for testing, and that the testing is "reasonable." These two witnesses are:

(1) James Ginger. He will respond to defendants' justification of testing based on the alleged relationship of drug testing to public safety, promotion of drug-free housing, and protection of youth.

(2) Niranjan Karnik. He will respond to defendants' justification of testing based on the alleged relationship of drug testing to promotion of drug-free housing.

Defendants have the burden to establish a "special need." See Dkt. #63 at p. 7. While defendants have indicated their intent to assert various special needs and interests, substantial discovery remains regarding what particular witnesses, documents, and other evidence defendants will proffer in support of such assertions. We propose that the parties agree to a schedule that allows for reports and deposition of experts in an orderly fashion. Plaintiff suggests that March 17 would be an appropriate deadline for disclosure of initial written reports of any experts. That date is 90 days before our June 16 hearing date, and Rule 26(a)(2)(D)(i) of the Federal Rules of Civil Procedure requires disclosure of expert testimony 90 days before trial. The interval between this March 17 disclosure date and the April 11 close of discovery would provide sufficient time for depositions of experts. Plaintiffs suggest that all parties disclose any special needs evidence well before the time for disclosure of expert reports. If not, then any experts might need to prepare and serve

supplemental reports based on such evidence. If any defendant intends to call any expert witnesses at the preliminary injunction hearing, plaintiff expects that such experts will be disclosed today.

Finally, plaintiff herein incorporates by reference his Rule 26(a)(1) initial disclosures of January 10, 2014.

If you have any questions, please do not hesitate to call me at 312/201-9740-x316.

Sincerely,

Adam

Adam Schwartz
Senior Staff Counsel
ACLU of Illinois
180 N. Michigan Ave. #2300
Chicago, IL 60601
(312) 201-9740

This message and any files or text attached to it are intended only for the recipients named above, and contain information that may be confidential or privileged. If you are not an intended recipient, you must not read, copy, use or disclose this communication. Please also notify the sender by replying to this message, and then delete all copies of it from your system. Thank you.

The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author. ************************************************************************* Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

# Exhibit 11

Page 1

1        IN THE UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF ILLINOIS
3                    EASTERN DIVISION
4
5   JOSEPH PEERY, on behalf of      )
6   himself and all persons         )
7   similarly situated,             )
8           Plaintiffs,             )
9        vs.                        ) No. 13-cv-05819
10  CHICAGO HOUSING AUTHORITY, and  )
11  HOLSTEN MANAGEMENT CORPORATION, )
12          Defendants.             )
13
14          The 30(b)(6) deposition of CHICAGO
15  HOUSING AUTHORITY by SHARNETTE BROWN, called for
16  examination, taken pursuant to the Federal Rules of
17  Civil Procedure of the United States District
18  Courts pertaining to the taking of depositions,
19  taken before KRISTIN C. BRAJKOVICH, a Certified
20  Shorthand Reporter, CSR. No. 84-3810, of said
21  state, at Suite 3800, One South Dearborn Street,
22  Chicago, Illinois, on the 13th day of February,
23  A.D. 2014, at 12:02 p.m.
24

Page 2

1   PRESENT:
2
3        ROGER BALDWIN FOUNDATION OF ACLU, INC.,
4        (180 North Michigan Avenue, Suite 2300,
5        Chicago, Illinois 60601,
6        1-312-201-9740), by:
7   MS. KAREN SHELEY,
8        ksheley@aclu-il.org,
9   MR. ADAM SCHWARTZ,
10       aschwartz@aclu-il.org,
11  MS. INGRID BERGSTROM,
12       ibergstrom@aclu-il.org,
13  MS. LINDSAY MILLER,
14       lmiller@aclu-il.org,
15           -and-
16  SIDLEY AUSTIN LLP,
17       (One South Dearborn Street,
18       Chicago, Illinois 60603,
19       1-312-853-7000), by:
20  MR. ERIC T. SCHMITT,
21       eric.schmitt@sidley.com,
22  MR. WILLIAM B. BRUCE, JR.,
23       wbruce@sidley.com,
24           appeared on behalf of the Plaintiff;

Page 3

1   PRESENT (Continued):
2
3        WINSTON & STRAWN LLP,
4        (35 West Wacker Drive,
5        Chicago, Illinois 60601,
6        1-312-558-5755), by:
7   MR. SAMUEL MENDENHALL,
8        smendenhall@winston.com,
9           appeared on behalf of Defendant
10          Chicago Housing Authority;
11
12       JOHNSON, JONES, SNELLING & GILBERT,
13       (36 South Wabash Avenue, Suite 1310,
14       Chicago, Illinois 60603,
15       1-312-578-8100) by:
16  MR. JEFFREY B. GILBERT,
17       jgilbert@jjsgd.com,
18          appeared on behalf of Defendant
19          Holsten Management Corporation;
20
21
22
23
24

Page 4

1   PRESENT (Continued):
2
3        LOEVY & LOEVY,
4        (312 North May Street, Suite 100,
5        Chicago, Illinois 60607,
6        1-312-243-5900), by:
7   MS. SAMANTHA LISKOW,
8        samantha@loevy.com,
9           appeared on behalf of Plaintiffs in the
10          related Stubenfield matter;
11
12       LAW OFFICES OF FIGLIULO & SILVERMAN,
13       (10 South LaSalle Street, Suite 3600,
14       Chicago, Illinois 60603,
15       1-312-251-5281), by:
16  MS. STEPHANIE D. JONES,
17       sjones@fslegal.com,
18          appeared on behalf of Defendant The
19          Community Builders in the related
20          Stubenfield matter.
21
22
23  REPORTED BY:  KRISTIN C. BRAJKOVICH,
24          CSR No. 84-3810.



1    (WHEREUPON, the witness was duly
2    sworn.)
3    SHARNETTE BROWN,
4  called as a witness herein, having been first duly
5  sworn, was examined and testified as follows:
6    EXAMINATION
7  BY MS. SHELEY:
8    Q.  Can you please say your name.
9    A.  Sharnette Brown.
10   Q.  Have you ever been deposed before?
11   A.  No.
12   Q.  All right.  I'm going to walk through a
13 couple of ground rules then.  Just let me know if
14 you need to take a break.  As long as there's not a
15 question pending or a set of questions pending,
16 we'll take a break, and just let me know when you
17 need that.
18   A.  Okay.
19   Q.  If you need to get water, feel free to
20 get up and get some.  We have coffee over here too.
21      We want to make sure that we speak one
22 at a time so that the court reporter, who is here,
23 can write down all of our answers.
24   A.  Uh-huh.

1    Q.  Will you do that?
2    A.  Yes.
3    Q.  And will you also -- I know it's hard,
4  but it would be better if you say yes or no instead
5  of uh-huh or uhn-uhn, so that the court reporter
6  can write that down, too.  Is that okay?
7    A.  Yes.
8    Q.  Great.  If you don't understand a
9  question that I ask, please tell me.  Will you do
10 that?
11   A.  Yes.
12   Q.  Okay.  And did you bring any documents
13 with you today?
14   A.  No.
15   Q.  Okay.  Did you review any documents to
16 prepare for your deposition?
17   A.  No.
18   Q.  What did you do to prepare for your
19 deposition?  Don't tell me content of conversations
20 with counsel, but other than that, if you could
21 tell me what you did to prepare.
22   A.  Just sat with counsel and he
23 explained --
24   MR. MENDENHALL:  Okay.  That is it right

1  there.  You just simply say you met with counsel.
2  That is all she's entitled to.
3  BY MS. SHELEY:
4    Q.  Did you meet with anyone other than
5  counsel?
6    A.  No.
7    Q.  Did you conduct any interviews within
8  the CHA?
9    A.  No.
10   MS. SHELEY:  Ingrid, could you pull out the
11 exhibits and figure out what is the last number
12 that we had marked at the last deposition in the
13 yellow binder.
14   MS. BERGSTROM:  11.
15   THE WITNESS:  I would like to get coffee.
16   MS. SHELEY:  Get coffee while we are doing
17 this.
18      (WHEREUPON, a certain document was
19      marked Deposition Exhibit No. 12,
20      for identification.)
21 BY MS. SHELEY:
22   Q.  Okay.  I'm handing you what has been
23 marked as Exhibit 12.  It's titled Third Amended
24 Notice of Rule 30(b)(6) Deposition to CHA.  Have

1  you seen this document before?
2    A.  I do not recall.
3    Q.  Okay.  Do you understand that you are
4  here to testify on behalf of the CHA based on a
5  30(b)(6) notice?
6    A.  Yes.
7    Q.  Okay.  Thank you.
8    MR. MENDENHALL:  Karen, let me just enter for
9  the record, that in response to that third amended
10 rule deposition notice, CHA filed a -- CHA served a
11 set of objections on plaintiff.
12   MS. SHELEY:  And you filed that last night at
13 6:00 o'clock.
14   MR. MENDENHALL:  I did not file anything.
15   MS. SHELEY:  Well, you served it last night at
16 6:00 o'clock.
17 BY MS. SHELEY:
18   Q.  Ms. Brown, are you employed at the CHA?
19   A.  Yes.
20   Q.  What is your title?
21   A.  Development manager.
22   Q.  What do you do as the development
23 manager?
24   A.  Work with developers to build new



1 mixed-income housing.
2    Q.    How long have you had that title?
3    A.    Ten years.
4    Q.    And what are your duties as a
5 development manager?
6    A.    I'm basically a project manager, work to
7 procure developers, to do the planning for the
8 sites, work through the entitlement process, and
9 work through oversight of construction.
10    Q.    Do you have involvement with the
11 mixed-income communities after they have been
12 constructed?
13    A.    No.  That is handed off to someone else,
14 another department.
15    Q.    What department is that?
16    A.    Asset management.
17    Q.    Were you employed by the CHA before you
18 had that title?
19    A.    Yes.
20    Q.    What was your title before development
21 manager?
22    A.    Project coordinator.
23    Q.    And what were your duties as a project
24 coordinator?

1    A.    Work on environmental issues on
2 traditional public housing sites.
3    Q.    What was your involvement at Parkside?
4    A.    Development manager, so I came in and
5 started working with the developer to get to a
6 closing for construction.
7    Q.    Were you involved at the very beginning
8 of the project?
9    A.    No.
10    Q.    Who was involved at the beginning of the
11 project?
12    A.    I do not know.
13    Q.    What is your highest educational degree?
14    A.    Bachelor's.
15    Q.    And when did you get a bachelor's?
16    A.    1994.
17    Q.    Where is your bachelor's from?
18    A.    Indiana State University.
19    Q.    And what is the degree?
20    A.    Safety management.
21    MS. SHELEY:  Could you mark this 13.
22         (WHEREUPON, a certain document was
23          marked Deposition Exhibit No. 13,
24          for identification.)

1 BY MS. SHELEY:
2    Q.    You have been handed what is marked
3 Exhibit 13.  Do you recognize this document?
4    A.    Yes.
5    Q.    What is it?
6    A.    It's a map showing the existing
7 mixed-income properties in the Cabrini area.
8    Q.    And do you see Parkside of Old Town on
9 that map marked?
10    A.    Yes.
11    Q.    Okay.  So when we talk about Parkside of
12 Old Town for the rest of the deposition, is this --
13 can we agree that this is the development that we
14 are talking about?
15    A.    Yes.
16    MR. MENDENHALL:  Excuse me one second.  Do I
17 get a copy, Adam?
18    MR. SCHWARTZ:  Oh, I'm sorry.  I failed to
19 give you one.
20    MR. MENDENHALL:  Sorry about that, Ms. Sheley.
21    MR. SCHWARTZ:  It was my mistake, Sam.
22 BY MS. SHELEY:
23    Q.    Can you describe the buildings that are
24 at that development?

1    A.    There are currently four midrise
2 buildings and interior townhomes, two- and
3 three-story townhomes.
4    Q.    And is Parkside one of the mixed-income
5 developments that you were talking about?
6    A.    Yes.
7    Q.    And what does it mean for it to be a
8 mixed-income development?
9    A.    Mixed-income means it's a market rate
10 component, an affordable component, and a public
11 housing component.
12    Q.    And was it built through a HUD program?
13    A.    Yes.
14    Q.    What is that HUD program?
15    A.    Well, it was built through the
16 revitalization through the Hope VI program.
17    Q.    And can you tell me the total number of
18 units that are in Parkside of Old Town?
19    MR. MENDENHALL:  Object to the form of the
20 question.
21 BY THE WITNESS:
22    A.    I do not know.
23 BY MS. SHELEY:
24    Q.    Okay.  Do you know the total number of



Page 13

1  CHA assisted units that are in Parkside of Old
2  Town?
3     A.   Yes.
4     Q.   How many are there?
5     A.   146.
6     Q.   Okay.  If you wanted to know the total
7  number of units that are in Parkside of Old Town,
8  would you be able to find out?
9     A.   Yes.
10    Q.   How would you find out?
11    A.   Documents that I have.
12    Q.   What documents are those?
13    A.   The project documents.
14    Q.   Do you have a more specific name for any
15  of the project documents?
16    A.   The master development agreement.
17    Q.   Do you report those numbers to HUD?
18    A.   Yes.
19    Q.   Are those numbers then also in the
20  reports that you give to HUD?
21    A.   Yes.
22    Q.   Is there a name for the document that
23  you are giving to HUD?
24    A.   It's an electronic system.  It's a

Page 14

1  Hope VI reporting system.
2     Q.   Do you have access to the reports that
3  you have given to HUD?
4     A.   Yes.
5     Q.   Do you give that information to HUD for
6  other mixed-income developments as well?
7     MR. MENDENHALL:  I'm going to object.
8  BY THE WITNESS:
9     A.   No, I do not.
10    MR. MENDENHALL:  Okay.  Whenever I object, let
11  me get my objection in.  We are here today on
12  Parkside, Ms. Sheley.  We are not getting into the
13  other mixed-income developments.  Judge Coleman's
14  December 13th order was clear that class discovery
15  is not allowed, so I'm shutting this down,
16  questions about other mixed-income development.
17  BY MS. SHELEY:
18    Q.   Will you answer the question?
19    MR. MENDENHALL:  I'm instructing you not to
20  answer.
21  BY MS. SHELEY:
22    Q.   So will you answer the question?
23    A.   No.
24    Q.   Okay.  Do you have access to the other

Page 15

1  Cabrini-Green area mixed-income development unit
2  numbers?
3     A.   Yes.
4     Q.   Do you know the total number of units
5  that are in Old Town Village West?
6     MR. MENDENHALL:  Object, instruct you not to
7  answer.
8  BY MS. SHELEY:
9     Q.   Will you answer the question?
10    A.   No.
11    Q.   Do you know the total number of units in
12  River Village North?
13    MR. MENDENHALL:  Same instruction.
14  BY MS. SHELEY:
15    Q.   Will you answer the question?
16    A.   No.
17    Q.   Do you know the total number of CHA
18  units in either of these -- in either -- in -- let
19  me start again.
20         Do you know the total number of CHA
21  units in River Village North?
22    MR. MENDENHALL:  Same objection, same
23  instruction.
24

Page 16

1  BY MS. SHELEY:
2     Q.   Will you answer the question?
3     A.   No.
4     Q.   Do you know the total number of units in
5  North Town Village?
6     A.   No.
7     Q.   Would you be able to find that
8  information out?
9     A.   Yes.
10    Q.   Okay.  And do you know the number of CHA
11  units in North Town Village?
12    A.   No.
13    MR. MENDENHALL:  Same.  Same objection.
14  BY MS. SHELEY:
15    Q.   Okay.  Just to be clear, when I asked
16  about North Town Village, were you saying that you
17  would not answer the question or were you saying
18  that you didn't know?
19    MR. MENDENHALL:  And I instruct you not to
20  answer.
21  BY MS. SHELEY:
22    Q.   Will you answer that question?
23    A.   No.
24    Q.   Okay.  Can you tell me does Parkside of



Page 17

1  Old Town have a policy of drug testing its
2  residents?
3     A.   Yes.
4     Q.   Do you know if other developments in the
5  Cabrini-Green area also drug test their residents?
6     A.   No.
7     Q.   So do you know whether River Village
8  North drug tests its residents?
9     MR. MENDENHALL:  And I'm instructing you not
10 to answer.
11 BY MS. SHELEY:
12    Q.   Will you answer the question?
13    A.   No.
14    Q.   Does North Town Village have a policy of
15 drug testing its residents?
16    MR. MENDENHALL:  Same instruction.
17 BY MS. SHELEY:
18    Q.   Will you answer the question?
19    A.   No.
20    Q.   Okay.  So the ground where Parkside
21 stands today, it used to be part of the site of
22 Cabrini Extension North; is that right?
23    A.   Yes.
24    Q.   And that was a traditional public

Page 18

1  housing development owned by the CHA; is that -- is
2  that correct?
3     A.   Yes.
4     Q.   Does CHA still own the land under
5  Parkside?
6     A.   Yes.
7     Q.   And why does it still own the land under
8  Parkside?
9     MR. MENDENHALL:  Object to the form of the
10 question.  If you know.
11 BY MS. SHELEY:
12    Q.   Can you please answer the question?
13    A.   No.
14    Q.   Do you not know?
15    A.   No, I don't.
16    Q.   Okay.
17    MR. MENDENHALL:  Let me just state on the
18 record my basis for the objection, when I
19 instructed the witness not to answer, in case we do
20 go before the Court.  Rule 30(c)(2) of the Federal
21 Rules of Civil Procedure says, "A person may
22 instruct a deponent not to answer only when
23 necessary to preserve a privilege to enforce a
24 limitation ordered by the Court or to present a

Page 19

1  motion under Rule 30(d)(3)."
2     I am specifically instructing the
3  witness not to answer because Judge Coleman said
4  that class discovery was not allowed, she entered
5  and continued a class motion.
6     Discovery is only relevant as to the
7  preliminary injunction as to Parkside and
8  Mr. Peery's constitutional claim.
9     So 30(c)(2) is the basis of my objection
10 under the Federal Rules of Civil Procedure.
11    Please continue, Ms. Sheley.
12    MS. SHELEY:  I would also like to state that
13 we believe these questions are relevant to the
14 preliminary injunction hearing.  We believe that
15 comparisons to other buildings will shed light on
16 the CHA's assertion of special needs, and we also
17 think that it's relevant to understanding the ways
18 that the developments were created.
19    So with that, I'm going to also ask
20 that, you know, counsel not make speaking
21 objections and that we can go back to the
22 deposition.
23    MR. MENDENHALL:  I did not make a speaking
24 objection.  I put the basis for the objection on

Page 20

1  the record, Counsel.
2  BY MS. SHELEY:
3     Q.   Ms. Brown, how long is -- is there a
4  lease for Parkside of Old Town?
5     A.   Could you be more specific?
6     Q.   Is there a lease for the land for
7  Parkside of Old Town?
8     A.   Yes.
9     Q.   And what is that lease?
10    A.   A 99-year ground lease.
11    Q.   Who is the lease with?
12    A.   Holsten.
13    Q.   Are there any other parties to the
14 lease?
15    A.   It's the developer entity.
16    Q.   So it's a lease between the CHA and
17 Holsten?
18    A.   And the developer entity, which Holsten
19 is a partner.
20    Q.   What is the rent term of the lease?
21    MR. MENDENHALL:  Let me just object to this
22 line of questioning.  The document speaks for
23 itself.  If you know the terms, please answer.
24



Page 21

1 BY MS. SHELEY:
2   Q.   Can you answer, please?
3   A.   No, I don't know.
4   Q.   Okay.  Do you know what happens when the
5 99-year lease ends?
6   A.   No.
7   Q.   What would tell you -- if you wanted to
8 know what happened when the 99-year lease ends,
9 what would you do?
10   A.   Look at the ground lease.
11   MS. SHELEY:  Okay.  Could you please mark this
12 exhibit.
13       (WHEREUPON, a certain document was
14       marked Deposition Exhibit No. 14,
15       for identification.)
16 BY MS. SHELEY:
17   Q.   You have just been handed an exhibit
18 which is marked 14.  The Bates range is
19 CHA_PEER 888 through 972.  What is this document?
20   A.   The ground lease.
21   Q.   The ground lease that we were just
22 discussing that is between CHA and the developer?
23   A.   Yes.
24   Q.   Okay.  Can you turn to what is marked

Page 22

1 page 2 of this document, and paragraph A, does this
2 explain what happens to the land at the end of the
3 99-year term?
4   MR. MENDENHALL:  Ms. Brown, review it, if you
5 need to to answer her question.
6 BY THE WITNESS:
7   A.   Repeat the question.
8 BY MS. SHELEY:
9   Q.   Does this explain what will happen to
10 the land at the end of the 99-year lease?
11   A.   Yes, it explains the purchase option.
12   Q.   And what is the purchase option?
13   A.   I would have to read through this.
14   CHA has the option to purchase the land
15 at the end of the lease for fair market value.
16   Q.   Were you involved in the creation of
17 this document?
18   A.   No.  I was a project manager.  No, legal
19 drafts this.
20   MR. MENDENHALL:  Just answer the question
21 asked, Ms. Brown.
22 BY MS. SHELEY:
23   Q.   Can you turn to page 15.  Can you look
24 at Section 3.1.  Does Section 3.1 define the rent

Page 23

1 in the lease?
2   A.   Yes.
3   Q.   And is it $99 for the full term of the
4 lease?
5   A.   Yes.
6   Q.   Are you aware of any other payments that
7 are made for the use of the land under the lease?
8   A.   No.
9   Q.   Thank you.  I'm going to take this
10 document back.
11       Actually, was this document for all of
12 the phases of Parkside?
13   A.   I need to look at the document again.
14   Q.   Sure.  I'm handing you Exhibit 14 again.
15       Does Exhibit 14 control all of the
16 phases of Parkside?
17   A.   No.
18   Q.   Which phase of Parkside does it control?
19   A.   Phase I - Townhomes.
20   Q.   Okay.  And do you know what -- the other
21 phases of Parkside that this lease does not
22 control?  Do you know the names -- let me try that
23 again.
24       Do you know the names of the other

Page 24

1 phases of Parkside that this document does not
2 control?
3   A.   Yes.
4   Q.   What are they?
5   A.   Phase I - Condo, Phase I-B - Rental,
6 Phase II-A - Rental.
7   Q.   Do those phases also have documents
8 associated with them to -- as leases for the land
9 beneath those buildings?
10   A.   Yes.
11   Q.   Okay.  And are there -- are the terms of
12 the rent in those documents controlling of the
13 amount of rent paid for the --
14   MR. MENDENHALL:  Finish your question before I
15 state my objection.
16 BY MS. SHELEY:
17   Q.   Do the leases for those phases control
18 the amount of rent that is paid to the CHA by the
19 developer?
20   MR. MENDENHALL:  Object to the form of the
21 question.  The document speaks for itself, calls
22 for a legal conclusion.  If you know, please
23 answer.
24



Page 25

1 BY THE WITNESS:
2    A.   Yes.
3 BY MS. SHELEY:
4    Q.   Do those documents for the other phases
5 also control what happens to the land at the end of
6 the 99-year lease?
7    MR. MENDENHALL:  Same objection.  If you know.
8 BY THE WITNESS:
9    A.   Yes.
10 BY MS. SHELEY:
11    Q.   Currently who owns Parkside itself?
12    MR. MENDENHALL:  Objection, vague.  Any
13 particular phase, Counsel?
14 BY MS. SHELEY:
15    Q.   Can you answer the question?
16    A.   It needs to be more specific.
17    Q.   Okay.  Who owns the land?
18    A.   CHA.
19    Q.   Who owns -- in Phase I, who owns the
20 building?
21    A.   The developer.
22    Q.   Who owns the condo units?
23    A.   The homeowners themselves.
24    Q.   Who owns the rental units?

Page 26

1    A.   The developer.
2    Q.   Who owns the hallways?
3    A.   The developer.
4    Q.   Who owns the other common areas like
5 lobbies and common rooms?
6    A.   The developer and homeowners.
7    Q.   Okay.  And the other phases of Parkside
8 involve -- do they involve rental units?
9    A.   Yes.
10    Q.   Do they -- and who owns the land in
11 those phases of Parkside?
12    A.   CHA.
13    Q.   Who owns the building in those phases of
14 Parkside?
15    A.   The developer.
16    Q.   Who owns the common areas?
17    A.   The developer.
18    MS. SHELEY:  Could you please mark this
19 exhibit.
20         (WHEREUPON, a certain document was
21         marked Deposition Exhibit No. 15,
22         for identification.)
23 BY MS. SHELEY:
24    Q.   You have been handed what has been

Page 27

1 marked as Exhibit 15.  The Bates stamp range is
2 CHA_PEER-000189 through 000387.  Do you recognize
3 this document?
4    A.   Yes.
5    Q.   What is it?
6    A.   Moving to Work, Annual Report.
7    Q.   It's from the year 2008; is that right?
8    A.   Yes.
9    Q.   Okay.  What is the purpose of this
10 report?
11    MR. MENDENHALL:  Object to the form.
12 BY THE WITNESS:
13    A.   It outlines CHA's annual activities for
14 2008.
15 BY MS. SHELEY:
16    Q.   Are you required to provide this
17 document to HUD?
18    A.   I don't know.
19    Q.   Can you turn to the page Bates stamped
20 CHA_PEER-000382.  Is this a certification from the
21 CHA approving this report?
22         I'll turn your attention to the first
23 "that" on the right-hand side, which says, "The
24 Board of Commissioners hereby approves the attached

Page 28

1 FY2008 Moving to Work, Annual Report, and grants
2 authorization to the chief executive officer, the
3 board chairperson, or their designee to make any
4 final changes deemed necessary."
5    MR. MENDENHALL:  I'm just going to object to
6 the form of the question, "certification."  But you
7 can answer, if you can, Ms. Brown.
8 BY THE WITNESS:
9    A.   What was the question?  Repeat the
10 question.
11 BY MS. SHELEY:
12    Q.   Is this a certification that --
13    A.   I don't know.
14    Q.   Okay.  Did the Board of Commissioners
15 approve this report?
16    A.   Yes.
17    Q.   And in the first paragraph under
18 Explanation, it states that, "FY2008 MTW Annual
19 Report provides information necessary for HUD to
20 assess the CHA's performance in 2008 regarding both
21 day-to-day operations and activities authorized by
22 the MTW Demonstration Program."
23         It states that, doesn't it?
24    A.   Yes, it does state that.



Page 29

1    Q.    And is this report provided to HUD?
2        MR. MENDENHALL:  If you know.  If you don't
3   know, you don't.
4   BY THE WITNESS:
5        A.   I don't.
6   BY MS. SHELEY:
7        Q.    Okay.  How would you find out whether it
8   was provided to HUD?
9        A.   I would have to ask the appropriate
10  department.
11       Q.    Which department is that?
12       A.   Planning and Reporting.
13       Q.    Is there a particular person you would
14  ask in that department?
15       A.   Yes.
16       Q.    Does the CHA try to -- does the -- let
17  me start again.
18           Does the CHA provide accurate
19  information to HUD when it files required reports?
20       A.   I don't know.
21       Q.    You don't know whether the CHA
22  provides --
23       A.   I would think it would be, but I would
24  be making an assumption.  I would hope we would,

Page 30

1   but I don't know.  I don't do the reports.
2        Q.    So do you ever provide documentation to
3   HUD that is required under the Moving to Work
4   agreements?
5        A.   I do not know what is required under the
6   Moving to Work agreements.
7        Q.    Okay.  I would like to turn your
8   attention to the Bates stamp page 206.  I would
9   like you to take a look at the first paragraph on
10  206.  It starts with, "While CHA recognizes."
11          It states that, "While CHA recognizes
12  that each mixed-income/mixed-finance community is
13  unique and requires narrowly tailored redevelopment
14  plans, every mixed-income/mixed-finance community
15  requires CHA to follow a series of interdependent
16  steps, which are crucial to the development of each
17  new community."
18          Do agree with that statement?
19       A.   Yes.
20       Q.    And can you take a look at the headings
21  for the next three -- four pages of the document.
22  Actually, let's break it down.
23          So would Create a Working Group be one
24  of the crucial steps that is required for the

Page 31

1   development of each new community?
2        MR. MENDENHALL:  Could you repeat the
3   question, Madam Court Reporter?
4           (WHEREUPON, the record was read by
5            the reporter.)
6        MR. MENDENHALL:  And I'm just going to object
7   to the form of the question.  Vague, "community."
8   BY MS. SHELEY:
9        Q.    Can you answer?
10       A.   No.
11       Q.    Okay.  Are working groups required for
12  each new mixed-income community?
13       MR. MENDENHALL:  Same objection.  Ms. Sheley,
14  if I could just get a clarification.  Are you using
15  mixed-income development and mixed-income --
16       MS. SHELEY:  Can you please make your
17  objection and not make a speaking objection.
18       MR. MENDENHALL:  Let's go off the record then.
19  Because here is the thing, rather than go through
20  and object to your whole development, it says,
21  Mixed-income development here.  You are saying
22  community.
23       MS. SHELEY:  I don't want to go off the
24  record.  I would like to be on the record.

Page 32

1        MR. MENDENHALL:  If you are using it as the
2   same, I'm not going to object every time, if we get
3   a clarification as to that.
4        MR. SCHWARTZ:  I just want to say that I'm the
5   second chair, and you should direct your comment to
6   Karen.
7   BY MS. SHELEY:
8        Q.    Ms. Brown, can you answer the question?
9        A.   Repeat the question, please.
10       Q.    Is it necessary -- is it a crucial step
11  to the creation of mixed-income/mixed finance
12  communities to create a working group?
13       MR. MENDENHALL:  Same objection.  "Community"
14  is undefined.
15  BY THE WITNESS:
16       A.   Yes.
17  BY MS. SHELEY:
18       Q.    Okay.  Why is that?  Ms. Brown, why is
19  that?
20       A.   I cannot answer that question.
21       Q.    Do you create a working group before the
22  development of each mixed-income community --
23  development?
24       A.   No.



Page 33

1    Q.   Did you do that for Parkside?
2    A.   No.
3    Q.   Did the CHA?
4    A.   No.
5    Q.   Was there a working group for Parkside?
6    A.   Yes.
7    Q.   How was it created?
8    A.   Consent decree.
9    Q.   Can you explain that process?
10   A.   Could you be clearer on which process?
11   Q.   How did the working group come out of
12 the consent decree?
13   A.   The consent decree stipulated that there
14 would be a working group formed and the members of
15 the working group.
16   Q.   And what were -- at the beginning of
17 when -- at the beginning of the process for the
18 development, who were the members of the working
19 group?
20   A.   CHA, the City of Chicago, the Cabrini
21 LAC, Habitat, as the receiver for CHA, and BPI.
22   Q.   Has the composition of the working
23 group -- has the composition of the working group
24 changed since that original composition?

Page 34

1    A.   Yes.
2    Q.   Who is in it now?  How has it changed?
3    A.   Habitat is no longer a member of the
4 working group.
5    Q.   Have there been any other additions?
6    A.   No.
7    Q.   Okay.  What does the working group do?
8    MR. MENDENHALL:  The witness needs to clarify.
9 She misspoke with an answer.
10 BY MS. SHELEY:
11   Q.   Okay.  What did you miss -- what do you
12 need to clarify?
13   A.   The working group is not specific to
14 Parkside.  It's for the near north community area.
15   Q.   Okay.  What role did the working group
16 have in developing Parkside?
17   A.   They participated in the development of
18 the RFP and the selection of the developer.
19   Q.   What is the RFP?
20   A.   Request for proposals.
21   Q.   What did they -- what did the working
22 group do to have the request for proposals?
23   A.   They participate in the drafting of the
24 language for the proposal.

Page 35

1    Q.   What role did the CHA have in drafting
2 the language for the proposal?
3    A.   They are a member of the working group,
4 so they participated in the drafting of the
5 language.
6    Q.   Were you a member of the working group
7 at that time?
8    A.   No.
9    Q.   Do you know who was?
10   A.   The members were BPI, Habitat, CHA, the
11 City of Chicago, and the Cabrini LAC.
12   Q.   Do you know who was the representative
13 for the CHA in the working group?
14   A.   No.
15   Q.   What was the working group's role in
16 selecting the developer?
17   A.   Evaluation of the proposals.
18   Q.   How were the proposals evaluated?
19   A.   I do not know.
20   Q.   What was the CHA's role in evaluating
21 the proposals by the developers?
22   A.   They are one of the voting members.
23   Q.   Did the CHA have an independent review
24 outside of the working group to review the

Page 36

1 selection of the developer?
2    A.   I do not know.
3    Q.   What other responsibilities does the --
4 other than requesting the proposals and selecting
5 the developer, what other responsibilities does the
6 working group have?
7    A.   Participate in oversight of
8 redevelopment activities.
9    Q.   What are redevelopment activities?
10   A.   Selection of developers, monitoring
11 construction activities.
12   Q.   Okay.  Does the working group have other
13 responsibilities?
14   MR. MENDENHALL:  Object to the form of the
15 question, vague.
16 BY THE WITNESS:
17   A.   Selection of developers, review of
18 proposals, planning.
19 BY MS. SHELEY:
20   Q.   What does "monitoring construction"
21 mean?
22   A.   Review the status of construction.
23   Q.   And how does the working group do that?
24   A.   In updates provided to the working



Page 37

1    group.
2       Q.    Is that a report?
3       A.    No.
4       Q.    How is an updated provided to the
5    working group?
6       A.    Verbally.
7       Q.    Who provides the update to the working
8    group?
9       A.    The CHA representative.
10      Q.    Why is it the CHA representative that
11   provides the update to the working group?
12      A.    CHA receives the reports on the
13   construction status.
14      Q.    Who does CHA receive the reports on the
15   construction status from?
16      A.    The Habitat Company.
17      Q.    Okay.  Does the CHA -- does the working
18   group also work on the creation of jobs in the
19   area?
20      A.    Yes.  They have input.
21      Q.    What is the role of the CHA in providing
22   input on the creation of jobs?
23      A.    Could you repeat that question?
24      Q.    What role does the CHA have in providing

Page 38

1    input on the creation of jobs in the area?
2       MR. MENDENHALL:  I'm just going to object to
3    the form, relevancy.
4    BY THE WITNESS:
5       A.    CHA requires jobs on any activities
6    where we have federal funds.
7    BY MS. SHELEY:
8       Q.    And how do they go about ensuring that
9    there are jobs?
10      A.    There is a compliance department.
11      Q.    And is the mixed-income developments, is
12   that one of the places where they require jobs?
13      A.    Yes.
14      Q.    So are they required to have jobs at
15   Parkside?
16      A.    Yes, under construction, where the
17   dollars went in.
18      Q.    Okay.  Are those jobs for CHA residents?
19      A.    CHA residents are included, yes.
20      Q.    Does the working group also work on the
21   provision of employment training?
22      A.    They provide input.
23      Q.    Okay.  What input do they provide?
24      A.    Recommendations.

Page 39

1       Q.    Do you know what kind of recommendations
2    the working group put on the provision of
3    employment training for Parkside?
4       A.    No.
5       Q.    Does the working group also work on the
6    provision of social services?
7       A.    They provide input.
8       Q.    What does it mean to provide input?
9       A.    They provide recommendations.
10      Q.    What kind of recommendations do they
11   provide?
12      A.    On -- it could be any organization that
13   we could possibly partner with, ideas on different
14   types of services that may be needed in the area.
15      Q.    And what is the CHA's role on the
16   provision of -- on providing recommendations and
17   the provision of social services?
18      A.    CHA has a department that specifically
19   works for social services and does contracts.
20      Q.    Okay.  How often does the working group
21   currently meet?
22      A.    Once a month.
23      Q.    Does the working group still discuss
24   Parkside?

Page 40

1       A.    Yes.
2       Q.    Does it discuss the buildings that are
3    already completed?
4       A.    Yes.
5       Q.    What are the subjects of the discussions
6    for completed buildings?
7       A.    LAC may arrive with complaints or issues
8    with property management.
9       Q.    How does the working group solve
10   disagreements?
11      MR. MENDENHALL:  Object to the form of the
12   question.
13   BY THE WITNESS:
14      A.    The working group provides a
15   recommendation to CHA, and CHA makes a decision.
16   BY MS. SHELEY:
17      Q.    Okay.  Does the -- could you please
18   describe the CHA's role in the creation of the
19   lease at Parkside?
20      A.    CHA provides a minimum -- and, actually,
21   I'm confusing that with something else, so I
22   apologize.  No.
23      Q.    Do you know whether the CHA has a role
24   in the creation of the lease at Parkside?



Page 41

1    A.    If we have a role in the creation of the
2  lease?
3    Q.    Yes.
4    MR. MENDENHALL:  I'm just going to object to
5  the form of the question.  If you know, you know.
6  If you don't, you don't.
7    MS. SHELEY:  Can I please ask that you not
8  make speaking objections.
9  BY THE WITNESS:
10   A.    Yes.
11 BY MS. SHELEY:
12   Q.    What is the CHA's role in the creation
13 of the lease at Parkside?
14   A.    Make sure it complies with the Chicago
15 ordinance and HUD requirements.
16   Q.    Okay.  What are the HUD requirements?
17   A.    I don't know.
18   Q.    What does the CHA do to ensure that it
19 complies with the Chicago ordinance and the HUD
20 requirements?
21   A.    CHA legal reviews.
22   Q.    Is the lease also presented to the
23 working group?
24   A.    I can't answer that.  It's not a blanket

Page 42

1  answer.
2    Q.    Well, can you explain what the working
3  group's role is in --
4    A.    The working group does not get into
5  details on any management documents or any
6  documents pertaining to closing.
7    Q.    Does that include the lease?
8    A.    That includes the lease.
9    Q.    So does the CHA have a role in the
10 tenant selection plan at Parkside?
11   A.    Yes.
12   Q.    What role does the CHA have in the
13 tenant selection plan at Parkside?
14   A.    The CHA provides the minimum tenant
15 selection plan.
16   Q.    Okay.  And what happens once they
17 provide the minimum tenant selection plan?
18   A.    The developer reviews and provides any
19 additional requirements they may have.
20   Q.    What happens next?
21   A.    It goes out for public comment, and the
22 CHA board approves.
23   Q.    I'm going to pull a document.
24   MS. SHELEY:  Could you please mark this

Page 43

1  document.
2    (WHEREUPON, a certain document was
3    marked Deposition Exhibit No. 16,
4    for identification.)
5  BY MS. SHELEY:
6    Q.    Do you recognize this document?
7    A.    Yes.
8    Q.    So you have been handed Exhibit No. 16.
9  It's CHA_PEER-000737 through 796.  What is
10 Exhibit 16?
11   A.    Mixed-Finance Amendment to Consolidated
12 Annual Contributions Contract.
13   Q.    Okay.  Are you familiar with this
14 document?
15   A.    Yes.
16   Q.    Is this one of the documents that is
17 associated with the closing of mixed-income
18 developments?
19   A.    Yes.
20   Q.    Could you turn to page 740 and look at
21 paragraph 6.  Before reading it, does the CHA have
22 an obligation to HUD to ensure that the leases and
23 the tenant selection plans at mixed-income
24 developments comply with federal law?

Page 44

1    MR. MENDENHALL:  Objection to the form of the
2  question.
3  BY THE WITNESS:
4    A.    Repeat the question.
5    MS. SHELEY:  Can you repeat it for me?
6    (WHEREUPON, the record was read by
7    the reporter.)
8    MR. MENDENHALL:  I renew my objection, calls
9  for a legal conclusion.
10 BY THE WITNESS:
11   A.    I can't attest to that.
12 BY MS. SHELEY:
13   Q.    Could you please take a look at
14 paragraph 6, and I'm going to direct you to the
15 first -- could you take a look at the paragraph.
16 Tell me when you are finished.
17   Have you finished reading paragraph 6?
18   A.    Yes.
19   Q.    Does paragraph 6 assist your memory at
20 all in whether the CHA has an obligation to HUD to
21 ensure that the tenant selection plans and leases
22 comply with federal law?
23   MR. MENDENHALL:  Same objection, calls for a
24 legal conclusion.  The document speaks for itself.

ESQUIRE
SOLUTIONS

Page 45

MS. SHELEY: Sam, again, I'm going to ask for you not to make speaking objections.
MR. MENDENHALL: That is not a speaking objection, Counsel. That is a proper objection. And I don't need you to lecture me about how to do depositions. I have been doing them longer than you, Counsel.
MS. SHELEY: Can you mark that, please.
(WHEREUPON, a certain document was marked Deposition Exhibit No. 17, for identification.)
BY MS. SHELEY:
Q. Ms. Brown, does that assist your memory?
A. No.
Q. Okay. If there is a -- so the first step in the process is that CHA provides the tenant selection plan to the developer; is that right?
A. A minimum tenant selection plan.
Q. Okay. And what is the process if a developer wishes to make changes to the minimum tenant selection plan?
A. The developer provides those changes to CHA, they review them to make sure that they are in accordance with HUD guidelines, and, if so, it's

Page 46

published for public notice and it's adopted by the CHA Board after that.
Q. Has CHA ever rejected any of the changes that were made by the developer?
A. I do not know.
Q. Has -- is CHA responsible -- I have -- I'm trying to ask a question, Sam.
Ms. Brown, is CHA responsible for facilitating the public comment period?
A. Yes.
Q. What does the CHA do to facilitate the public comment period?
A. There is a notice made to the public. The document is put out for public comment. There's a hearing held, and comments are responded to that are submitted.
Q. Okay. Does the CHA respond to the comments that are made by members of the public?
A. Yes.
Q. What does the CHA do to respond to the comments made by the members of the public?
A. Could you be more specific?
Q. Once the comments are made, does the CHA respond to members of the public about comments on

Page 47

the tenant selection plan?
A. They respond to the comments. How the response is made, I don't know.
Q. Have they ever made changes based on comments during the comment period?
A. In reference to Parkside, I do not know.
Q. What about at other developments where this process occurs?
MR. MENDENHALL: Objection. Instruct the witness not to answer.
BY MS. SHELEY:
Q. Will you answer the question?
A. No.
Q. Could I have that document back, please. We are just going to take a moment. We are going to take a five-minute break, and you can have your lunch and we can be back on the record.
It's 12:59 right now. We'll resume at about 1:05.
(WHEREUPON, a recess was had.)
MS. SHELEY: Do the people who entered after we started want to put their names on the record?
MR. SCHMITT: I guess begin with me. It's Eric Schmitt.

Page 48

MR. BRUCE: William Bruce.
MS. LISKOW: Samantha Liskow, L-i-s-k-o-w.
BY MS. SHELEY:
Q. I'm going to hand you Exhibit 15. Can you turn to the Bates stamped page 207?
MR. GILBERT: I'm sorry. Which one are we looking at, 15?
MS. SHELEY: Yes, the Moving to Work document, Bates stamp page 207.
MR. GILBERT: Thank you.
BY MS. SHELEY:
Q. Under the heading, Draft a Tenant Selection Plan and Lease, it says, "The master developer in consultation with the working group is in charge of creating the criteria for admissions." Is that accurate?
A. Yes.
Q. Could you describe that process as to Parkside?
A. Yes. The developer created the tenant selection plan, they provided copies to the working group.
Q. What happened next?
A. The developer moves forward.

Page 49

1    Q.   What did the working group do?
2    A.   Reviewed the documents.
3    Q.   Did they make any comments?
4    A.   I do not recall.
5    Q.   Did the CHA make any comments on the
6  tenant selection plan?
7    A.   I do not recall.
8    Q.   Okay.
9    Q.   You have been handed what has been
10  marked Exhibit 17.  It's CHA_PEER-001737 through
11  1739.  Do you recognize this document?
12   A.   No.
13   Q.   Okay.  Could you tell me anything about
14  the content of this document?
15   A.   I need a moment.
16   Q.   Okay.  Set the document down for a
17  second, please.
18       Other than reading it, do you have any
19  knowledge about this document?
20   A.   No.
21   Q.   This letter is a letter from the Legal
22  Assistance Foundation to the Chicago Housing
23  Authority, isn't it?
24       MR. MENDENHALL:  She's still reviewing it,

Page 50

1  Counsel.  You said you would give her a chance to
2  review it.  When you are done reviewing it, let
3  Ms. Sheley know.
4  BY THE WITNESS:
5    A.   Okay.
6       MS. SHELEY:  Could you repeat my last
7  question?
8       (WHEREUPON, the record was read by
9        the reporter.)
10  BY THE WITNESS:
11   A.   Yes.
12  BY MS. SHELEY:
13   Q.   And the letter lists several objections
14  to the Parkside draft TSP and lease, correct?
15   A.   Yes.
16   Q.   Why did they send the CHA this letter?
17       MR. MENDENHALL:  Object to the form of the
18  question.
19  BY THE WITNESS:
20   A.   I don't know.
21  BY MS. SHELEY:
22   Q.   Did the CHA make changes to the draft
23  TSP and lease based on this letter?
24   A.   I don't know.

Page 51

1    Q.   Who would know?
2    A.   The developer.
3    Q.   Who at the CHA -- who is Kellye Keyes?
4    A.   She was an employee of the Housing
5  Authority.
6    Q.   What was her role?
7    A.   I don't know her exact position.
8    Q.   Okay.  Do you know why she was sent this
9  letter?
10   A.   It -- no, I don't.
11   Q.   Do you have a guess as to why she was
12  sent this letter?
13       MR. MENDENHALL:  I instruct the witness not to
14  guess.  You are not required to guess.  If you
15  know, please let her know.  If you don't know, you
16  don't know.
17  BY THE WITNESS:
18   A.   I don't know.
19       MR. MENDENHALL:  Do not guess.
20  BY MS. SHELEY:
21   Q.   Can you answer the question?
22   A.   I don't know.
23   Q.   You don't know?
24   A.   No.

Page 52

1    Q.   If you were to guess, what basis would
2  you guess on?
3       MR. MENDENHALL:  Again, object to the form.
4  Do not guess.
5  BY MS. SHELEY:
6    Q.   Will you answer the question?
7    A.   Yes, I'll answer the question.  I don't
8  know.
9    Q.   Do you know what department Kellye Keyes
10  worked in?
11   A.   Management Analysis and Planning
12  Department.
13   Q.   Do you know if she was involved in the
14  negotiation of the TSP and the lease?
15   A.   No, she was not.
16   Q.   Do you know why this letter was sent to
17  the Chicago Housing Authority instead of the
18  developer?
19       MS. SHELEY:  Mr. Mendenhall, can I ask that I
20  get the response from the witness without your
21  interference, please.
22       MR. MENDENHALL:  Object to the form of the
23  question, misstates the document.
24       MS. SHELEY:  And I'll also ask that you not



1  make objections that are directing the witness'
2  answer.
3  BY THE WITNESS:
4      A.   No, I don't know.
5      MS. SHELEY:  Okay.  I'll take that back.
6  Thank you.  Okay.  Could I have this document
7  marked, please.
8           (WHEREUPON, a certain document was
9           marked Deposition Exhibit No. 18,
10          for identification.)
11 BY MS. SHELEY:
12     Q.   We have marked as 18 CHA_PEER-001733
13 through 1734.  Do you recognize this document?
14     A.   Yes.
15     Q.   What is it?
16     A.   CHA board resolution approving the lease
17 and tenant selection plan.
18     Q.   Okay.  If you look at the last paragraph
19 on the first page, there's a sentence that says,
20 "These documents have been subject to negotiation
21 among the CHA, the developer, and Cabrini-Green
22 LAC, and the documents are recommended as
23 acceptable."  Is that true?
24     A.   No.

1      Q.   Why is that not true?
2      A.   No negotiations.
3      Q.   Okay.  How is this document submitted to
4  the Board?
5      A.   There's a Board process, and there's a
6  package that is submitted.  The hard copy is
7  submitted to the Board members.
8      Q.   Who prepares this document?
9      A.   The development manager and legal.
10     Q.   And when you say "legal," do you mean
11 legal at Chicago Housing Authority?
12     A.   Yes.
13     Q.   When you say "development manager," do
14 you mean the development manager at the Chicago
15 Housing Authority?
16     A.   Yes.
17     Q.   Did you prepare this document?
18     A.   Yes, I worked with legal.
19     Q.   Why does it say that it was subject to
20 negotiation?
21     A.   Wrong terminology.  It's based on
22 complying with CHA's minimum tenant selection plan.
23     Q.   What does that mean?
24     A.   Complying with CHA's minimum tenant

1  selection plan?
2      Q.   What do you mean by "wrong terminology"?
3      A.   "Negotiation."  As I stated earlier, CHA
4  provides a minimum tenant selection plan that all
5  of the leases and tenant selection plans have to
6  comply with.
7      Q.   Were there changes to the minimum tenant
8  selection plan in this case?
9      A.   The developer added additional
10 requirements.
11     Q.   Were those subject to negotiation?
12     A.   No.
13     Q.   What is in the packet that the Board of
14 Commissioners receives with Exhibit 18?
15     A.   The board resolution and the draft
16 documents being approved.
17     Q.   Do you know if that happened in this
18 case?
19     A.   Yes.
20     Q.   Did it happen?
21     A.   Yes.
22     Q.   Okay.  What does the CHA Board do once
23 they receive the packet?
24     A.   They review it.

1      Q.   Do they consult with the CHA?
2      A.   They may have questions, if they have
3  questions.
4      Q.   Do you know if they had any questions
5  about Exhibit 18 and the associated packet?
6      A.   What is Exhibit 18?  I'm not sure.
7      Q.   The one that you are holding.
8      A.   Oh.
9      Q.   The CHA authorization, do you see it,
10 it's marked Exhibit 18?
11     A.   Yes.
12     Q.   Just so that we know what we are talking
13 about, it's the Authorization For Approval of the
14 Lease, Lease Riders, Tenant Selection Plan that we
15 have been talking about.  Do you know if they had
16 any questions about this exhibit and the
17 attached -- the accompanying documents in the
18 packet?
19     A.   I do not recall any questions.
20     Q.   Okay.  Do you know if -- if the board
21 has had questions about other tenant selection
22 plans or leases that had to go through this process
23 in order to form a mixed-income development?
24     A.   No.



Page 57

1    Q.   You don't know?
2    A.   No, I'm not aware of any.
3    Q.   Okay.  But the board did have an
4  opportunity to read the lease and the tenant
5  selection plan and any of the other accompanying
6  documents that came with Exhibit 18 prior to
7  approval?
8    A.   Yes.
9    Q.   And this document was approved; is that
10 right?
11   A.   Yes.
12   Q.   Do you know what standards the Board of
13 Commissioners uses to determine whether to approve
14 these documents?
15   A.   No, I don't.
16   Q.   Okay.  What would happen if the Board of
17 Commissioners didn't approve Exhibit 18 and the
18 accompanying documents?
19     MR. MENDENHALL:  Object to the form of the
20 question, calls for speculation.
21 BY THE WITNESS:
22   A.   I don't know.
23 BY MS. SHELEY:
24   Q.   Why do they -- why are the tenant

Page 58

1  selection plan and the lease presented to the Board
2  of Commissioners for approval?
3    A.   I do not know.  I do not have the basis
4  for CHA Board approvals.
5    Q.   Okay.  Do you know who would?
6    A.   No, I don't.
7    Q.   Is this document part of the closing
8  documents that are required to close a mixed-income
9  development?
10   A.   No, I do not know.
11   Q.   Is this document or notification -- is
12 this document provided to HUD?
13   A.   I do not know.
14   Q.   Is notification that the Board of
15 Commissioners approved the lease and tenant
16 selection plan provided to HUD?
17   A.   Yes.
18   Q.   How is it provided to HUD?
19   A.   I do not know.
20   Q.   How do you know that it's provided to
21 HUD?
22   A.   It's a requirement upon submitting a
23 package to HUD for approval --
24   Q.   What's the --

Page 59

1    A.   -- that CHA Board approves first.
2    Q.   What is the basis of that requirement?
3    A.   I do not know.
4    Q.   What happens after it's submitted to
5  HUD?
6    A.   HUD reviews and approves.
7    Q.   Okay.  What would happen if HUD didn't
8  approve?
9      MR. MENDENHALL:  Object to the form of the
10 question, calls for speculation.
11 BY MS. SHELEY:
12   Q.   Please answer the question.
13   A.   I do not know.
14   Q.   Why is the lease and tenant selection
15 plan submitted to -- so is it the lease and the
16 tenant selection plan, are they submitted to HUD
17 for approval?
18   A.   Yes.
19   Q.   Why?
20   A.   I do not know.
21   Q.   Okay.  Did the CHA Board have the power
22 to withhold its approval?
23     MR. MENDENHALL:  Object to the form of the
24 question, vague.

Page 60

1  BY MS. SHELEY:
2    Q.   Can you answer?
3    A.   Could you repeat the question, please?
4    Q.   Did the CHA -- did the CHA Board have
5  the power to withhold its approval of Exhibit 18
6  and the accompanying questions?
7    A.   Yes.
8    Q.   Yes?
9    A.   Yes.
10   MS. SHELEY:  Could we take a moment, please.
11        (WHEREUPON, there was a short
12        interruption.)
13   MS. SHELEY:  I'll take this back.
14 BY MS. SHELEY:
15   Q.   I'm handing you Exhibit 15 again.  If
16 you turn to page 6, one of the headings that
17 describes one of the crucial independent steps --
18   A.   What page am I turning to?
19   Q.   I'm sorry.  The Bates stamp number is
20 206, so it was 6 of the document itself.
21   A.   Okay.
22   Q.   If we are -- I'm turning your attention
23 to the heading Create the Redevelopment Plans for
24 the Mixed-Income/Mixed-Finance Communities.



1 Earlier we discussed that these headings reflect
2 the crucial independent steps to the development of
3 each new community, and that is referring to the
4 mixed-income/mixed finance developments; is that
5 right?
6    A.   Yes.
7    Q.   In this paragraph, it says -- the second
8 sentence says, "The working group reviews design
9 proposals and gives constructive input as to what
10 aspects of the redevelopment plans will be feasible
11 and what areas need improvement." Did that happen?
12    A.   Yes.
13    Q.   Can you tell me what it means to give
14 constructive input?
15    A.   No.
16    Q.   How about "reviews design proposals"?
17    A.   Yes.  The developer provides -- submits
18 their proposals, renderings of the site.  The
19 working group gives input on what features they
20 like and what features they don't like.
21    Q.   Did that happen with Parkside?
22    A.   Yes.
23    Q.   Do you remember some of the features
24 that members of the working group liked?

1    A.   No.
2    Q.   Do you remember any features that the
3 working group didn't like?
4    A.   No.
5    Q.   Can we turn to -- do you know if the
6 developer made any changes based on the comments of
7 the working group?
8    A.   No.
9    Q.   You don't know or they didn't?
10    A.   So repeat the question.
11    Q.   Do you know if the working -- if the
12 developer made any changes based on the comments of
13 the working group?
14    A.   Yes.
15    Q.   Do you know what changes those are?
16    A.   Interior features.
17    Q.   Did they make any other changes?
18    A.   No.
19    Q.   What changes did they make to the
20 interior features?
21    A.   Finishes.
22    Q.   What are finishes?
23    A.   Floor finishes, cabinets, walls, paint.
24    Q.   Is that as to the CHA housing?

1    A.   All of the housing.
2    Q.   Okay.  Could you turn to the next page
3 of this document, it's Bates stamped 200 -- I'm
4 sorry -- 208.  So one of the critical steps to the
5 development of the mixed-income developments is to
6 close and demolish the building; is that right?
7    A.   Yes.
8    Q.   What is the CHA's role in closing and
9 demolishing the building?
10    A.   Can you be more specific?
11    Q.   What does the CHA do to close the
12 building?
13    A.   Okay.  They meet with residents, provide
14 residents with their housing options, provide
15 residents with a timeline for building closure,
16 help relocate residents.
17    Q.   And we are talking about the original
18 CHA buildings that were on the site; is that
19 correct?
20    A.   Yes.
21    Q.   So the original Cabrini-Green?
22    A.   Cabrini Extension North.
23    Q.   Okay.  Does the CHA spend money to do
24 that?

1    A.   Yes.
2    Q.   Do you know how much money the CHA
3 expended in the process that you just described?
4    A.   No.
5    Q.   What does the CHA do to demolish the
6 building?
7    A.   Could you be more specific?
8    Q.   Once the residents have left, what is
9 the CHA's role in tearing the building down?
10    A.   The CHA hires a contractor to demolish
11 the buildings.
12    Q.   Does the CHA pay for that?
13    A.   Yes.
14    Q.   And that is part of the process that
15 the -- closing the building and demolishing the
16 building is part of the process for the
17 mixed-income developments, that's right, isn't it?
18    A.   Yes.
19    Q.   Do you know the cost of the demolition?
20    A.   No.
21    MS. SHELEY:  Okay.  Mr. Mendenhall, I would
22 like to continue asking questions, if you could
23 please stop speaking with the witness.
24    MR. MENDENHALL:  Ms. Sheley, there was no



Page 65

1 question pending.
2    MS. SHELEY: Okay.
3 BY MS. SHELEY:
4    Q.   Does the CHA have a role in improving
5 the infrastructure and the surrounding area of the
6 mixed-income development?
7    MR. MENDENHALL: Can we hold one second, and
8 we can do this on the record because I can tell you
9 my issue. When you keep saying "the mixed-income
10 development," the witness is only speaking as to
11 Parkside. Rather than me object every time, can
12 that be agreed upon?
13    MS. SHELEY: We won't agree to -- no.
14    MR. MENDENHALL: Object to the form of the
15 question. Speak as to Parkside.
16    MS. SHELEY: Are you instructing the witness
17 not to answer the question as to anything other
18 than Parkside?
19    MR. MENDENHALL: Counsel, I made my objection
20 clear earlier today, and I have sent you notice of
21 the objections. We are here as to Parkside and the
22 preliminary injunction relating to Mr. Peery. I'm
23 not allowing the witness to speak as to
24 mixed-incomes development-wide.

Page 66

1 BY MS. SHELEY:
2    Q.   Are you refusing to answer as to other
3 mixed-income developments?
4    A.   Yes.
5    Q.   Okay. Could you please tell me what the
6 CHA's role is in approving the infrastructure and
7 the area surrounding the mixed-income developments?
8    MR. MENDENHALL: As to Parkside, Ms. Brown.
9 BY THE WITNESS:
10    A.   It's the developer's responsibility to
11 improve infrastructure.
12 BY MS. SHELEY:
13    Q.   Okay. Can I direct your attention to
14 page 208 of the document in front of you.
15    MR. GILBERT: Plaintiff's Exhibit 15, correct?
16    MS. SHELEY: Yes. It's Plaintiff's
17 Exhibit 15. Thank you. It's Bates stamped
18 No. 208.
19 BY MS. SHELEY:
20    Q.   Do you see a paragraph that says,
21 "Improve Infrastructure" on the right-hand side of
22 that page?
23    A.   Yes.
24    Q.   And at the bottom, the sentence is,

Page 67

1 "Throughout FY2008 CHA and master developers worked
2 collaboratively with various City of Chicago
3 Departments, sister agencies, and utility companies
4 to accomplish the infrastructure improvement goals
5 for each site undergoing construction." Is that
6 sentence correct?
7    A.   Yes.
8    Q.   What was the CHA's role in -- I think
9 the term is "worked collaboratively"?
10    A.   Project management, oversight of the
11 process to make sure that it moved along and all
12 the infrastructure improvements and whatever else
13 needed to be done was done.
14    Q.   And did that include -- in the sentence
15 before, it lists updated utilities, revised street
16 grids, new alleys, landscaping, additional green
17 space, upgrades to sewer and water lines, and
18 upgraded public facilities.
19       Is that what we are talking about when
20 we are talking about improving the infrastructure?
21    MR. MENDENHALL: Object to the form of the
22 question.
23 BY THE WITNESS:
24    A.   No.

Page 68

1 BY MS. SHELEY:
2    Q.   Okay. What are we talking about?
3    A.   In reference to Parkside, work with the
4 developer on their proposal for new streets,
5 alleys, landscaping, green space, sewer, and water,
6 not other public facilities.
7    MS. SHELEY: Could you repeat the answer,
8 please, Court Reporter.
9       (WHEREUPON, the record was read by
10        the reporter.)
11 BY MS. SHELEY:
12    Q.   What did the CHA do to improve the
13 streets?
14    MR. MENDENHALL: Object to the form.
15 BY THE WITNESS:
16    A.   The CHA did not --
17    MR. MENDENHALL: Let me get my objection on
18 the record. Object to the form of the question.
19 BY THE WITNESS:
20    A.   The CHA did not. We worked as the
21 project manager. The developer proposed the
22 streets, and we work with the City agencies to make
23 sure that the process moved forward.
24



Page 69

1 BY MS. SHELEY:
2    Q.   What does that mean?
3    A.   Worked as a project manager.  My
4 responsibility is to oversee the project, not to do
5 the -- all of the aspects, so their architectural
6 plans, make sure they get in to have meetings, to
7 have their plans reviewed by the Department of
8 Planning.
9         If they have streets proposed, make sure
10 they sit down with CDOT on those processes.
11    Q.   And how did you facilitate those
12 meetings?
13    A.   I do not facilitate the meetings.  I
14 just follow through to make sure that they are set
15 up and that the process moves forward.
16    Q.   And what was your role in terms of the
17 alleys?
18    A.   Same role.
19    Q.   What was the CHA's role in terms of
20 green space?
21    A.   Same role.
22    Q.   And what was the CHA's role in terms of
23 sewers and water?
24    A.   Same role.

Page 70

1    Q.   Did the CHA assist in other areas that
2 are similar to these improvements?
3    MR. MENDENHALL:  Object to the form of the
4 question, vague.
5    MS. LISKOW:  Could you -- Sam, could you speak
6 up when you object.  I can't hear you.
7    MR. MENDENHALL:  Could you repeat my objection
8 back for her?
9    MS. LISKOW:  No, I'm just asking, we can't
10 hear you down here, so can you speak up when you
11 object.  Thank you.
12    MR. MENDENHALL:  Okay.
13 BY MS. SHELEY:
14    Q.   Can I -- I'm going to take this document
15 back then, and I'm handing you what has been
16 previously marked Exhibit 16.
17    A.   Uh-huh.
18    Q.   This is the -- we already discussed it.
19 It's the mixed-finance amendment to consolidated
20 annual contributions contract.  And who are the
21 parties to this contract?  Do you know without
22 looking at the document?
23    A.   No.
24    Q.   Is HUD a party to this contract?

Page 71

1    A.   I do not know.
2    Q.   Okay.  Can I ask you to turn to Bates
3 stamp 786.  Do you have the page?
4    A.   Yes.
5    Q.   Okay.
6    MR. MENDENHALL:  Can she have one second to
7 review it, Counsel?
8    MS. SHELEY:  Yes.
9    MR. MENDENHALL:  Okay.  Thank you.
10 BY MS. SHELEY:
11    Q.   I'm only going to be asking about
12 Part 1.  Does this document outline the amount of
13 money that CHA put toward this phase of the
14 development of Parkside?
15    MR. MENDENHALL:  Object to the form of the
16 question.  The document speaks for itself.
17         You can answer, Ms. Brown.
18 BY THE WITNESS:
19    A.   Yes.
20 BY MS. SHELEY:
21    Q.   Can you answer, please?
22    A.   Yes.
23    Q.   And does this refresh your recollection
24 about the amount that that -- it cost for the

Page 72

1 demolition of the previous Chicago Housing
2 Authority buildings?
3    A.   No.
4    Q.   If the line, which is like the fifth
5 line down says, "Demolition" and says it's
6 $2 million, would that be accurate?
7    A.   I do not know.
8    Q.   Okay.  Can I take the document back,
9 please.  Thank you.
10         What is the CHA's role in approving the
11 quality of the development?
12    MR. MENDENHALL:  Object to the form of the
13 question.  Can you repeat the question?
14         (WHEREUPON, the record was read by
15          the reporter.)
16    MS. SHELEY:  Approving.
17 BY MS. SHELEY:
18    Q.   What is the CHA's role in approving the
19 quality of the development?
20    MR. MENDENHALL:  Same objection.
21 BY THE WITNESS:
22    A.   At Parkside of Old Town we rely on
23 Habitat to review construction.
24



Page 73

1  BY MS. SHELEY:
2     Q.  What is Habitat?
3     A.  The receiver.
4     Q.  And what did they do?
5     A.  Monitor construction activities and
6  provide construction reports to CHA.
7     Q.  Okay.  Was the CHA required to inspect
8  and approve the buildings for initial occupancy?
9     A.  The Habitat Company served that
10  function.
11    Q.  And they did that?
12    A.  Yes.
13    Q.  Is there a continued inspection of the
14  property by the CHA?
15    MR. MENDENHALL:  Repeat the question.
16        (WHEREUPON, the record was read by
17        the reporter.)
18  BY THE WITNESS:
19    A.  Could you be specific?  Do you mean
20  after construction?
21  BY MS. SHELEY:
22    Q.  Yes.  After construction does the CHA
23  continue to inspect the property?
24    A.  I do not know.

Page 74

1     Q.  Is Habitat the agent of the CHA?
2     MR. MENDENHALL:  Objection, calls for a legal
3  conclusion.
4  BY THE WITNESS:
5     A.  I do not know.
6  BY MS. SHELEY:
7     Q.  Does Habitat continue to inspect
8  properties after construction?
9     A.  No.
10    Q.  Does the CHA do that now?
11    A.  I do not know in reference to Parkside.
12    Q.  Does the CHA inspect mixed-income
13  developments prior to occupancy at other
14  mixed-income developments?
15    A.  That was the role of Habitat, the
16  receiver.
17    Q.  And as to developments other than
18  Parkside, does the CHA inspect and approve
19  developments prior to occupancy?
20    MR. MENDENHALL:  I'm going to instruct the
21  witness not to answer as to other developments.
22  BY MS. SHELEY:
23    Q.  Will you answer?
24    A.  I don't know.

Page 75

1     Q.  Does the CHA inspect Parkside on a
2  regular basis now that construction is complete?
3     A.  I do not know.
4     Q.  Okay.  Do you know if the CHA conducts
5  any audits or -- of the finances or the -- of the
6  finances of the mixed-income development?
7     A.  I do not know.
8     Q.  Okay.  Do you know if the mixed-income
9  development has regular meetings with the CHA?
10    A.  No, I do not know.
11    Q.  Do you know who would know?
12    A.  The developer.
13    Q.  Do you know who at CHA would know?
14    A.  No.
15    Q.  Do you know who at CHA would know
16  whether the CHA inspects the buildings each year?
17    A.  Yes.
18    Q.  Who?
19    A.  Occupancy.
20    Q.  What is Occupancy?
21    A.  A department.
22    Q.  Who is in charge of that department?
23    A.  I do not know.
24    Q.  What -- what does Occupancy do as a

Page 76

1  department?
2     A.  I do not know all of their functions.
3     Q.  What functions do you know?
4     A.  They determine a resident's lease
5  compliance when they are eligible for a new unit.
6     Q.  What other functions do they have?
7     A.  I do not know.
8     Q.  Okay.  Does the CHA approve the
9  designation of which units are CHA units in
10  Parkside?
11    A.  Initially, yes.
12    Q.  How does it do that?
13    A.  The developer provides a site plan
14  showing the unit mix and CHA reviews.
15    Q.  And then it approves the location of the
16  units?
17    A.  Yes.
18    Q.  If the developer wants to change the
19  designation of CHA units, are they required to get
20  the approval of CHA?
21    MR. MENDENHALL:  Object to the form of the
22  question.
23  BY THE WITNESS:
24    A.  It would have to be more specific.



Page 77

BY MS. SHELEY:

2 Q. If the developer wants to move a CHA
3 unit from one floor -- designated unit from one
4 floor to another, does the CHA have to approve that
5 new designation?
6 A. It depends.
7 Q. What does it depend on?
8 A. The type of building that it's in.
9 Q. Why does it depend on the type of
10 building that it's in?
11 A. Rental units float in rental buildings.
12 Q. What does that mean?
13 A. They float. They can be at different
14 locations.
15 Q. Okay. Does the total number of CHA
16 units in rental buildings have to remain the same?
17 A. Yes.
18 Q. And if it isn't a rental building, does
19 the developer have to seek the CHA approval to move
20 the location of the CHA unit?
21 A. It depends.
22 Q. What does it depend on?
23 A. Whether it's before construction or
24 after construction, occupancy.

Page 78

1 Q. What if it's before construction?
2 A. Yes.
3 Q. What if it's after construction?
4 A. I'm not sure. I don't know.
5 Q. Okay. Can the developer terminate --
6 MS. SHELEY: I'm going to ask that you not --
7 that you wait to have a conversation with the
8 witness until I'm not asking a question.
9 MR. MENDENHALL: Ms. Sheley, there was no
10 question pending.
11 MS. SHELEY: I was trying to ask a question.
12 MR. MENDENHALL: There was no question
13 pending, Ms. Sheley. Ask your next question,
14 please.
15 MS. SHELEY: Could you mark that, please.
16 BY MS. SHELEY:
17 Q. The owner cannot -- can -- who is the
18 management agent at mixed-income developments?
19 A. I'm not clear on that question.
20 Q. Do you know if there's a management
21 agent at mixed-income developments?
22 MR. MENDENHALL: Object to the question.
23 Answer only as to Parkside.
24

Page 79

1 BY THE WITNESS:
2 A. I'm still not clear on the question.
3 MS. SHELEY: Okay. I'm going to mark this
4 document, please. Oh, it's already marked. This
5 is from a previous deposition. It's Exhibit 5 from
6 a previous deposition, and we have discussed at the
7 last deposition that we are going to go forward
8 with the exhibit numbers from that deposition.
9 BY MS. SHELEY:
10 Q. And Exhibit 5, for the record, is
11 CHA_PEER 000797 through 857. Do you recognize this
12 document?
13 A. Yes.
14 Q. What is it?
15 A. Regulatory and Operating Agreement.
16 Q. Were you involved in writing this
17 document?
18 A. No.
19 Q. Were you involved in the approval of
20 this document at all?
21 A. Yes.
22 Q. What was your involvement?
23 A. Project manager.
24 Q. And what did you do as the project

Page 80

1 manager in relation to this document?
2 A. Confirmed the number of units, make sure
3 that the document was drafted so we can close.
4 Q. Okay. Were you involved in the drafting
5 of the document?
6 A. Provided the number of units.
7 Q. And are you -- turning to page -- Bates
8 stamped page 812, and Part E. Do you have an
9 understanding of --
10 MR. MENDENHALL: She's reviewing it, Counsel,
11 Section E. If you could give her a minute to
12 review Section E, thank you very much.
13 Let her know when you are done reviewing
14 Section E.
15 BY THE WITNESS:
16 A. I'm done.
17 BY MS. SHELEY:
18 Q. Okay. Do you have an understanding of
19 what "the management agent" means in this
20 paragraph?
21 A. Yes.
22 Q. What is "the management agent"?
23 A. According to this paragraph, they are
24 responsible for management of the public housing



1  units.
2      Q.   Do you have an independent knowledge of
3  what "the management agent" is?
4      A.   No.
5      Q.   Okay.  Do you -- without referencing the
6  document, do you have knowledge of what the
7  management plan is?
8      A.   No.
9      Q.   Okay.  Do you know what the tenant
10 grievance procedure is?
11     A.   No.
12     Q.   Is the CHA required to review and
13 approve the annual operating budget of the
14 mixed-income developments?
15     A.   Yes.
16         MR. MENDENHALL:  I'm going to object to the
17 form of the question, to the extent that it calls
18 for a legal conclusion and if it goes beyond
19 Parkside.
20 BY MS. SHELEY:
21     Q.   Is the CHA required to review and
22 approve proposed capital expenditures at
23 mixed-income developments?
24         MR. MENDENHALL:  Same objection.  Answer as to

1  Parkside.
2  BY THE WITNESS:
3      A.   Yes.
4  BY MS. SHELEY:
5      Q.   Is the CHA required to receive quarterly
6  statements of income and expense from mixed-income
7  developments?
8      A.   I do not know.
9          MR. MENDENHALL:  Same objection.
10 BY MS. SHELEY:
11     Q.   Do you -- as to reviewing and approving
12 the annual budget, does the CHA actually review and
13 approve the annual operating budget at mixed-income
14 developments?
15         MR. MENDENHALL:  Same objection.
16 BY THE WITNESS:
17     A.   I do not know.
18 BY MS. SHELEY:
19     Q.   Does the CHA receive annual financial
20 statements from the mixed-income developments?
21     A.   I do not know.
22         MR. MENDENHALL:  Same objection.
23 BY MS. SHELEY:
24     Q.   Does CHA -- does the CHA require

1  management companies to use any of the CHA's
2  software systems?
3      A.   I do not know.
4      Q.   Okay.  I'm going to take this back.
5  Thank you.
6          MS. SHELEY:  Why don't we break now.  It's
7  2:08.
8              (WHEREUPON, a recess was had.)
9          MS. SHELEY:  All right.  So it's 2:17 and we
10 are going back on the record.
11 BY MS. SHELEY:
12     Q.   Does the CHA have a role in which CHA
13 residents live at Parkside?
14     A.   Yes.
15     Q.   What is that role?
16     A.   We provide residents who are lease
17 compliant with CHA to the developer.
18     Q.   How does the CHA provide residents for
19 lease compliance to the developer?
20     A.   They provide a list of names.
21     Q.   How is that list of names generated?
22     A.   Can you be more specific?
23     Q.   Does the CHA create the list of names
24 that are provided to the developer?

1      A.   For Parkside the list of names come from
2  the residents who have a right of return.
3      Q.   Does the CHA maintain the list of
4  residents who have a right of return?
5      A.   Yes.
6      Q.   How does the CHA -- let me start again.
7          How do the CHA residents with a right of
8  return end up on that list?  What is the process?
9      A.   For Parkside of Old Town, it came from
10 the consent decree.
11     Q.   And what are the requirements in the
12 consent decree that lead to the list?
13         MR. MENDENHALL:  Object to the form of the
14 question.  The document speaks for itself.
15 BY THE WITNESS:
16     A.   The document just lists the priority of
17 residents and which buildings they came from.
18 BY MS. SHELEY:
19     Q.   How is the priority of residents
20 established?
21     A.   By the consent decree, based on which
22 buildings they lived in.
23     Q.   Does the CHA maintain the list?
24     A.   Yes.



1    Q.    How does the CHA maintain the list?
2    A.    I'm not sure I understand your question.
3    Q.    Is there a department that is in charge
4  of the list?
5    A.    Yes.
6    Q.    What department is that?
7    A.    Resident Services.
8    Q.    And what does -- what steps does
9  Resident Services do to maintain the list of CHA
10  residents who may live at mixed-income
11  developments?
12    A.    I do not know.
13    Q.    Is there a role for the relocation
14  rights contract in terms of maintaining a list?
15    A.    I don't know.
16    Q.    Does the relocation rights contract
17  apply to people who are on the list generated from
18  the Cabrini consent decree?
19    A.    No.  Clarify.  It depends on where they
20  lived and when they lived there.
21    Q.    Why does it depend on that?
22    A.    It's based on the buildings that they
23  lived in.  There were people who were given an
24  opportunity to sign up that lived in Cabrini

1  also fall under the relocation rights contract.
2    Q.    Okay.  And how would a person fall under
3  both the consent decree and the relocation rights
4  contract?
5    A.    They lived at Cabrini at the time that
6  the consent decree was being drafted, and they
7  signed up on the list or -- and they were a 10/1/99
8  resident living in a development outside of
9  extension north.
10    Q.    Okay.  Did the relocation rights
11  contract apply to Mr. Peery?
12    A.    Not under Parkside, no.
13    Q.    What happened on October 1, 1999, that
14  makes a difference for the residents?
15    A.    I do not know.
16    Q.    Okay.  Does the -- are you familiar with
17  the document called the ACOP, A-C-O-P?
18    A.    Vaguely.
19    Q.    Do you know if it applies to people who
20  are applying to live at a mixed-income site?
21    A.    I don't.
22    Q.    What do you know about the ACOP?
23    MR. MENDENHALL:  Object to the form of the
24  question, vague.

1  BY THE WITNESS:
2    A.    That it's a continuing occupancy
3  document.
4  BY MS. SHELEY:
5    Q.    Do you know anything else about it?
6    A.    No.
7    Q.    Do you know who administers the ACOP
8  within the Chicago Housing Authority?
9    A.    No.
10    Q.    Do you know how -- do you know what
11  happens when someone gets to the top of the Cabrini
12  list, what options are available to them?
13    A.    The options that they selected.
14    Q.    What does that mean?
15    A.    So the residents are given a choice of
16  whether they select mixed-income, traditional
17  public housing, or a voucher.
18    Q.    And when -- if they select mixed-income,
19  do they also select particular developments?
20    A.    Yes.
21    Q.    Are the developments they select always
22  available?
23    A.    I don't know.
24    Q.    Do you know what happens if a

1  development that they select or location they
2  select isn't available?
3    A.    I don't know.
4    Q.    Do you know what would happen if someone
5  got to the front of the list and the offer that was
6  made was a mixed-income development that had drug
7  testing?
8    A.    Yes, they have a choice.
9    Q.    What is their choice?
10    A.    To move in there or not, to wait for an
11  additional site.
12    Q.    Do you know how long the wait would be
13  for someone if --
14    A.    No.
15    Q.    -- they chose to wait for an additional
16  site?
17    A.    No.
18    Q.    Do you know how long on average it takes
19  for a new slot to open?
20    A.    No.
21    Q.    Do you know how long the Cabrini-Green
22  list is?
23    A.    No.
24    Q.    Do you know how long the lists are under



Page 89

1  the relocation rights contract for people who were
2  not Cabrini-Green residents?
3      A.   No.
4      Q.   Do you know how long -- are there other
5  lists other than the Cabrini-Green consent decree
6  list and the relocation rights list that could
7  result in people ending up in mixed-income
8  developments?
9      A.   I don't know what the relocation rights
10  list is.
11      MR. MENDENHALL:  Let me object.  Counsel, this
12  is way off Parkside.  I'm going to give you a
13  little latitude here but not much.
14      MS. SHELEY:  Okay.
15      MR. MENDENHALL:  This is class discovery.
16  BY MS. SHELEY:
17      Q.   Did you say that you don't know what the
18  relocation rights list is?
19      A.   Uh-huh.
20      Q.   Okay.  Are there lists other than the
21  lists that are -- for Cabrini-Green residents,
22  former Cabrini-Green residents?
23      A.   So, yes, for Cabrini Extension North,
24  you have the Cabrini lottery list.

Page 90

1      Q.   What is the Cabrini lottery list?
2      A.   The list under that consent decree of
3  those residents who lived in buildings at Extension
4  North and other Cabrini properties that signed up
5  to be on the list.
6      Q.   Are there other lists for the
7  Cabrini-Green -- for the former Cabrini-Green
8  residents?
9      A.   For Cabrini Extension North, you have
10  the HOP list and then the wait list.
11      Q.   What is the hot (sic) list?
12      A.   The 10/1/99 list of those families that
13  were lease compliant 10/1/99.
14      Q.   What does 10/1/99 mean?
15      A.   It's a date that was selected that those
16  residents that were lease compliant on that date
17  have a right to return.
18      Q.   And what is the wait list?
19      A.   Individuals waiting to get into public
20  housing.
21      Q.   When you are talking about -- when you
22  say "the wait list," is it people who previously
23  lived at Cabrini?  Are we still talking about
24  people who lived at Cabrini Extension North --

Page 91

1      A.   No.
2      Q.   -- when you say "the wait list"?
3      A.   No.
4      Q.   Are there any other lists?
5      A.   No, not that I'm aware of.
6      Q.   Now, are there any other lists other
7  than the hot (sic) list and the wait list?
8      A.   The lottery list.
9      Q.   And the lottery list.  Are these -- are
10  these three lists that -- are you only listing
11  lists that are within the -- that apply to the
12  Cabrini-Green area, the former Cabrini-Green area?
13      A.   Yes.
14      Q.   Are there lists that apply to other
15  mixed-income developments in other parts of the
16  city?
17      MR. MENDENHALL:  Object.  Instruct the witness
18  not to answer.
19  BY MS. SHELEY:
20      Q.   Okay.  Is the hot (sic) list separate
21  from the Cabrini lottery list?
22      A.   Yes.
23      Q.   Is the wait list separate from the hot
24  (sic) list and the Cabrini lottery list?

Page 92

1      A.   Yes.
2      Q.   What makes the Cabrini lottery list and
3  the hot (sic) list different?
4      A.   The Cabrini lottery list are those
5  families that lived at Extension North at a certain
6  time period.
7      Q.   Do you know the time period?
8      A.   It started in the mid-'90s.
9      Q.   Was Joseph Peery on that list?
10      A.   I do not know.
11      Q.   Do you know if he was on the hot (sic)
12  list?
13      A.   I do not know.
14      Q.   Do you know if he was on the wait list?
15      A.   I do not know.
16      Q.   Has anyone from the wait list gotten
17  housing at Parkside?
18      A.   I do not know.
19      Q.   Has anyone from the --
20      MS. SHELEY:  I would like to ask a question.
21      MR. MENDENHALL:  I'm entitled.  There was no
22  question pending.  You consult with Adam.  I am
23  consulting with my client.
24      MS. SHELEY:  Okay.  I would like to note for



Page 93

1  the record that Mr. Mendenhall is having a
2  conference with his client.
3  BY THE WITNESS:
4      A.   So I have to clarify.
5  BY MS. SHELEY:
6      Q.   What would you like to clarify?
7      A.   Your question with Mr. Peery being on
8  the wait list.  As I stated, the wait list are not
9  public housing residents.  These are residents
10  waiting to get into public housing.
11      MR. MENDENHALL:  And so let the record reflect
12  that is what I was speaking to my client about,
13  that clarification.
14  BY MS. SHELEY:
15      Q.   What rules apply to the Cabrini lottery
16  list?
17      A.   The priority in which families are
18  offered new units at Parkside.
19      Q.   And what sets those priorities?
20      A.   The timing of how the buildings were
21  demolished.
22      Q.   Does the person -- let me start again.
23      Does the -- does the person's place on
24  the list, is it affected by whether they meet the

Page 94

1  qualifications of a mixed-income development?
2      A.   No.
3      Q.   If someone is unwilling to take a drug
4  test, would they be allowed to live at a building
5  that requires drug testing?
6      A.   No.
7      Q.   Okay.  What happens to a person who
8  refuses to take a drug test if they are on the
9  Cabrini lottery list?
10      A.   They will wait until another option
11  becomes available.
12      Q.   How would they communicate -- how would
13  a person who didn't want to take a drug test tell
14  the CHA that they were refusing to take a drug test
15  at a mixed-income development?
16      MR. MENDENHALL:  Counsel, I need clarification
17  before I instruct this witness not to answer.  Are
18  you talking about someone seeking admission or
19  continued occupancy?
20  BY MS. SHELEY:
21      Q.   Do you understand my question?
22      A.   No.
23      MR. MENDENHALL:  Because if it's admission,
24  I'm instructing her not to answer because that has

Page 95

1  nothing to do with this case.  Peery is a continued
2  resident.  If it's continued occupancy, you can
3  answer.
4  BY MS. SHELEY:
5      Q.   Do you -- can you answer the question?
6      A.   Could you repeat the question?
7      MS. SHELEY:  Can you read the question,
8  please.
9      There's a question pending,
10  Mr. Mendenhall.
11      (WHEREUPON, the record was read by
12      the reporter.)
13      MR. MENDENHALL:  And I'm instructing you to
14  answer only as to Parkside and only as to continued
15  occupancy, not as to admissions.  That is not at
16  issue for purposes of the preliminary injunction.
17  BY MS. SHELEY:
18      Q.   Can you please answer the question.
19      A.   I need clarity.
20      Q.   Okay.  Why don't we break this apart.
21      So if someone applied to live at
22  Parkside and they refused to take a drug test and
23  they didn't want to take -- I'm going to start
24  again.

Page 96

1      If someone wanted to live at Parkside
2  and did not want to take a drug test, how would
3  they communicate that to the CHA?
4      MR. MENDENHALL:  Object to the form of the
5  question.
6  BY THE WITNESS:
7      A.   They wouldn't because that's not a part
8  of CHA's process.
9  BY MS. SHELEY:
10      Q.   Is there a form or -- so there's no
11  form, there's no standard way for people who are
12  applying to live at Parkside to inform the CHA that
13  they don't want to have to take a drug test?
14      MR. MENDENHALL:  Object, misstates prior
15  testimony.
16  BY THE WITNESS:
17      A.   I'm not aware of a form, no.
18  BY MS. SHELEY:
19      Q.   Okay.  Is there any other way that the
20  CHA would find out that someone who is applying to
21  live at Parkside objects to taking a drug test as a
22  condition of residency?
23      MR. MENDENHALL:  Could you repeat the
24  question, please?



1          (WHEREUPON, the record was read by
2          the reporter.)
3    BY THE WITNESS:
4         A.   I do not know.
5    BY MS. SHELEY:
6         Q.   Is there any way that the CHA -- is
7    there any way that the CHA could find out that a
8    resident objects to taking a drug test as a
9    condition of admission to Parkside?
10        A.   If that resident reached out to CHA to
11   voice their opinion.
12        Q.   Okay.  Who would they reach out to?
13        A.   Don't know.
14        Q.   Is there a mechanism for -- is there a
15   mechanism for CHA tenants who wish to apply to
16   other mixed-income developments to inform the CHA
17   that they do not want to have to take a drug test
18   as a condition of admission?
19        MR. MENDENHALL:  Can you repeat the question,
20   Madam Court Reporter.
21         (WHEREUPON, the record was read by
22         the reporter.)
23   BY THE WITNESS:
24        A.   I do not know.

1    BY MS. SHELEY:
2         Q.   Is there a mechanism for former CHA
3    tenants who are currently living in mixed-income
4    developments to inform the CHA if they don't want
5    to take a drug test as a condition of continuing to
6    live in a mixed-income development?
7         A.   The grievance policy.
8         Q.   What is the grievance policy?
9         A.   It's a formal way for residents to
10   grieve -- I don't want to say any issues, but if
11   there are lease issues or compliance issues, to
12   grieve.
13        Q.   What is the process to file a grievance?
14        A.   I do not know.
15        Q.   Have any CHA residents of any of the
16   mixed-income developments filed a grievance over
17   this issue?
18        A.   I do not know.
19        Q.   If someone got to the top of the
20   Cabrini-Green lottery list and they took and failed
21   a drug test, what would happen to them?
22        A.   I do not know.  CHA does not manage that
23   process.  That is the property manager's process.
24        Q.   If a property manager reported to you --

1    if a property manager reported to the CHA that
2    someone on the Cabrini lottery list was rejected
3    from admission because they failed a drug test,
4    what would happen to the person's position on the
5    lottery list?
6         MR. MENDENHALL:  I'm going to object and
7    instruct the witness not to answer.  This has
8    nothing to do with the preliminary injunction
9    hearing.
10   BY MS. SHELEY:
11        Q.   Will you answer?
12        A.   No.
13        MS. SHELEY:  Sam, I would like to point out
14   that the CHA has raised the point that -- has
15   argued that Mr. Peery and other tenants have
16   consented to the drug testing, and I just want to
17   put that on the record.
18        MR. MENDENHALL:  And let me tell you what CHA
19   objected to.  They objected to Mr. Peery.  We have
20   not objected to other residents.  This is not a
21   class action.  This is a preliminary injunction.
22   It is as to Peery only.
23   BY MS. SHELEY:
24        Q.   Do you know whether Mr. Peery was on the

1    Cabrini lottery list?  I believe you said earlier
2    that you don't know.
3         A.   (Nodding head.)
4         Q.   And you don't know whether he's on the
5    hot (sic) list?
6         A.   I don't know.
7         Q.   But you know he wasn't on the wait list?
8         A.   Yes.
9         MS. SHELEY:  Are you going to stand by your
10   instruction not to allow the witness not answer?
11        MR. MENDENHALL:  Yes, I am, as to -- hold on.
12   BY MS. SHELEY:
13        Q.   If he got to the top of the hot (sic)
14   list and he took a drug test --
15        MR. MENDENHALL:  One second.  We would like to
16   go off the record for a second.
17        MS. SHELEY:  Can you note that counsel are
18   taking a break at 3:39 -- 2:39.
19         (WHEREUPON, a recess was had.)
20        MS. SHELEY:  Could we go back on the record.
21   The time is 2:44.
22        So can you read back the last question?
23         (WHEREUPON, the record was read by
24         the reporter.)



1 BY MS. SHELEY:
2    Q.   If Mr. Peery -- if someone got to the
3 top of the hot (sic) list and took -- refused to
4 take a drug test, what would happen to their
5 station on the list?
6      MR. MENDENHALL:  I'm going to object and
7 instruct the witness to answer only as to
8 Mr. Peery.
9 BY MS. SHELEY:
10    Q.   Are you going to follow your counsel's
11 instruction?
12    A.   In reference to Mr. Peery, yes, I do not
13 know.
14    Q.   And what would happen if a person got to
15 the top of the hot (sic) list, applied at a
16 mixed-income development, and failed a drug test?
17    A.   I do not know.
18      MR. MENDENHALL:  And I'm going to instruct the
19 witness not to answer.
20      MS. SHELEY:  Now, I would like to note that
21 there are a lot of questions that I have asked and
22 the answer has been, I don't know.  We notice this
23 as a 30(b)(6) deposition, and we expect the CHA to
24 put forward a witness in the future who can respond

1 to these questions and the previous questions that
2 she didn't have an answer to.
3      MR. MENDENHALL:  And let me state on the
4 record, we filed our objections yesterday, which I
5 duly noted.  We served our objections yesterday,
6 and, again, we stand by our objections and the
7 objection I put earlier on the record.
8      MS. SHELEY:  Okay.  Just to clarify, my
9 additional concern is that the witness doesn't know
10 the answer to a lot of questions, and we will seek
11 a 30(b)(6) witness who does.
12      MR. MENDENHALL:  And let me be clear, Counsel,
13 so there's no confusion.  We are not producing a
14 30(b)(6) witness for questions that do not relate
15 to Peery and the preliminary injunction.
16      MS. SHELEY:  Okay.
17      MR. MENDENHALL:  We will comply in every
18 aspect with Judge Coleman's order of December 13,
19 2013.  We will not -- we will comply with Judge
20 Coleman's order of December 13, 2013.
21      MS. SHELEY:  Just to clarify one more time, in
22 the universe of information where you were not
23 instructing the witness not to answer, she has
24 answered "I don't know" to a large number of

1 questions.  And we will seek a 30(b)(6) -- we have
2 filed this as a 30(b)(6) deposition, and we believe
3 that we are entitled to a witness who can answer
4 the questions that we have propounded throughout
5 the deposition, and we would like you to provide a
6 witness who can do that.
7      MR. MENDENHALL:  I stand by my objections and
8 my previous statements, Counsel.  Let's make the
9 best use of our time today, if we can.
10 BY MS. SHELEY:
11    Q.   If someone gets to the top of the
12 Cabrini-Green lottery list and they reject two
13 options for housing, what happens to their place on
14 the wait list?
15    A.   They maintain their place.
16    Q.   If someone is on the hot (sic) list and
17 they reject two options for housing, what happens
18 to their place on the list?
19    A.   I do not know.
20    Q.   If someone is on the general wait list
21 and they --
22      MS. SHELEY:  Can I finish my question before
23 you object?
24

1 BY MS. SHELEY:
2    Q.   If someone is on the general wait list
3 and they reject two options for housing, what
4 happens to their place on the wait list?
5      MR. MENDENHALL:  Object and instruct the
6 witness not to answer.
7 BY MS. SHELEY:
8    Q.   Is a CHA tenant's location on the
9 lottery list determined by whether they meet
10 property specific requirements?
11    A.   No.
12    Q.   Is a person's location on the hot (sic)
13 list determined by whether they meet property
14 specific requirements?
15    A.   No.
16    Q.   Is a person's spot on a wait list -- the
17 general wait list impacted by whether they meet
18 property specific requirements?
19      MR. MENDENHALL:  Object, instruct the witness
20 not to answer.
21 BY MS. SHELEY:
22    Q.   Will you answer?
23    A.   No.
24    Q.   If someone who currently lives in a



1 mixed-income development decides they don't want to
2 take a drug test, would they be eligible for other
3 CHA housing?
4    MR. MENDENHALL: I'm going to object and
5 instruct you only to answer as to Mr. Peery with
6 respect to Parkside.
7 BY THE WITNESS:
8    A.  They have an option to request a
9 transfer.
10 BY MS. SHELEY:
11    Q.   And were you following your counsel's
12 instruction as to only answer as to Mr. Peery?
13    A.  Yes.
14    Q.   What does it mean to request a transfer?
15    A.   Request to be transferred to another
16 site.
17    Q.   What is the process that -- what is the
18 first step that a CHA tenant would take to request
19 a transfer?
20    A.   File a request with the property
21 manager.
22    Q.   Okay.  And what would happen once they
23 filed a request with the property manager?
24    A.   That information would be submitted to

1 CHA.
2    Q.   What would happen once the CHA received
3 the information?
4    A.  I do not know.
5    Q.   Do you know how long it takes to get a
6 transfer?
7    A.  I don't know.
8    Q.   Do you know if people are placed on a
9 wait list if they want a transfer?
10    A.  I don't know.
11    Q.   Okay.  If someone ages into the testing
12 at a mixed-income development and does not want to
13 take the test, would they be eligible for other CHA
14 housing?
15    MR. MENDENHALL: Object to the question.
16 Instruct you not to answer.
17 BY MS. SHELEY:
18    Q.   If someone is -- if someone is evicted
19 because they fail a drug test, when renewing their
20 lease at a mixed-income development, would they be
21 eligible for CHA housing in the future?
22    MR. MENDENHALL: Objection.  Instruct you not
23 to answer.
24

1 BY MS. SHELEY:
2    Q.   If someone requests to transfer from a
3 mixed-income development because they don't want to
4 take a drug test, what are the -- are there limits
5 on where they can transfer?
6    A.  I don't know.
7    MS. SHELEY: Can you please mark this
8 document.
9        (WHEREUPON, a certain document was
10         marked Deposition Exhibit No. 19,
11         for identification.)
12 BY MS. SHELEY:
13    Q.   Okay.  You have been handed what has
14 been marked as Exhibit 19.  It's CHA_PEER-001782
15 through 1788.  Do you remember recognize this
16 document?
17    A.  No.
18    Q.   Do you know whether this cover sheet is
19 a CHA document?
20    A.  No.
21    Q.   Do you know, are people who are -- are
22 CHA tenants who live in mixed-income developments
23 required to go through a CHA recertification each
24 year in order to maintain their status as CHA

1 tenants?
2    A.  I do not know.
3    MR. MENDENHALL: Ms. Sheley, for the record, I
4 suggest you ask her the questions as to Mr. Peery
5 and Parkside.
6 BY MS. SHELEY:
7    Q.   Do you know if Mr. Peery has to
8 recertify his CHA -- has to do a recertification
9 with the CHA each year in order to maintain a
10 status as a CHA tenant in Parkside?
11    A.  I do not know.
12    Q.   Okay.  We are done with this one.
13    MS. SHELEY: Could we mark this document.
14        (WHEREUPON, a certain document was
15         marked Deposition Exhibit No. 20,
16         for identification.)
17 BY MS. SHELEY:
18    Q.   Is this cover sheet -- I have handed you
19 what has been marked Exhibit 20.  It is
20 CHA_PEER-001808 through 1832.  Do you recognize
21 this document?
22    A.  No.
23    Q.   Do you know if the cover sheet is a CHA
24 document?



Page 109

1     A.   No, I don't.
2     Q.   Could I turn your attention to the Bates
3  stamp 1823, and it's one, two, three, four pages.
4  If you could take a look at those four pages. They
5  go from 1823 to 1826.
6         Is this a CHA lease?
7     MR. MENDENHALL:  I'm going to just object to
8  the form of the question.
9  BY THE WITNESS:
10    A.   I guess this is a CHA document.
11 BY MS. SHELEY:
12    Q.   Is it a CHA lease?
13    MR. MENDENHALL:  Same objection.
14 BY THE WITNESS:
15    A.   This is a CHA lease for traditional
16 properties.
17 BY MS. SHELEY:
18    Q.   On 1826 do you see Mr. Peery's
19 signature?
20    A.   Yes.
21    Q.   And do you also see his signature on
22 1825?
23    A.   Yes.
24    Q.   And do you see a signature for the

Page 110

1  property manager?
2     A.   Yes.
3     Q.   Do you know who that is?
4     A.   Yes.
5     Q.   Who is it?
6     A.   A manager with Holsten Management
7  Corporation.
8     Q.   And is her name Janet Anderson?
9     A.   Yes.
10    Q.   Do you know Ms. Anderson?
11    A.   Yes.
12    Q.   Do you know why -- so do you know why
13 Mr. Peery and Ms. Anderson executed this lease?
14    A.   No, I do not.  It should not be used.
15    Q.   These documents were produced by the CHA
16 as part of Mr. Peery's file; is that right?
17    A.   I do not know.
18    Q.   Do you know why these documents would be
19 in Mr. Peery's file?
20    A.   I do not know.
21    Q.   If the CHA received it every year, who
22 would have received it?
23    A.   I do not know.
24    Q.   Do you know who maintains Mr. Peery's

Page 111

1  file with the CHA?
2     A.   No.
3     Q.   Do you know -- do you know why this
4  lease is within his file?
5     A.   No, I don't.
6     Q.   Okay.  Do you know if the CHA ever
7  objected to this lease being placed in Mr. Peery's
8  file?
9     A.   I do not.
10    Q.   Do you know if anyone objected to
11 Holsten Management using this lease?
12    A.   I don't.
13    MS. SHELEY:  Can we please this have marked
14 Exhibit -- are we on, 20 -- 21.
15         (WHEREUPON, a certain document was
16         marked Deposition Exhibit No. 21,
17         for identification.)
18 BY MS. SHELEY:
19    Q.   Okay.  We are going to switch out.  I'm
20 taking Exhibit 20 from you, and now you have
21 Exhibit 21.  21 is marked 1875 through 1910.
22         Do you recognize this document?
23    A.   No.
24    Q.   Do you know if this cover sheet is a CHA

Page 112

1  document?
2     A.   No.
3     Q.   Is there a process -- do you -- looking
4  at the cover sheet and the fifth box from the
5  bottom, it says, "Results of Drug Screening,"
6  correct?
7     A.   Yes.
8     Q.   And then at the very bottom it says, "No
9  criminal or drug screening documentation should be
10 maintained in the file unless initial/continued
11 occupancy is denied"; is that right?
12    A.   Yes, that is what it states.
13    Q.   Do you know if it's the policy of the
14 CHA to collect information on -- to collect the
15 results of drug screening if a person fails?
16    A.   We do not receive that information.
17    Q.   So you don't receive information if
18 somebody fails -- fails a drug test?
19    A.   No.
20    Q.   Why is -- why is there a line in this
21 box that says, "Results of Drug Screening (if
22 applicable)"?
23    A.   I don't know.  I don't know that this is
24 a CHA document.



Page 113

1    Q.   Okay.  Is there a process -- just
2  without looking at the document, do you know
3  independently if there's a process for setting the
4  rent of CHA tenants?
5    A.   I know there's a -- their rents are
6  determined, their options for rent.
7    Q.   And what are the options for rent?
8    A.   30 percent of the resident's income or,
9  depending, a flat rate.
10   Q.   And where do those standards come from?
11   A.   I don't know.
12   Q.   Are they CHA standards?
13   A.   Yes.
14   Q.   Do they apply to all CHA tenants?
15   A.   Yes.
16   Q.   If a developer in a mixed-income -- if a
17 mixed-income developer wanted to charge more than
18 30 percent of a tenant's income or -- what was the
19 second amount?
20   MR. SCHWARTZ:  Flat fee.
21 BY MS. SHELEY:
22   Q.   -- the flat fee, would they be allowed
23 to do that?
24   MR. MENDENHALL:  I'm going to object to the

Page 114

1  form and instruct you not to answer.  If you can
2  answer as to Parkside and Mr. Peery, that is fine.
3  Otherwise, I'm instructing you not to answer.
4  BY THE WITNESS:
5    A.   At Parkside residents pay 30 percent of
6  their income or a flat fee.
7  BY MS. SHELEY:
8    Q.   If the developer at Parkside wanted to
9  charge any tenant more than 30 percent of their
10 income or a flat fee, could they do that?
11   MR. MENDENHALL:  Objection, clarification.
12 Karen, you said "any tenant."  Does that include
13 market?  That is -- object to the form of the
14 question.
15 BY MS. SHELEY:
16   Q.   Okay.  If the -- if a developer -- if
17 Parkside wanted to charge a CHA tenant more than a
18 third of their rent (sic) or a flat fee could they
19 do that?
20   A.   No.  Correction.  I do have one
21 correction.  Parkside has a minimum rent, I
22 believe, of $50.
23   Q.   How did the minimum rent of $50 come --
24 how did -- let me start again.

Page 115

1    Why is there a minimum rent of $50?
2    A.   I do not know.
3    Q.   Was it -- did Parkside have to go to the
4  CHA and negotiate in order to have a minimum rent
5  of $50?
6    A.   I do not know.
7    Q.   Other than the $50, can Holsten increase
8  the rent above $50 without -- let me start again.
9      Other than the $50 minimum, could the
10 developer or the property manager at Parkside raise
11 the rent above $50?
12   MR. MENDENHALL:  Object to the form of the
13 question.
14 BY THE WITNESS:
15   A.   No.  The resident pays 30 percent of
16 their income or a flat fee.
17 BY MS. SHELEY:
18   Q.   Okay.  Do you know if the $50 is in
19 Parkside's tenant selection plan or lease?
20   A.   It was when we closed.
21   Q.   And that lease and tenant selection plan
22 were subject to the negotiations that we discussed
23 this morning, right?
24   MR. MENDENHALL:  Objection, misstates prior

Page 116

1  testimony.
2  BY THE WITNESS:
3    A.   Uhn-uhn.
4  BY MS. SHELEY:
5    Q.   Okay.  What is the total amount of CHA
6  funds that were used to develop Parkside in all of
7  its phases?
8    A.   I do not know off the top of my head.
9    Q.   Do you know how much were used in
10 Phase I?
11   A.   I do not know those numbers off the top
12 of my head.
13   Q.   Where would you look to find those
14 numbers?
15   A.   Mixed finance, ACC.
16   Q.   Okay.  Could we pull out Exhibit 16,
17 please.  Is this the document that you were talking
18 about?
19   A.   Maybe not.
20   Q.   Can I direct your attention to --
21   A.   Yes.
22   Q.   Okay.  Great.  I'm going to first direct
23 your attention to -- okay.  We are looking at
24 Exhibit 16, and I'm directing your attention to



1 Bates stamp ending 738. Starting with Part G, does
2 this reflect the number -- the amount of grants
3 that were dedicated to Parkside by HUD?
4     MR. GILBERT: I'm sorry. Which page are you
5 on?
6     MS. SHELEY: 738.
7 BY THE WITNESS:
8     A.  Yes, for this phase.
9 BY MS. SHELEY:
10     Q.  And are there -- there are similar
11 documents for other phases that lay out the amount
12 of grants that HUD contributed to those phases; is
13 that correct?
14     A.  Yes.
15     Q.  Did HUD actually contribute these
16 amounts to Phase I that are listed in Part G on
17 page 738?
18     A.  Yes.
19     Q.  And there's an additional amount on 739,
20 and HUD contributed that as well?
21     A.  Yes.
22     Q.  So we are looking at -- did the HUD
23 money go directly to the developer, or did it pass
24 through the CHA?

1     A.  CHA.  It passed through CHA.
2     Q.  How did that work?
3     A.  CHA has -- CHA is federally funded.  We
4 have our funds, and we receive approval from HUD on
5 how those funds are used.
6     Q.  Can we turn to 768.  Under Part D it
7 says, "Authority," and Part A says, "Shall loan
8 $7,375,000 to the owner entity pursuant to the
9 Authority loan agreement."
10     Was that loan made to develop Parkside
11 by the CHA?
12     A.  Yes.
13     Q.  Okay.  And Part C discusses Series A
14 Bonds and Series B Bonds in the amount -- turn to
15 the next page -- of $14,238,640?
16     MR. MENDENHALL: Can you repeat that last
17 part.
18 BY MS. SHELEY:
19     Q.  Could you explain what happened with --
20     MR. MENDENHALL: One second, Ms. Sheley.
21         (WHEREUPON, the record was read by
22         the reporter.)
23 BY MS. SHELEY:
24     Q.  So it discusses that amount, right?

1     A.  Yes.
2     Q.  How were those funds used to fund the
3 development?
4     A.  They were funded through construction
5 draws.
6     Q.  What does that mean?
7     A.  The developer submits, based on their
8 progress and what has been completed, a request for
9 funds.
10     Q.  And that money went to the developer as
11 well?
12     A.  Yes.
13     Q.  Okay.  Further down the page it says,
14 "City of Chicago, Department of Housing."  This is
15 on 769.  Did the money listed in this subheading
16 also go to the developer?
17     A.  Yes.
18     Q.  What was the CHA's connection to the
19 City of Chicago, Department of Housing in procuring
20 these funds?
21     A.  I am not sure what you mean by
22 "connection."
23     MR. MENDENHALL: Let me enter an objection to
24 the form of the question.

1 BY MS. SHELEY:
2     Q.  Did the CHA have meetings with the
3 Chicago Department of Housing about the development
4 at Parkside?
5     A.  Yes.  We participated in meetings with
6 the developer and the City.
7     Q.  And did the CHA make any recommendations
8 about the amount that the City provide to Parkside?
9     A.  No.
10     Q.  Did the CHA know how much was being
11 contributed by the City of Chicago prior to making
12 its commitments to fund Parkside?
13     A.  Yes, based on the proposed budget that
14 was submitted to both CHA and the City.
15     Q.  So there are other agreements -- we have
16 discussed that there are other agreements for the
17 other phases of Parkside, correct?
18     A.  Yes.
19     Q.  Do those agreements also correctly
20 outline the amount of money that the Chicago
21 Housing Authority provided to the developer?
22     MR. MENDENHALL: Object to the form of the
23 question.  The documents speak for themselves.
24



1  BY THE WITNESS:
2      A.    Repeat the question, please.
3              (WHEREUPON, the record was read by
4              the reporter.)
5  BY THE WITNESS:
6      A.    Yes.
7  BY MS. SHELEY:
8      Q.    You said yes?
9      A.    Yes.
10     Q.    Okay.  Do they also reflect the
11  amount -- the amount of money that other government
12  agencies provided to Parkside?
13         MR. MENDENHALL:  Same objection.  My
14  understanding is she's not asking you about this
15  document, I don't think.
16         THE WITNESS:  No, she's not.
17         MR. SCHWARTZ:  I'm sure the answers are in
18  there, if you look hard enough.
19  BY THE WITNESS:
20     A.    No.  Yes.
21  BY MS. SHELEY:
22     Q.    Your answer is, yes, that the other
23  documents accurately reflect the amount of money
24  that was provided to Parkside by other government

1  entities?
2          MR. MENDENHALL:  And my objection, same
3  objection.
4  BY THE WITNESS:
5      A.    (Nodding head.)
6  BY MS. SHELEY:
7      Q.    Can you answer out loud?
8      A.    Yes.
9      Q.    Thank you.  So were there -- in the
10  other two phases -- in the other two phases of the
11  contracts, there were additional CHA loans, right?
12     A.    Yes.
13     Q.    And there was Chicago TIF money; is that
14  right?
15     A.    I would need to see.  Depending on which
16  phase.
17     Q.    Okay.  Were there Chicago tax credits
18  that went into the development?
19     A.    Yes.
20     Q.    Did Chicago TIF money generally go into
21  the development?
22     A.    Yes.
23     Q.    Did the Illinois Housing Development
24  Authority provide funding for the development?

1      A.    I would need to see which phase.
2      Q.    In any of the phases did it provide
3  funding?
4      A.    Yes.
5      Q.    Do you know how much?
6      A.    No.
7      Q.    Setting aside the amount -- actually,
8  could we have this document back.  After
9  construction, did the CHA provide any money to
10  Parkside?
11     A.    Operating subsidies.
12     Q.    What is the operating subsidy?
13     A.    I don't know the amount.
14     Q.    What is an operating subsidy?
15     A.    An amount provided to the developer for
16  each unit to help maintain the units.
17     Q.    How is that amount set?
18     A.    It's determined between asset management
19  and the developer.
20     Q.    Okay.  Is the amount set per unit per
21  year?
22     A.    Yes.
23     Q.    And in addition -- other than the
24  operating subsidy, are there other amounts that are

1  provided to the -- to Parkside?
2      A.    No, not that I'm aware of.
3      Q.    Okay.  If it costs more to operate
4  Parkside than the CHA pays through the operating
5  subsidy, is there some point that the CHA provides
6  the difference between the costs and the amount --
7  and the monthly provision?
8          MR. MENDENHALL:  Object to the form of the
9  question.
10  BY MS. SHELEY:
11     Q.    Can you answer?
12         MR. MENDENHALL:  We can do this on the record
13  or off the record.  When you say "Parkside," that's
14  the whole development, and CHA only has a certain
15  number of units.  So when you say "operating
16  Parkside," but that is your question, so object to
17  the form of the question.
18  BY MS. SHELEY:
19     Q.    Can you answer?
20     A.    CHA provides operating subsidy for the
21  public housing units.
22     Q.    And if the -- the amount that you --
23  that the CHA pays per month doesn't match the
24  amount that it costs to operate Parkside, does CHA



1 provide the difference in what --
2     MR. MENDENHALL: Object to the form of the
3 question.
4 BY MS. SHELEY:
5     Q.    If the CHA -- if the amount that the CHA
6 provides per month is not enough to cover the
7 amount it costs to run CHA units at Parkside, does
8 the CHA make up the difference?
9     A.    There is a process for additional funds
10 at the end of the year.
11     Q.    Did there come a time that Parkside
12 needed additional government funds in order to
13 continue to operate after the housing crash?
14     A.    No.
15     Q.    Going back a step, could you tell me
16 what the process is for reconciling the difference
17 between the operating costs and the amount for
18 maintaining CHA units and the amount that the CHA
19 provides throughout the year?
20     A.    I cannot.
21     Q.    Do you not know?
22     A.    No, I don't.
23     Q.    Okay.  Did there come a point that the
24 City of Chicago purchased some of Holsten's debts

1 in order to assist Holsten to continue to operate?
2     A.    Not that I'm aware of.
3     MR. MENDENHALL:  Whenever you get to a place
4 where you are comfortable, she just wanted to eat
5 her lunch.  It's 3:30 now.  Or she can eat during
6 it.  You said you would rather her eat separately.
7 If she can take five minutes and just some of
8 her salad for lunch, or she can eat while being
9 questioned.
10     MS. SHELEY:  We can take a ten-minute break,
11 if you want to take a ten-minute break for her to
12 have lunch.
13     MR. MENDENHALL:  We need five minutes.
14     MS. SHELEY:  Are you comfortable with a
15 five-minute break?
16     MR. GILBERT:  Let's just take ten just for all
17 of us.
18     MS. SHELEY:  Okay.  So we'll come back at
19 3:30.
20          (WHEREUPON, the record was read by
21          the reporter.)
22     MS. SHELEY:  It's 3:36.
23 BY MS. SHELEY:
24     Q.    Okay.  So a drug test is a condition of

1 admission at Parkside, right?
2     A.    Yes.
3     Q.    And it's also a condition of occupancy;
4 is that right?
5     A.    Yes.
6     Q.    What do you know about the drug
7 screening at Parkside?
8     A.    Just that it's required, it's part of
9 the property manager's application process.
10     Q.    Is it also required as part of the
11 annual lease?
12     A.    I do not know.
13     Q.    Did the CHA approve both -- approve the
14 annual lease at Parkside?
15     A.    Yes, we approved Holsten's lease.
16     Q.    I'm handing you what has been previously
17 marked Exhibit 7.
18     A.    Uh-huh.
19     Q.    Does anybody need a copy?
20     MR. GILBERT:  Yes, I would like one.  Thanks.
21     MR. SCHWARTZ:  Sam, you have your own already?
22     MR. MENDENHALL:  Yes.
23     MR. GILBERT:  We can also share one, if we
24 need to.

1     MR. SCHWARTZ:  I think there's plenty to go
2 around.
3 BY MS. SHELEY:
4     Q.    So we are now referring to Exhibit 7,
5 which is HMC 00641 through 713.  Do you recognize
6 this document?
7     A.    Yes.
8     Q.    Is this the Holsten portion of the lease
9 that the CHA approved?
10     MR. MENDENHALL:  Object to the form of the
11 question.
12 BY THE WITNESS:
13     A.    Just one second.
14 BY MS. SHELEY:
15     Q.    Sure.
16     A.    This is the lease that was -- yes, it's
17 the lease, uh-huh.
18     Q.    Okay.  Can you turn to the page Bates
19 stamped marked HMC 00650.  Looking at the first
20 sentence of this page, it says, "As a precondition
21 to renewing this lease, lessor requires that all
22 adults members, persons 18 and older, submit to
23 drug testing for nonprescribed, prohibited
24 controlled substances by a qualified laboratory



1 selected by the lessor."
2     The CHA approved this portion as well,
3 right? Did it approve the entire lease?
4     MR. MENDENHALL: Object to the form of the
5 question.
6 BY THE WITNESS:
7     A. I do not know if this was a part of the
8 initial lease packet that was approved when we went
9 to board.
10 BY MS. SHELEY:
11     Q. In order for Holsten to use it, would it
12 need to be part of the lease package that was
13 approved by the CHA Board?
14     A. It should be.
15     Q. Is this a yearly lease?
16     A. I don't know. I have to read through
17 this.
18     Q. Without looking at the document --
19     A. Oh, here it is.
20     MR. MENDENHALL: Oh, you are not --
21 BY MS. SHELEY:
22     Q. Do you know?
23     A. No, I did not know off the top of my
24 head.

1     Q. Looking at the first page, do you know
2 now?
3     A. Yes.
4     Q. Okay. Is it a yearly lease?
5     A. Yes.
6     Q. So in order to renew the lease, which is
7 yearly, all adult members who are 18 years and
8 older, living in the household are required to
9 submit to a drug test; is that right?
10     MR. MENDENHALL: I'm going to object. You can
11 answer as to Mr. Peery.
12 BY THE WITNESS:
13     A. Yes, according to the documents.
14 BY MS. SHELEY:
15     Q. Okay. Is the CHA notified if someone is
16 evicted for failing the drug test?
17     A. The CHA is notified if someone is
18 evicted.
19     Q. Is the CHA notified if the reason for
20 the eviction is failure of a drug test?
21     MR. MENDENHALL: I'm going to object to the
22 form of the question.
23 BY THE WITNESS:
24     A. I do not know specific to a drug test.

1 BY MS. SHELEY:
2     Q. Okay.
3     MS. SHELEY: Could you please mark this
4 document?
5     (WHEREUPON, a certain document was
6     marked Deposition Exhibit No. 22,
7     for identification.)
8 BY MS. SHELEY:
9     Q. Can you please review -- are you
10 familiar with the document?
11     A. No.
12     Q. Okay. The document has been marked
13 Exhibit 22, and this is correspondence between the
14 ACLU and the CHA, right?
15     A. Yes.
16     Q. And if you look at the first page, I
17 thank -- the letter thanks the CHA for confirming
18 that both of the charts attached as Exhibits A and
19 B to my letter only show data for CHA residents and
20 not non-CHA residents at mixed-income communities.
21     Are you familiar with this letter, or
22 are you familiar --
23     A. No, I have never seen this.
24     Q. Okay. Can you turn to the back. The

1 part marked Exhibit A, are you familiar with this
2 chart?
3     A. No.
4     Q. Do you know how the CHA could have
5 compiled information about the number of positive
6 tests at the listed mixed-income communities?
7     A. The developer would have had to provide
8 that information.
9     Q. And in the second page of this exhibit,
10 it states that the CHA explained that the CHA
11 chart, Attachment B, shows the total number of
12 residents who are 18 and older in each development,
13 as of September of 2011, and the date range
14 indicates a search of birth year by residents.
15     Are you familiar with this chart?
16     A. No.
17     Q. Do you know if the CHA is capable of
18 providing -- what process the CHA went through to
19 provide this information?
20     A. I don't know.
21     Q. Okay. Do you know -- going back to
22 Exhibit A, do you know if the CHA asked the
23 developer for the number of positive tests?
24     A. Excuse me. I do not know.



1    Q.   Turning to Exhibit B, what is the CHA
2 database that was used to generate these numbers,
3 do you know?
4    A.   I don't know.
5    MR. MENDENHALL:  Objection, misstates the
6 evidence.
7 BY MS. SHELEY:
8    Q.   I'll take that back.  Thank you.
9       So at Parkside, do you know where the
10 specimen for the drug test is gathered?
11    A.   No.
12    Q.   Do you know who gathers it?
13    A.   No.
14    Q.   Do you know where the specimen for the
15 drug test is analyzed?
16    A.   No.
17    Q.   Do you know who analyzes it?
18    A.   No.
19    Q.   Do you know what drugs are subject to
20 testing?
21    A.   No.
22    Q.   Do you know how many people at Parkside
23 have been notified of a positive result?
24    A.   No.

1    Q.   Do you know what measures the CHA takes
2 to ensure confidentiality of people who are tested?
3    A.   No.  CHA does not manage that process.
4    Q.   Do you know what measures Holsten takes
5 to ensure the confidentiality of the tested
6 persons?
7    A.   No.
8    Q.   Do you know what protocols are in place
9 for people at risk of false positives due to their
10 use of lawful medicine?
11    A.   No.
12    Q.   Do you know by year the number of
13 applicants to CHA units who take the drug test at
14 Parkside?
15    A.   No.
16    Q.   Do you know the number of applicants to
17 CHA units at other mixed-income developments who
18 take the drug test?
19    MR. MENDENHALL:  Object and instruct you not
20 to answer.
21 BY MS. SHELEY:
22    Q.   Do you know the number of -- well, do
23 you decline to answer?
24    A.   Yes, I decline.

1    Q.   Do you know the number of current
2 residents of CHA units at Parkside who take the
3 drug test?
4    A.   No.
5    Q.   Do you know the number of current
6 residents at CHA units at other mixed-income
7 developments who take the drug test?
8    MR. MENDENHALL:  Instruct you not to answer.
9 BY MS. SHELEY:
10    Q.   Will you answer?
11    A.   No.
12    Q.   Do you know the number of applicants to
13 CHA units who -- at Parkside who have tested
14 positive?
15    A.   No.
16    Q.   Do you know the number of people who
17 have been admitted and are living at Parkside who
18 have tested positive?
19    A.   No.
20    Q.   Do you know the number of CHA residents
21 at other mixed-income developments who have tested
22 positive at the application point?
23    MR. MENDENHALL:  Instruct you not to answer.
24

1 BY MS. SHELEY:
2    Q.   Do you know the number of people who are
3 currently living in mixed-income developments who
4 are CHA residents who have tested positive?
5    MR. MENDENHALL:  Instruct you not to answer.
6 BY MS. SHELEY:
7    Q.   Will you answer?
8    A.   No.
9    Q.   At Parkside owners are not tested, are
10 they?
11    A.   No.
12    Q.   Are their household members tested?
13    A.   Owners, no.
14    Q.   Are the renters of owners tested?
15    A.   I do not know.
16    Q.   People who -- and people who are under
17 18 who are renters are not tested, are they?
18    A.   According to this policy, no.
19    Q.   Why aren't the owners tested?
20    A.   Owners do not have a lease with the
21 property manager and they own their units.
22    Q.   Did the CHA ever investigate other ways
23 to require the testing of owners?
24    A.   No, because we didn't --



Page 137

1    MR. MENDENHALL:  Object to the form of the
2  question.
3  BY MS. SHELEY:
4    Q.   Can you answer?
5    A.   No, we didn't.  We didn't recommend drug
6  testing.  That is not our policy.
7    Q.   In order to live at Parkside, a CHA
8  resident is required to have a year of prior lease
9  compliance; is that right?
10    A.   Yes.
11    Q.   A CHA tenant is required to have paid
12  all outstanding CHA rent; is that correct?
13    A.   Not totally, no.
14    Q.   Why?
15    A.   They can go into a payment arrangement.
16    Q.   What does a payment arrangement look
17  like?
18    A.   I don't know.  It's different for
19  different tenants.  They negotiate a price to pay
20  off the debt.
21    Q.   Do they have to show compliance with
22  that agreement?
23    A.   They have to be current with that
24  agreement, yes.

Page 138

1    Q.   CHA tenants have to undergo a credit
2  check in order to live at Parkside, right?
3    A.   Yes.
4    Q.   They have to undergo a criminal
5  background screening; is that correct?
6    A.   Yes.
7    Q.   They -- and during that screening, they
8  can be excluded for a conviction for any drug
9  crime; is that correct?
10    MR. MENDENHALL:  Can you read the question
11  back.
12        (WHEREUPON, the record was read by
13          the reporter.)
14    MR. MENDENHALL:  Object to the form of the
15  question.
16  BY THE WITNESS:
17    A.   I don't think that is totally correct.
18  BY MS. SHELEY:
19    Q.   Why not?
20    A.   You stated "any."  I don't think it's
21  for any, but I don't know.
22    Q.   CHA tenants can be excluded for previous
23  drug crimes, correct?
24    A.   That is at the property manager's

Page 139

1  discretion.
2    Q.   Is it a part of the lease?
3    A.   I don't know.  I cannot remember.  I
4  would have to read the lease.
5    Q.   Okay.  Do you have the lease in front of
6  you now?
7    A.   Uh-huh.
8    Q.   Can you turn to 675, the Bates stamp.
9  This describes a criminal background screening; is
10  that correct?
11    A.   Yes.
12    Q.   And it prevents -- it includes screening
13  for involvement in criminal activity by any member
14  of an applicant household that would adversely
15  affect the health, safety, or welfare of other
16  tenants; is that correct?
17    MR. MENDENHALL:  Let me just object.  The
18  document speaks for itself.
19        You can answer the question.
20  BY THE WITNESS:
21    A.   Repeat that question, please.
22    MR. MENDENHALL:  Would you like to direct her
23  to where?
24    MS. SHELEY:  Can you repeat the question,

Page 140

1  please.
2        (WHEREUPON, the record was read by
3          the reporter.)
4  BY THE WITNESS:
5    A.   One moment, please.
6    MR. MENDENHALL:  Again, Ms. Sheley, is there a
7  place that you would like to point the witness to?
8    MS. SHELEY:  I believe she's looking at
9  paragraph 3 right now.
10  BY THE WITNESS:
11    A.   That's correct, according to the
12  document.
13  BY MS. SHELEY:
14    Q.   Okay.  And this is the document that
15  the -- the CHA Board of Directors approved, right?
16    MR. MENDENHALL:  Objection, asked and
17  answered.
18  BY MS. SHELEY:
19    Q.   You can answer.
20    A.   Yes.
21    Q.   Okay.  Could you turn to -- actually,
22  we'll stay here.  In paragraph 5, it also says that
23  criminal offenses include disturbing the peace; is
24  that correct?



1    MR. MENDENHALL:  Objection.  Again, the
2  document speaks for itself.
3      You can answer.
4  BY THE WITNESS:
5    A.   Yes, that's stated.
6  BY MS. SHELEY:
7    Q.   And these are all part -- all of these
8  parts that are in paragraph 5 are part of the lease
9  that are part of the standards for the application
10 at Parkside; is that right?
11   A.   Yes.
12   Q.   If you turn to 683, if you look at
13 2(a)(i) and (ii), are these the drug crimes that
14 you were discussing that are included in the
15 exclusions from Parkside?
16   A.   One moment.  Repeat the question,
17 please.
18        (WHEREUPON, the record was read by
19         the reporter.)
20   MR. MENDENHALL:  I'm just going to object to
21 the form of the question.
22 BY THE WITNESS:
23   A.   I didn't discuss any exclusions
24 previously.

1  BY MS. SHELEY:
2    Q.   Okay.  Are these -- do these -- would a
3  CHA tenant be excluded from Parkside for these
4  kinds of criminal drug activities?
5    MR. MENDENHALL:  Objection.
6  BY THE WITNESS:
7    A.   The document states they could be.
8  BY MS. SHELEY:
9    Q.   Okay.  Do any CHA renters have a work
10 requirement?
11   MR. MENDENHALL:  Objection.  You can answer
12 with respect to Parkside.
13 BY MS. SHELEY:
14   Q.   We are off the document now.
15   A.   Yeah.  Okay.
16   Q.   Do CHA tenants have a work requirement?
17   A.   There's a work requirement for some
18 residents at Parkside.
19   Q.   How many?
20   A.   A number is not stipulated.
21   Q.   What does that mean?
22   A.   I don't know.  There's not a number that
23 says a certain number of residents has to work.
24   Q.   What does that mean?  Where does the

1  requirement for -- where does the work requirement
2  come from?
3    A.   It depends on what they fall under.  If
4  they fall under the Cabrini consent decree or if
5  they fall under the relocation rights contract.
6    Q.   If they fall under the Cabrini consent
7  decree, how many CHA tenants have to have a work
8  requirement?
9    A.   Depending on where they lived and where
10 they fall under the consent decree, 50 percent have
11 to work.
12   Q.   And under the relocation rights
13 contract?
14   A.   I believe all residents have a work
15 requirement.
16   Q.   Under the Cabrini consent decree for the
17 people who have a work requirement, what is that
18 work requirement.  Is it 30 hours?
19   A.   I do not know the number of hours.
20   Q.   And for the relocation rights contract,
21 do they have a 30-hour requirement?
22   A.   I don't know the requirement.
23   Q.   Are CHA tenants living at Parkside
24 required to document that their children attend

1  school regularly?
2    MR. MENDENHALL:  Just enter an objection as to
3  relevancy.
4  BY THE WITNESS:
5    A.   I don't know.
6  BY MS. SHELEY:
7    Q.   And before a tenant can -- as part of
8  the application process at Parkside, can Parkside
9  do a home visit on as little as 24-hour notice with
10 the applicant?
11   MR. MENDENHALL:  And I'm going to object and
12 instruct you -- objection.  You can answer.
13 BY THE WITNESS:
14   A.   I do not know.  That is the property
15 manager's process.
16 BY MS. SHELEY:
17   Q.   Okay.  Can you take a look -- again, I'm
18 going to hand this Exhibit 7 back to you again, and
19 you are at -- let me find it.  Page 676, Part H,
20 the first sentence states -- includes the
21 requirement that applicants provide documentation
22 that their children attend school regularly,
23 correct?
24   MR. MENDENHALL:  I'm going to object and

1  instruct you not to answer. Mr. Peery has no kids,
2  and that is not relevant to the preliminary
3  injunction so do not answer.
4  BY MS. SHELEY:
5     Q.   Will you answer?
6     A.   No.
7     Q.   All right. If a renter's guest is
8  disruptive at Parkside, they can be permanently
9  barred; is that correct?
10    MR. MENDENHALL:  Object to the form.
11  BY THE WITNESS:
12    A.   The guest can be permanently disbarred,
13  is that what you are asking?
14  BY MS. SHELEY:
15    Q.   Yes.
16    MR. MENDENHALL:  Ms. Sheley, we can do this on
17  the record or off the record, but let's do it on
18  the record. You keep saying a renter at Parkside.
19  That does not make a distinction between a market
20  rate and affordable or CHA. She does not know as
21  the market rate.
22        Object to the form of the question.
23  BY MS. SHELEY:
24    Q.   Can you answer the question?

1     MR. MENDENHALL:  If you need additional
2  clarification, let her know.
3     MS. SHELEY:  Can I please asking that you just
4  make speaking objections (sic).
5     MR. MENDENHALL:  I'm going to instruct her not
6  to answer the question unless that is clarified.
7  Do not answer the question unless she clarifies
8  what she means by "renter."
9     MS. SHELEY:  On what basis?
10    MR. MENDENHALL:  Because there's market rate
11  renter, there's affordable housing, and there's
12  CHA. I simply asked you to make a distinction in
13  terms of what is question that you are asking her.
14  If you don't want to do that, I'm not going to let
15  her answer.
16  BY MS. SHELEY:
17    Q.   Okay. Do you --
18    MR. MENDENHALL:  Answer as to CHA residents,
19  if you know.
20  BY MS. SHELEY:
21    Q.   Can you answer?
22    A.   Yes.
23    MS. SHELEY:  Can you repeat my question, Court
24  Reporter.

1        (WHEREUPON, the record was read by
2        the reporter.)
3     MR. MENDENHALL:  And the same objections I
4  just stated.
5     MS. SHELEY:  I needed the question reviewed.
6  Thank you.
7  BY MS. SHELEY:
8     Q.   If a CHA tenant's guest is disruptive --
9  if a CHA tenant who is living at Parkside's guest
10  is disruptive, they can be permanently barred; is
11  that correct?
12    A.   As I understand, the guest can be
13  permanently disbarred, yes.
14    Q.   If a CHA tenant at Parkside does not
15  cooperate with this bar, the CHA tenant can be
16  evicted; is that correct?
17    MR. MENDENHALL:  Objection.
18  BY THE WITNESS:
19    A.   I do not know. I would have to read the
20  specific language.
21  BY MS. SHELEY:
22    Q.   Can you turn to 645?
23    A.   Uh-huh.
24    Q.   The last sentence -- can I turn your

1  attention to the last sentence in the first
2  paragraph.
3     MR. MENDENHALL:  Read the whole paragraph.
4     MS. SHELEY:  So can you read back my last
5  question, please?
6        (WHEREUPON, the record was read by
7        the reporter.)
8     MR. MENDENHALL:  And I'm going to --
9  BY MS. SHELEY:
10    Q.   Can you please answer that question?
11    MR. MENDENHALL:  And I'm going to object to
12  the form. The document speaks for itself.
13  BY MS. SHELEY:
14    Q.   Can you answer the question?
15    A.   According to the document, yes.
16    Q.   Okay. Does the document refresh any of
17  your recollection about how the process of eviction
18  works at Parkside?
19    A.   No.
20    Q.   Tenants are also barred from criminal
21  activity; is that correct?
22    A.   Yes.
23    Q.   And that includes -- that bar includes
24  crimes of drug possession, manufacture, and sale;



Page 149

1  is that correct?
2      MR. MENDENHALL:  Same objection.
3  BY THE WITNESS:
4      A.  I would have to see the specific
5  language.
6  BY MS. SHELEY:
7      Q.  Okay.  Without looking at the document,
8  do you know if CHA tenants and other tenants at
9  Holsten and the properties are treated -- sign the
10 same lease?  Let me start again.
11      Do you know if the same rules apply to
12 CHA tenants and other renters that are at Parkside?
13     A.  It's my understanding that the rules
14 apply to all renters.
15     Q.  Do you know why?  Is that a requirement
16 of the CHA?
17     A.  Yes, that's one of our requirements.
18     Q.  Under the CHA lease -- let's pull that
19 out again.  I can take this one back.  This was
20 previously marked Exhibit 10 in a prior deposition.
21     MR. MENDENHALL:  Oh, I have it.
22 BY MS. SHELEY:
23     Q.  Is this -- do you recognize this
24 document?

Page 150

1      A.  No.
2      Q.  Is this a CHA lease?
3      A.  I don't know.  This is not a lease that
4  I'm familiar with, with mixed-income.
5      Q.  Can you turn to the Bates stamp 741, and
6  do you see that Mr. Peery and someone signing as
7  the property manager executed this document?
8      A.  Yes, I do.
9      Q.  Do you know why?
10     A.  No, I don't.
11     Q.  Are you familiar with the CHA lease in
12 general?  Do you have knowledge of this lease?
13     A.  I only have knowledge of leases that
14 apply to mixed-income, and this does not look like
15 a mixed-income lease.
16     Q.  Have you ever seen this document before?
17     A.  No, I don't think so.
18     Q.  So setting the document aside -- if you
19 could set it down for me, please.
20      People who are at Parkside, they can
21 be -- CHA tenants at Parkside can be evicted for
22 not paying rent, right?
23     A.  Yes.
24     Q.  CHA tenants at Parkside can be evicted

Page 151

1  for damaging the unit, right?
2      A.  I don't know.
3      Q.  Can CHA tenants be evicted for
4  housekeeping violations?
5      A.  I don't know.
6      Q.  CHA tenants can be evicted for
7  disturbing other residents's peaceful enjoyment,
8  correct?
9      MR. MENDENHALL:  Object to the form.
10 BY THE WITNESS:
11     A.  Repeat the question.
12 BY MS. SHELEY:
13     Q.  CHA unit -- CHA tenants at Parkside can
14 be evicted for disturbing another resident's
15 peaceful enjoyment of the their home; is that
16 correct?
17     A.  I don't know.
18     Q.  Does CHA have a one strike policy?
19     A.  I don't know.
20     Q.  Are you familiar with the term "one
21 strike policy"?
22     A.  I have heard that years ago.
23     Q.  What is your understanding of the one
24 strike policy?

Page 152

1      A.  I don't know.  I don't have an
2  understanding.
3      Q.  Does the CHA track the number of
4  evictions that it has per year?
5      A.  I don't know.
6      Q.  Does the CHA track the number of agreed
7  move-outs that it has per year?
8      MR. MENDENHALL:  Again, I'm going to object.
9  Answer as to Parkside, if you know.  Do not answer
10 Authority-wide.  Class discovery is not allowed.
11 BY THE WITNESS:
12     A.  I do not know.
13 BY MS. SHELEY:
14     Q.  Do you know if the CHA maintains
15 statistics on the number of evictions per year at
16 mixed-income developments?
17     MR. MENDENHALL:  Same instruction.
18 BY THE WITNESS:
19     A.  I do not know.
20 BY MS. SHELEY:
21     Q.  I'm handing you Exhibit 15.  This is the
22 Moving to Work, Annual Report, that we discussed
23 before.  Can you turn to page 305.  Do you see the
24 box in the lower right-hand side?



1    A.   Yes.
2    Q.   It says, "Criminal Activity Evictions
3  FY2008."  Do you know what this -- what the
4  information -- where the information in this box
5  came from?
6    A.   No.
7    Q.   Do you know who would know at the CHA?
8    MR. MENDENHALL:  And I'm going to object to
9  this again, class.  This is beyond Parkside.
10 BY MS. SHELEY:
11   Q.   Can you answer the question?
12   A.   No.
13   Q.   Do you not know?  Is that your answer?
14   A.   I don't know.
15   Q.   Do you know what the criminal
16 activity -- in the first sentence under, Criminal
17 Activity Eviction, it says, "CHA has created and
18 enforces a Criminal Activity Eviction Policy at the
19 behest of HUD."
20        Do you know what the criminal activity
21 eviction policy is?
22   A.   No.
23   Q.   The last sentence of that paragraph
24 says, "Furthermore, CHA continued to partner with

1  the Chicago Police Department in order to mitigate
2  criminal activity on CHA properties throughout the
3  year."  Do you know -- can you describe that
4  partnership?
5    MR. MENDENHALL:  And I'm going to instruct her
6  not to answer this.
7    MS. SHELEY:  On what basis?
8    MR. MENDENHALL:  This says, "Criminal activity
9  on CHA properties."  Parkside is owned by private
10 developers.  Beyond the discovery allowed for the
11 preliminary injunction.  Do not answer.
12 BY MS. SHELEY:
13   Q.   Will you answer?
14   A.   No.
15   Q.   Does the CHA partner with the Chicago
16 Police Department in regard to safety at
17 mixed-income developments?
18   MR. MENDENHALL:  Instruct the witness to
19 answer only with respect to Parkside.
20   MS. SHELEY:  Just to be clear, each time that
21 you are saying that, you are instructing the
22 witness not to answer the full question that is
23 right, correct?
24   MR. MENDENHALL:  Can you read back my

1  objection?
2        (WHEREUPON, the record was read by
3        the reporter.)
4    MR. MENDENHALL:  Now read the question for me.
5        (WHEREUPON, the record was read by
6        the reporter.)
7    MR. MENDENHALL:  Yes, Ms. Sheley, you are
8  absolutely correct, I am not allowing her to answer
9  classwide mixed-income questions.  We are limiting
10 it to the scope that Judge Coleman set forth.
11   MS. SHELEY:  Can you repeat my last question.
12        (WHEREUPON, the record was read by
13        the reporter.)
14 BY MS. SHELEY:
15   Q.   Can you answer the question?
16   MR. MENDENHALL:  And I instruct you to answer
17 with respect to Parkside.
18   THE WITNESS:  Uh-huh.
19 BY THE WITNESS:
20   A.   I'm not sure what the term "partner"
21 means here, but CHA works with the property manager
22 and the police department.
23 BY MS. SHELEY:
24   Q.   What does the CHA do when it works with

1  the property manager and the police department?
2    A.   Help bring the group together to discuss
3  any issues, any activities.
4    Q.   How often does that happen?
5    A.   I don't know.
6    Q.   Is there an ongoing relationship between
7  the CHA, the property manager, and the Chicago
8  Police Department?
9    A.   Yes.
10   Q.   Is there data sharing between the
11 Chicago Police Department and the CHA regarding the
12 mixed-income developments?
13   MR. MENDENHALL:  Same objection.  Answer only
14 as to Parkside.
15 BY THE WITNESS:
16   A.   Yes, in relation to Parkside.
17 BY MS. SHELEY:
18   Q.   What is the data sharing between the CHA
19 and the Chicago Police Department in relation to
20 Parkside?
21   A.   Report on criminal activities in the
22 area.
23   Q.   Who provides the report on criminal
24 activities in the area?



1    A.   The police department.
2    Q.   Who does the police department provide
3  the report to?
4    A.   I'm just struggling because I don't know
5  the title, CHA security department.
6    Q.   So someone at the CHA?
7    A.   Yes, and the property manager.
8    Q.   And the property manager.  What form
9  does the report from the Chicago Police Department
10  to the CHA take?  Is it a written report?
11    A.   That I don't know.
12    Q.   Who would know?
13    A.   The security department at CHA.
14    Q.   Does the CHA share information with the
15  Chicago Police Department about safety at Parkside?
16    A.   The property manager does.
17    Q.   Does the CHA facilitate that?
18    MR. MENDENHALL:  Objection.
19  BY THE WITNESS:
20    A.   CHA does meet with the property manager
21  and the police department.
22  BY MS. SHELEY:
23    Q.   And what does the property manager share
24  with the Chicago Police Department?

1    A.   Any concerns that they have on criminal
2  activity.
3    Q.   What form does that take?  Is it a
4  written -- do they provide written information to
5  the Chicago Police Department?
6    A.   I don't know that.
7    Q.   Okay.  Is the headquarters for the
8  CPD 18th District across the street from one of the
9  Parkside developments?
10    A.   Yes.
11    Q.   Does the CHA participate in discussions
12  of community policing in the area around Parkside
13  with the Chicago Police Department?
14    A.   Yes.
15    Q.   What kind of communications does it
16  participate in?
17    A.   I'm only aware of meetings that have
18  been attended.
19    Q.   How often are these meetings?
20    A.   That I don't know.
21    Q.   Has the CHA communicated with the
22  Chicago Police Department about beat patrols in the
23  area of Parkside?
24    A.   That I don't know.

1    Q.   Does the CHA communicate with the
2  Chicago Police Department about targeting open air
3  drug dealing around Parkside?
4    A.   Repeat the question, please.
5    Q.   Has the Chicago Housing Authority had
6  communications with the Chicago Police Department
7  about targeting open air drug dealing in the area
8  of Parkside?
9    A.   Oh, that I don't know.
10    Q.   There's a supermarket across Division
11  Street from Parkside, isn't there?
12    A.   There used to be, yes.
13    Q.   Yes.  It's soon to be again, right?
14    A.   (Indicating).
15    Q.   Hopefully?  That was the Dominicks?
16    A.   Yes.
17    Q.   And it's -- there's also a Target
18  diagonally across the street from Parkside; is that
19  correct?
20    A.   Yes.
21    Q.   And Seward Park is -- adjoins Parkside;
22  is that correct?
23    A.   Yes.
24    Q.   So we have -- we just discussed a few

1  new amenities that are near Parkside, the
2  supermarket, the Target.  Do those tend to make
3  Parkside a safer and more successful community?
4    MR. MENDENHALL:  Object to the form of the
5  question.
6    MS. LISKOW:  What was that objection?
7    MR. SCHWARTZ:  Form.
8    MR. GILBERT:  Form.
9    MS. LISKOW:  What?
10    MR. GILBERT:  Form.
11  BY THE WITNESS:
12    A.   I cannot speak to those making it a
13  safer environment.
14  BY MS. SHELEY:
15    Q.   Does it make it more successful?
16    A.   It helps having amenities in the
17  community.
18    Q.   Does the CHA encourage having amenities
19  in the community?
20    A.   Yes.
21    Q.   What does it do to encourage having new
22  amenities in the community?
23    A.   It is part of our planning process.  If
24  it's involved in our planning process, we work with



1  developers.
2      Q.   Does the CHA's communications with the
3  Chicago Police Department help make Parkside a
4  safer community?
5      MR. MENDENHALL:  Can you repeat the question?
6          (WHEREUPON, the record was read by
7          the reporter.)
8      MR. MENDENHALL:  Same objection.
9  BY THE WITNESS:
10     A.   I cannot speak to that.
11     MR. MENDENHALL:  Same objection as to form.
12 BY MS. SHELEY:
13     Q.   Do you not know?
14     A.   I don't know.
15     Q.   Do you know, why does the Chicago
16 Housing Authority communicate with the Chicago
17 Police Department?
18     A.   We work with the property managers and
19 the police department on any concerns that the
20 property manager has.
21     Q.   Is it to address concerns about safety?
22     A.   Yes.
23     Q.   We discussed a number of selection
24 criteria at Parkside, minimum monthly rent, prior

1  lease compliance, credit check, criminal background
2  check.  Do these measures help contribute to making
3  Parkside a safe community?
4      MR. MENDENHALL:  Same objection.
5  BY THE WITNESS:
6      A.   I don't know.  I can't speak to that.
7  BY MS. SHELEY:
8      Q.   Does the ability to evict disruptive
9  guests contribute to Parkside being a safer
10 community?
11     A.   I can only give my opinion.  I can't
12 speak to that.
13     MR. MENDENHALL:  And same objection.
14 BY MS. SHELEY:
15     Q.   Does the CHA have a position about
16 whether the selection -- the eviction -- that bars
17 disruptive guests makes Parkside a safer community?
18     A.   I would say it would depend on the
19 specific case.
20     Q.   Does the CHA believe that the powers of
21 eviction that the developer has tend to make
22 Parkside a safer community?
23     MR. MENDENHALL:  Could you repeat the
24 question?

1          (WHEREUPON, the record was read by
2          the reporter.)
3      MR. MENDENHALL:  Again, same objection.
4  BY THE WITNESS:
5      A.   That's a very broad question.
6  BY MS. SHELEY:
7      Q.   Can you try to answer it?
8      A.   It depends.
9      Q.   What does it depend on?
10     A.   In the document it says there could be
11 eviction for a number of reasons, which has nothing
12 to do with safety.
13     Q.   What would have to do with safety?
14     A.   We talked about criminal activity in the
15 document.
16     Q.   Would disruptive guests have to do with
17 safety?
18     A.   Not necessarily, no.
19     Q.   Does the power to evict based on
20 criminal activity increase safety?
21     MR. MENDENHALL:  Same objection.
22 BY THE WITNESS:
23     A.   I would need to see the definition of
24 "criminal activity."

1  BY MS. SHELEY:
2      Q.   Does the CHA have a role in selling the
3  condos at Parkside?
4      A.   You would have to be more specific.
5      Q.   Does CHA ever market the condos to
6  potential buyers?
7      A.   Generally, no, we don't market the
8  condos.
9      Q.   Does the CHA know how they are marketed
10 to buyers?
11     A.   Generally, not detailed specifics, no.
12     Q.   Okay.  What does the CHA know about how
13 the condos are marketed?
14     A.   We'll know what signs are put up on
15 buses, we will know what firms they are using to
16 market the units, but not down to specific details
17 on how they are marketed, no.
18     Q.   Does the CHA have other communications
19 with people who buy the condos?
20     A.   Generally, no.
21     Q.   When you say "generally," do they have
22 any communications with the people who purchase the
23 condos at Parkside?
24     A.   Maybe at a condo association meeting,



Page 165
1  but not -- no.
2     Q.   Okay.  Does the CHA attend the condo
3  association meetings?
4     A.   We have a representative that attends.
5     Q.   Who is that representative?
6     A.   Someone from the asset management
7  department.
8     Q.   Why do they attend?
9     A.   I can't give that answer.  I don't know.
10    Q.   Okay.  Do you know how often the
11 meetings are?
12    A.   No.
13    Q.   What does the CHA know about the manner
14 in which the condos are marketed to the condo
15 buyers at Parkside?
16    A.   Once again, we may know the firm that
17 they are using to market.  We may be aware of
18 signage and postings, but other than that, we are
19 not involved in the details.
20    Q.   So the CHA is only aware of the firm,
21 the signage, and the posting?
22    A.   We don't get involved in the details.
23 That is the property manager's or the developer's
24 asset.

Page 166
1     MS. SHELEY:  Okay.  I think we are going to
2  take just a two-minute break and come right back.
3          (WHEREUPON, a recess was had and the
4          deposition was adjourned until
5          9:30 a.m., 02/14/14.)

Page 167
1  STATE OF ILLINOIS )
2                   ) SS:
3  COUNTY OF C O O K )
4       I, KRISTIN C. BRAJKOVICH, a Certified
5  Shorthand Reporter of said state, do hereby
6  certify:
7       That previous to the commencement of the
8  examination of the witness, the witness was duly
9  sworn to testify the whole truth concerning the
10 matters herein;
11      That the foregoing deposition transcript
12 was reported stenographically by me,
13 was thereafter reduced to typewriting under my
14 personal direction and constitutes a true record
15 of the testimony given and the proceedings had;
16      That the said deposition was taken
17 before me at the time and place specified;
18      That I am not a relative or employee
19 or attorney or counsel, nor a relative or
20 employee of such attorney or counsel for any of
21 the parties hereto, nor interested directly or
22 indirectly in the outcome of this action.
23      IN WITNESS WHEREOF, I do hereunto set my
24 hand and affix my seal of office at Chicago,

Page 168
1  Illinois, this 17th day of February, 2014.

7  C.S.R. Certificate No. 84-3810.



```
                                          Page 169
1                     I N D E X
2   WITNESS                        EXAMINATION
3   SHARNETTE BROWN
4        By Ms. Sheley            5
5
6
7              E X H I B I T S
8   NUMBER                            PAGE
9   Deposition Exhibit
10   No. 12                           7
11   No. 13                          10
12   No. 14                          21
13   No. 15                          26
14   No. 16                          43
15   No. 17                          45
16   No. 18                          53
17   No. 19                         107
18   No. 20                         108
19   No. 21                         111
20   No. 22                         131
21
22
23
24
```



Page 170

```
 1            IN THE UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF ILLINOIS
 3                    EASTERN DIVISION
 4
 5   JOSEPH PEERY, on behalf of    )
 6   himself and all persons       )
 7   similarly situated,           )
 8           Plaintiffs,           )
 9        vs.                      ) No. 13-cv-05819
10   CHICAGO HOUSING AUTHORITY, and )
11   HOLSTEN MANAGEMENT CORPORATION, )
12           Defendants.           )
13
14                    February 14, 2014
15                    9:34 a.m.
16
17
18           The continued 30(b)(6) deposition of
19   CHICAGO HOUSING AUTHORITY by SHARNETTE BROWN,
20   resumed pursuant to recess at Suite 3800, One South
21   Dearborn Street, Chicago, Illinois.
22
23
24
```

Page 171

```
 1   PRESENT:
 2
 3        ROGER BALDWIN FOUNDATION OF ACLU, INC.,
 4        (180 North Michigan Avenue, Suite 2300,
 5        Chicago, Illinois 60601,
 6        1-312-201-9740), by:
 7        MS. KAREN SHELEY,
 8        ksheley@aclu-il.org,
 9        MR. ADAM SCHWARTZ,
10        aschwartz@aclu-il.org,
11        MS. INGRID BERGSTROM,
12        ibergstrom@aclu-il.org,
13             -and-
14        SIDLEY AUSTIN LLP,
15        (One South Dearborn Street,
16        Chicago, Illinois 60603,
17        1-312-853-7000), by:
18        MR. ERIC T. SCHMITT,
19        eric.schmitt@sidley.com,
20        MR. RICHARD J. O'BRIEN,
21        robrien@sidley.com,
22             appeared on behalf of the Plaintiff;
23
24
```

Page 172

```
 1   PRESENT (Continued):
 2
 3        WINSTON & STRAWN LLP,
 4        (35 West Wacker Drive,
 5        Chicago, Illinois 60601,
 6        1-312-558-5755), by:
 7        MR. SAMUEL MENDENHALL,
 8        smendenhall@winston.com,
 9             appeared on behalf of Defendant
10             Chicago Housing Authority;
11
12        JOHNSON, JONES, SNELLING & GILBERT,
13        (36 South Wabash Avenue, Suite 1310,
14        Chicago, Illinois 60603,
15        1-312-578-8100) by:
16        MR. JEFFREY B. GILBERT,
17        jgilbert@jjsgd.com,
18             appeared on behalf of Defendant
19             Holsten Management Corporation;
20
21
22
23
24
```

Page 173

```
 1   PRESENT (Continued):
 2
 3        LOEVY & LOEVY,
 4        (312 North May Street, Suite 100,
 5        Chicago, Illinois 60607,
 6        1-312-243-5900), by:
 7        MS. SAMANTHA LISKOW,
 8        samantha@loevy.com, and
 9        MS. RACHEL STEINBACK,
10        rachel@loevy.com,
11             appeared on behalf of Plaintiffs in the
12             related Stubenfield matter;
13
14        LAW OFFICES OF FIGLIULO & SILVERMAN,
15        (10 South LaSalle Street, Suite 3600,
16        Chicago, Illinois 60603,
17        1-312-251-5281), by:
18        MS. STEPHANIE D. JONES,
19        sjones@fslegal.com,
20             appeared on behalf of Defendant The
21             Community Builders in the related
22             Stubenfield matter.
23   REPORTED BY:  KRISTIN C. BRAJKOVICH,
24             CSR No. 84-3810.
```



Page 174

1    MS. SHELEY: Let's go on the record.
2    MR. MENDENHALL: Pursuant to Rule 30(b)(6) --
3    pursuant to Rule 30(d)(2), I want to make clear for
4    all parties here today, depositions are limited to
5    seven hours. We had four and a half hours --
6    four hours and 45 minutes or so yesterday. We are
7    down to two hours and 25 minutes, and that
8    includes, importantly, if indeed another witness is
9    brought in. Mr. Schwartz mentioned topics that
10   have not been answered under the 30(b)(6). The
11   30(b)(6) is limited to seven hours, so that would
12   include any other topics that you feel were not
13   thoroughly vetted.
14        So I would say to all of the parties,
15   please use the time wisely.
16   MS. SHELEY: We clearly disagree with your
17   position. This witness was not prepared to answer
18   the questions, the topics that were subject to the
19   30(b)(6) notice, and the deposition was disrupted
20   several times yesterday. We will finish today, and
21   we will move forward from there.
22   MR. MENDENHALL: And I stand by my position,
23   and let's move forward, Counsel.
24   MS. SHELEY: Okay. Ms. Brown, do you still

Page 175

1    understand that -- could we reswear the witness.
2         (WHEREUPON, the witness was duly
3          sworn.)
4         SHARNETTE BROWN,
5    called as a witness herein, having been first duly
6    sworn, was examined and testified as follows:
7         EXAMINATION
8    BY MS. SHELEY:
9    Q.   Ms. Brown, between last night and this
10   morning, did you do anything further to prepare for
11   your testimony today?
12   A.   No.
13   Q.   Did you have any discussions about your
14   testimony today?
15   A.   No.
16   Q.   Did you have any discussions about your
17   testimony from yesterday?
18   A.   No.
19   Q.   Did you meet with counsel?
20   A.   No.
21   Q.   So you worked on the Parkside
22   development; is that correct?
23   A.   Yes.
24   Q.   What was your first duty at the Parkside

Page 176

1    development?
2    A.   Doing environmental and infrastructure
3    improvements.
4    Q.   What does that mean?
5    A.   Doing environmental remediation and
6    infrastructure improvements, water, sewer, working
7    with the developer to make sure that those
8    activities were carried out.
9    Q.   Was the building constructed at that
10   point?
11   A.   Not when I started.
12   Q.   And what kind of improvements did you
13   work on?
14   A.   Remediation, streets, sewer, water, with
15   the developer, public utilities and private
16   utilities.
17   Q.   What does "remediation" mean?
18   A.   Cleaning the soil.
19   Q.   And how is that done?
20   A.   Or removing the soil.
21   Q.   How is that done?
22   A.   By removing the soil and placing new
23   soil in its place.
24   Q.   What were your responsibilities in

Page 177

1    regard to the remediation?
2    A.   Project management oversight, making
3    sure that the developer did what needed to be done.
4    Q.   What were your responsibilities in terms
5    of water?
6    A.   Making sure the developer had the proper
7    infrastructure in.
8    Q.   And how did you determine what was
9    proper?
10   A.   Based on the developer's proposals,
11   architect's work, engineer's work, and meeting with
12   the City.
13   Q.   What were your responsibilities in terms
14   of sewer?
15   A.   Oversight, making sure the developer had
16   coordination with the City and the process moved
17   forward.
18   Q.   And what were your responsibilities in
19   terms of utilities?
20   A.   The same responsibilities, working with
21   the developer and the City making sure that the
22   process moved forward.
23   Q.   What was your title at that point?
24   A.   Development manager.



Page 178

1    MS. SHELEY:  Mr. Mendenhall, can you hold off
2  eating the apple until a break?  I'm sorry.  It's a
3  little loud.
4    MR. MENDENHALL:  I'm going to finish eating an
5  apple, Ms. Sheley.  Can you hear fine?
6    THE WITNESS:  Uh-huh.
7    MS. SHELEY:  I'm having a little bit of
8  trouble hearing.
9  BY MS. SHELEY:
10    Q.   What was already complete on the project
11  at that point?
12    A.   Nothing.
13    Q.   So did you come in at the very beginning
14  of the Parkside development?
15    A.   No.
16    Q.   What work had CHA done prior to your
17  assignment to the Parkside development?
18    A.   The developer had been selected and
19  negotiation of a developer agreement.
20    Q.   What did the CHA do to -- in the process
21  of selecting the developer?
22    A.   I was not there at that time.
23    Q.   Does the CHA know what was done in terms
24  of selecting the developer for Parkside?

Page 179

1    A.   Yes.
2    Q.   Can you answer -- can you answer what
3  was done in terms of selecting the developer?
4    A.   I was not there at that time.
5    Q.   So you don't have that information --
6    MS. SHELEY:  Mr. Mendenhall, the time to
7  prepare your witness was before the deposition.
8  You are impeding the flow of the deposition by
9  reaching over to make comments with her.  I would
10  like to continue with my questions, please.
11    MR. MENDENHALL:  Ms. Sheley, I'm going to
12  inform the witness she's testifying on behalf of
13  the CHA.  So if she has knowledge about what the
14  CHA did separate from her, please answer the
15  question.
16      I would hope that would advance the
17  deposition.  So rather than objecting, I would
18  think that that would be to your benefit, but you
19  are free to use the rest of this time however you
20  choose.  Far be it from me to assist you,
21  Ms. Sheley.
22  BY MS. SHELEY:
23    Q.   Do you have information about the CHA,
24  about the selection of the developer at Parkside?

Page 180

1    A.   Yes.
2    Q.   What is your information?
3    A.   The working group worked with CHA to put
4  together a request for proposals and the Near North
5  Working Group evaluated and recommended the
6  selection of the developer.
7    Q.   And what was the CHA's goal in working
8  with the working group in the selection of the
9  developer?
10    A.   They are a member of the working group
11  and one of the evaluating members.
12    Q.   What comments did the CHA make about the
13  selection of the developer during the process --
14  during the working group process?
15    A.   I do not have those -- I have no
16  knowledge of those comments.
17    Q.   Does the CHA have knowledge of those
18  comments?
19    MR. MENDENHALL:  Object to the form of the
20  question.  Assumes comments were made.
21  BY THE WITNESS:
22    A.   I do not know.
23  BY MS. SHELEY:
24    Q.   Okay.  What was the CHA's role in

Page 181

1  negotiating the development agreement?
2    A.   The CHA is a party to the developer
3  agreement, with the developer, between CHA and the
4  developer.  They negotiated the terms of the
5  developer agreement.
6    Q.   Did they make objections to -- who
7  initially proposed the developer agreement?
8    A.   CHA typically provides them with a basic
9  form agreement.
10    Q.   So the initial agreement comes from the
11  CHA?
12    A.   Yes.
13    Q.   And what was the subject of the
14  negotiations after that?
15    A.   I have no record or knowledge of the
16  negotiations after that.
17    Q.   Does the CHA have record or knowledge of
18  the negotiations after that?
19    A.   I do not know.
20    Q.   Other than selecting the developer and
21  negotiating the development agreement, were any
22  other tasks completed before you were assigned to
23  work at Parkside?
24    A.   Could you be more specific?



1    Q.   Can you answer the question?

2        MR. MENDENHALL: Objection. The witness just

3 asked for clarification. If you can answer it,

4 answer it. If you need further clarification, let

5 her know.

6 BY THE WITNESS:

7    A.   I need further clarification.

8 BY MS. SHELEY:

9    Q.   Okay. Are there -- I think that my

10 question is pretty clear, but I'm going to --

11       MS. SHELEY: Mr. Mendenhall, please.

12 BY MS. SHELEY:

13   Q.   What other tasks needed to be

14 accomplished up until the point that you began

15 working on the development at Parkside?

16   A.   Some families were relocated.

17   Q.   And what was the CHA's role in

18 relocating the families at Parkside?

19   A.   CHA worked with the family in their

20 selections and paid for their relocation.

21   Q.   Other than relocating families,

22 selecting the developer, and negotiating the

23 development agreement, what other tasks were

24 completed before you started working on -- at

1 Parkside?

2    A.   Demolition of buildings.

3    Q.   After the demolition of buildings was

4 complete, what was the next step in developing

5 Parkside?

6    A.   Drafting a request for proposals.

7    Q.   What was the CHA's involvement in

8 drafting requests for proposals?

9    A.   They are a member of the working group.

10   Q.   What did they do as a member of the

11 working group in terms of drafting requests for

12 proposals?

13   A.   Provide language for the requests for

14 proposals to --

15   Q.   So the initial language --

16       MR. MENDENHALL: One at a time. Can you let

17 her finish answering, Ms. Sheley.

18       MS. SHELEY: Can you please not make speaking

19 objections, sir.

20       MR. MENDENHALL: Ms. Sheley, that is not an

21 objection. I'm asking, will you allow the witness

22 to finish answering your question.

23 BY MS. SHELEY:

24   Q.   Ms. Brown, can you finish answering,

1 please?

2    A.   Issuing language and goals for the RFP.

3    Q.   Okay. And was the language and the

4 goals from the RFP, did that come from the CHA?

5    A.   Some of it, yes.

6    Q.   Which parts of it did?

7    A.   Standard language, part of each request

8 for proposal, history on the site.

9    Q.   Anything else other than standard

10 language and history on the site?

11   A.   Probably the number of families with

12 right of return.

13   Q.   Anything else?

14   A.   No.

15   Q.   What was the next step after drafting

16 the request for proposals?

17   A.   Issuing it, releasing it.

18   Q.   What was the CHA's involvement in

19 issuing the drafts for proposals?

20   A.   CHA released the draft of the proposals

21 and put notice in the paper.

22   Q.   What does it mean to release the

23 draft -- the request for proposals?

24   A.   To put it out so that people can review

1 it and make bids on it.

2    Q.   And when you say "put it out," are you

3 mailing it to particular people?

4    A.   No. It's put out on CHA's website and a

5 notice is put in the paper.

6    Q.   What was the next step after issuing the

7 notice for proposals?

8    A.   Receiving proposals.

9    Q.   Were they received by the CHA?

10   A.   Yes.

11   Q.   Did the CHA -- what was the next step

12 after receiving the notice for proposals?

13   A.   Providing the copies to the working

14 group members and evaluation.

15   Q.   All right. After they provided the

16 copies to the working group, was there negotiation?

17   A.   Negotiation with who?

18   Q.   Among the working group regarding the

19 proposals.

20   A.   There's no negotiation on proposals.

21 There's a discussion, and each member has an

22 opportunity to evaluate and score.

23   Q.   Did the CHA evaluate and score the

24 proposals?



1     A.    Yes.  We have one vote.

2     Q.    What was the next step after the
3  evaluation of the proposals?

4     A.    Scoring.  Consolidating the scores and
5  selecting the developer.

6     Q.    What is the step after selecting the
7  developer, or how is the developer selected?

8     A.    Based on the scores, a compilation of
9  scores, the highest scoring developer.  They are
10  selected and brought in for any questions that the
11  working group may have.

12     Q.    At Parkside was the developer who had
13  the highest score also the developer -- among the
14  entire working group also the developer that the
15  highest score by the CHA?

16     MR. MENDENHALL:  Can you repeat --

17  BY THE WITNESS:

18     A.    I do not recall.

19     MR. MENDENHALL:  Can you repeat the question.

20          (WHEREUPON, the record was read by
21           the reporter.)

22     MR. MENDENHALL:  Object to the form of the
23  question.

24

1  BY MS. SHELEY:

2     Q.    You can answer.

3     MR. MENDENHALL:  She already answered.

4  BY THE WITNESS:

5     A.    I do not recall.

6  BY MS. SHELEY:

7     Q.    Does the CHA know?

8     A.    Yes.

9     Q.    Okay.  How would you find out?

10     A.    I would have to go back and look in the
11  files.

12     Q.    After the scores were tabulated -- or
13  after the developer was selected, what was the next
14  step?

15     A.    To begin negotiations on the master
16  developer agreement.

17     Q.    What was the CHA's role in beginning
18  negotiations on the master development agreement?

19     A.    Providing a form agreement.

20     Q.    Did the CHA have any other rules in
21  negotiating the master development agreement?

22     A.    We provided a form agreement and
23  negotiated the terms.

24     Q.    Did anyone else negotiate the terms?

1     A.    The developer and their partner.

2     Q.    What was the subject of the
3  negotiations?

4     A.    I do not recall.

5     Q.    Does the CHA know?

6     A.    Yes.

7     Q.    Can you tell me today?

8     A.    I would have to see files.

9     Q.    Okay.  What files are those?

10     A.    Historical files from the time the
11  negotiations took place.

12     Q.    At the end of the negotiations, what
13  happened next?

14     A.    An agreement is signed.

15     Q.    Who is the agreement between?

16     A.    The CHA and the developer.

17     Q.    What was the next step in developing
18  Parkside after the agreement was signed?

19     A.    Moving forward with the entitlement
20  process.

21     Q.    What is the entitlement process?

22     A.    Securing financing, securing City
23  approval, securing CHA board approvals, surveys,
24  title commitments, environmental investigations,

1  appraisals.

2     MS. SHELEY:  Can you read back that answer.

3          (WHEREUPON, the record was read by
4           the reporter.)

5  BY MS. SHELEY:

6     Q.    What was the CHA's role in securing
7  financing?

8     A.    CHA contributed to the project.

9     Q.    Financially?

10     A.    Yes.

11     Q.    Did CHA assist in getting financing from
12  other sources as well?

13     A.    That is the developer's role.

14     Q.    What was the CHA's role in getting City
15  approval?

16     A.    That is the developer's role.

17     Q.    Did the CHA assist in any manner in
18  getting City approval?

19     A.    No.  That was the developer's
20  responsibility.

21     Q.    Did the CHA set up any meetings between
22  the City and the CHA -- and the developer?

23     A.    Coordination meetings.

24     Q.    Did the CHA attend meetings between the



1   City and the developer?
2       A.   Coordination meetings.
3       Q.   What are coordination meetings?
4       A.   Where all parties that are working on
5   the deal come together and discuss the steps to
6   move forward and close the deal.
7       Q.   Who are the people who attend the
8   coordination meetings?
9       A.   CHA, the City of Chicago, the developer.
10      Q.   Okay.
11      A.   And any consultants working.
12      Q.   What is the CHA's role in getting
13  surveys?
14      A.   It's the developer's responsibility.
15      Q.   What is the CHA's role in getting title
16  commitments?
17      A.   That is the developer's responsibility.
18      Q.   What are title commitments in this
19  context?
20      A.   Shows ownership of land, legal
21  description.
22      Q.   And the CHA owns the land?
23      A.   Yes.
24      Q.   What was the CHA's role in environmental

1   investigations?
2       A.   Providing our reports that had been done
3   from our work.
4       Q.   And what were the contents of those
5   reports?
6       A.   Phase I investigation report, Phase II
7   investigation report.
8       Q.   What is a Phase I investigation report?
9       A.   The initial site investigation.
10      Q.   And what was the purpose of the
11  investigation?
12      A.   To determine if there were an
13  environmental impacts, previous uses of the site.
14      Q.   Were there?
15      A.   Yes.
16      Q.   What were they?
17      A.   PNAs.
18      Q.   What is a PNA?
19      A.   Polynuclear aromatics.
20      Q.   What is a polynuclear aromatic?
21      A.   It's an environmental contaminant, which
22  came from the Chicago Fire which exists in most of
23  Chicago.
24      Q.   Were there any other environmental

1   concerns?
2       A.   Lead.
3       Q.   And what was the source of that?
4       A.   I do not recall.
5       Q.   Were there others?
6       A.   Not that I recall.
7       Q.   Why did CHA do that investigation?
8       A.   To determine the condition of the site.
9       Q.   And why was it important that the CHA
10  determine the condition of the site?
11      A.   It's a requirement under HUD.
12      Q.   What was the Phase II investigation?
13      A.   To do any actual soil -- soil review.
14      Q.   And what was the result of the soil
15  review?
16      A.   It showed that there was lead and PNA
17  contamination.
18      Q.   What is the source of the HUD
19  requirement?
20      A.   Oh, I don't know the citation.
21      Q.   Do you know the purpose of the HUD
22  requirement?
23      A.   To make sure that the land is suitable
24  for residential.

1       Q.   What was the CHA's role in seeking
2   appraisals?
3       A.   CHA did not.  It was the developer's
4   responsibility.
5       Q.   And in this context, what does
6   "appraisals" mean?
7       A.   It determines the value of the land, the
8   market value of the land.
9       Q.   Did the CHA assist in any way in getting
10  the appraisals?
11      A.   No.  That is the developer's
12  responsibility.
13      Q.   Okay.  Were there any other -- other
14  than securing financing, getting city approval,
15  getting the CHA Board approval, conducting the
16  surveys, getting the title commitments, doing the
17  environmental investigation and the appraisals,
18  were there any other steps at this point?
19      MR. MENDENHALL:  Object to the form of the
20  question.
21  BY MS. SHELEY:
22      Q.   You can answer.
23      A.   Could you repeat those steps again?
24      Q.   Securing financing, City approval, the



1  CHA Board approval, doing surveys, doing title
2  commitments, environmental investigations and
3  appraisals.
4      MR. MENDENHALL:  Same objection.
5  BY MS. SHELEY:
6      Q.   You can answer.
7      A.   Seeking HUD approval.
8      Q.   What was the CHA's role in seeking HUD
9  approval?
10     A.   Working with the developer to submit all
11  of the necessary closing documents.
12     Q.   And what were the necessary closing
13  documents?
14     A.   I could only name a few.  The master
15  development agreement, the regulatory and operating
16  agreement, the mixed-finance ACC amendment, the
17  ground lease, appraisals, market studies, survey,
18  title commitment, all of the lender agreements,
19  City documents.
20     Q.   Anything else?
21     A.   That is all that I can remember.
22     Q.   Is there anything that would assist your
23  memory on other documents that might have been
24  provided through the process?

1      A.   Reviewing the closing checklist.
2      Q.   What is the closing checklist?
3      A.   A document that shows all of the items
4  needed to be submitted to HUD to close.
5      Q.   What City documents were required?
6      MR. MENDENHALL:  Could you repeat that
7  question?
8          (WHEREUPON, the record was read by
9           the reporter.)
10     MR. MENDENHALL:  Object to the form of the
11  question.  If you know, please answer.
12  BY THE WITNESS:
13     A.   It depends on what city financing was
14  involved, any city agreements on financing.
15     MS. SHELEY:  Mr. Mendenhall, I'm going to ask
16  that you not make speaking objections.  If you know
17  is a direction to the witness.
18  BY MS. SHELEY:
19     Q.   What was the next step -- what would
20  have happened if HUD had not approved the project?
21     MR. MENDENHALL:  Object to the form of the
22  question, calls for speculation.
23  BY THE WITNESS:
24     A.   HUD would identify why they did not

1  approve the project.
2  BY MS. SHELEY:
3      Q.   Have you ever had that experience?
4      A.   No.
5      Q.   And if the identified reasons were not
6  met, what would happen then?
7      A.   I do not know.
8      MR. MENDENHALL:  Object to the form of the
9  question, calls for speculation.
10     MS. SHELEY:  Mr. Mendenhall, I'm going to ask
11  again that you not make objections that direct the
12  witness' answer.
13     MR. MENDENHALL:  That is a proper objection,
14  Ms. Sheley.  And, again, please do not lecture me
15  about objections.
16  BY MS. SHELEY:
17     Q.   What was the next step after seeking HUD
18  approval?
19     A.   Setting up a closing.
20     Q.   What was the CHA's role in setting up a
21  closing?
22     A.   Working with the developer, attending,
23  and signing all of our documents.
24     Q.   The CHA signed some of these documents

1  as well?
2      A.   The CHA documents, yes.
3      Q.   What was the next step after -- what was
4  the next step?
5      A.   Start of construction.
6      Q.   What was the CHA's role in the start of
7  construction?
8      A.   Funding the portion of construction.
9      Q.   Did the CHA have any other role in the
10  start of construction?
11     A.   Turning over site to developer, entering
12  into a ground lease.
13     Q.   What else?
14     A.   Nothing else.
15     Q.   Did the CHA have meetings about the
16  status of construction?
17     A.   The developer holds construction status
18  meetings.
19     Q.   Did the CHA attend?
20     A.   The CHA had a representative, Habitat,
21  the receiver.
22     Q.   How many meetings were there?
23     A.   I do not recall.
24     Q.   Were you involved at this point?



Page 198
1    A.   Yes.
2    Q.   Did you work for Habitat at that point
3  or the CHA?
4    A.   I worked for CHA.
5    Q.   What was the next step after the start
6  of construction?
7    A.   Construction completion.
8    Q.   And how -- what was construction
9  completion?
10   A.   When the units are ready and the City of
11 Chicago issues a certificate of occupancy.
12   Q.   Did the CHA have a role in assessing
13 whether construction was complete?
14   A.   Making sure there was a certificate of
15 occupancy from the City.
16   Q.   And what did the CHA do to make sure
17 there was a certificate of occupancy from the City?
18   A.   Developer provided evidence.
19   Q.   Did the CHA inspect the building at that
20 time?
21   A.   No.
22   Q.   What was the next step?
23   A.   Lease up.
24   Q.   What is a lease up?

Page 199
1    A.   Getting applicants and residents to move
2  in.
3    Q.   What was the CHA's role in getting
4  applicants and residents to move in?
5    A.   Providing names of lease compliant
6  residents.
7    Q.   What was the next step in getting mixed
8  development -- Parkside running?
9    A.   The developer goes through the
10 application process.
11   Q.   What is the CHA's role in the
12 application process?
13   A.   The CHA provided a list of names of
14 eligible residents that are lease compliant.
15   Q.   Does the CHA have any other role?
16   A.   No.
17   Q.   What happens if the developer tells you
18 that someone isn't -- doesn't meet the application
19 criteria?
20   A.   Then we provide additional names.
21   Q.   Do you -- does the CHA have a process
22 for addressing the people who were not lease
23 compliant?  Or I'm sorry --
24   A.   We provided lease compliant residents.

Page 200
1    Q.   And does the CHA have a process for
2  dealing with applicants who were not accepted by
3  the developer?
4    A.   No.  Those applicants remain on the
5  list.
6    Q.   What is the next step in getting them --
7  what was the next step after the application -- the
8  lease up application process?
9    A.   Those residents that Holsten accepted,
10 moved in.
11   Q.   What role does the CHA have once the
12 residents have moved in?
13   MR. MENDENHALL:  Object to the form of the
14 question.
15 BY THE WITNESS:
16   A.   There is no role.
17 BY MS. SHELEY:
18   Q.   Does the CHA ensure that the CHA tenants
19 continue to be qualified for CHA housing?
20   A.   The property manager determines if the
21 residents are still lease compliant under their
22 rules.
23   Q.   If someone -- does the property manager
24 report that to the CHA?

Page 201
1    A.   If the resident is evicted, yes.
2    Q.   Does anyone assess whether CHA tenants
3  remain qualified for the benefit of being a CHA
4  resident by virtue of their income?
5    MR. MENDENHALL:  Could you repeat the
6  question?
7        (WHEREUPON, the record was read by
8         the reporter.)
9    MR. MENDENHALL:  I'm going to object to the
10 form of the question.
11 BY THE WITNESS:
12   A.   I do not know that process.
13 BY MS. SHELEY:
14   Q.   Does the CHA have a process?
15   A.   Yes.
16   Q.   Does the CHA know about the process?
17   A.   Yes.
18   Q.   But you don't know about the process?
19   A.   No.
20   Q.   Okay.  What oversight does the CHA over
21 the developer once the development is complete?
22   A.   We don't do oversight over the
23 developer.
24   Q.   Do you have meetings with the -- well,



Page 202

1  hold on a second.
2  Has the CHA ever informed the owners of
3  condo units at Parkside that the renters at
4  Parkside are subject to drug testing?
5  A.  No.
6  Q.  Does the CHA know if anyone else has
7  ever told the owners of condos at Parkside that
8  renters at Parkside are subject to drug testing?
9  A.  No.
10  (WHEREUPON, a certain document was
11  marked Deposition Exhibit No. 23,
12  for identification.)
13  BY MS. SHELEY:
14  Q.  You have been handed what has been
15  marked Exhibit 23.  It's titled Chicago Housing
16  Authority's Responses to Plaintiff's Second Set of
17  Interrogatories.  Have you seen this document
18  before?
19  A.  I don't recall.
20  Q.  Okay.  If you can take a moment to take
21  a look at it.
22  Does looking at the document help
23  refresh your recollection as to weather you have
24  seen it before?

Page 203

1  A.  No.
2  Q.  Okay.  Can you turn to page 10 of the
3  document?  Looking at Response O, can you please
4  read Response O to yourself and tell me when you
5  are finished.
6  A.  I'm finished.
7  Q.  The second sentence addresses the Near
8  North Working Group, including the CHA, Cabrini
9  Local Advisory Council, and says that they provided
10  comments to Parkside site specific tenant selection
11  criteria.  What comments did the CHA provide?
12  A.  I do not remember the comments.
13  Q.  What was your involvement at that time
14  period?
15  A.  Project manager.
16  Q.  Were you involved -- were you a
17  member -- were you representing the CHA at the
18  working group?
19  A.  Yes.
20  Q.  Was anyone else representing the CHA at
21  the working group?
22  A.  Yes.
23  Q.  Who?
24  A.  Legal, Resident Services.

Page 204

1  Q.  Can you give me names from Resident
2  Services?
3  A.  I do not recall who was there at that
4  time.
5  Q.  Do you know who was there from legal?
6  A.  Yes.
7  Q.  Who was there from legal?
8  A.  Joanne Boy.
9  Q.  Who is she?
10  A.  CHA policy attorney.
11  Q.  Does the CHA know what comments were
12  provided to Parkside site specific tenant specific
13  selection criteria?
14  MR. MENDENHALL:  Object to the form of the
15  question.
16  BY THE WITNESS:
17  A.  I would have to look back at the minutes
18  of the meeting.
19  BY MS. SHELEY:
20  Q.  Okay.  And the CHA has retained copies
21  of the minutes of the meetings?
22  A.  Yes.
23  Q.  When the CHA provided comments to
24  Parkside site specific tenant selection criteria,

Page 205

1  what was the developer's response?
2  A.  I do not remember.
3  Q.  Is there anything that would reflect
4  what the developer's response was?
5  A.  If it was at that meeting, minutes.
6  Q.  Would anybody else know what the
7  developer's response was?
8  A.  The developer and their partner.
9  Q.  Would anyone else at the CHA know what
10  the developer's response was?
11  A.  It depends on how that response was
12  provided.
13  Q.  Other than tenant services and Joanne
14  Boy, were there any other people that were
15  communicating with the developer about the tenant
16  selection plan?
17  A.  No.
18  MR. MENDENHALL:  Object to the form.
19  Misstates the evidence and misstates her prior
20  testimony.
21  MS. SHELEY:  I'll ask you to not make speaking
22  objections.
23  MR. MENDENHALL:  That's a proper objection,
24  Counsel.  Ask your next question.  Use your time



1 wisely.
2 BY MS. SHELEY:
3    Q.   Did the developer reject any suggestions
4 that the CHA made regarding the tenant selection
5 criteria?
6    A.   I do not recall.  I would have to check
7 files.
8    Q.   What files would you check?
9    A.   Historical files from that time.
10    Q.   And what would be in those files?
11    A.   Possible notes and minutes.
12    Q.   Okay.  At any mixed-income development,
13 has a developer ever rejected the suggestion of the
14 CHA about site specific tenant selection criteria?
15    MR. MENDENHALL:  Object to the form of the
16 question.  You can answer as to Parkside.
17    MS. SHELEY:  Are you instructing the witness
18 not to answer the question?
19    MR. MENDENHALL:  You can answer the question
20 as to Parkside.
21    MS. SHELEY:  My question is not as to
22 Parkside.
23    MR. MENDENHALL:  I know.
24

1 BY MS. SHELEY:
2    Q.   As for any other development, has any
3 developer rejected the site specific -- the
4 comments that the CHA made on-site specific tenant
5 selection criteria?
6    MR. MENDENHALL:  Same objection.  You can
7 answer.
8    MS. SHELEY:  Are you instructing the witness
9 not to answer?
10    MR. MENDENHALL:  You heard my instruction,
11 correct?
12    THE WITNESS:  Uh-huh.
13    MR. MENDENHALL:  Okay.
14 BY MS. SHELEY:
15    Q.   Can you answer?
16    A.   No.
17    Q.   Okay.  Are you saying, no, that you will
18 not answer?
19    A.   I'm saying, no, I will not answer.
20    Q.   Thank you.  Did the CHA make any
21 adjustments to the site specific tenant criteria at
22 Parkside?
23    A.   The developer did.
24    Q.   What do you mean?

1    A.   CHA provides the minimum tenant
2 selection plan, and the developer made additions.
3    Q.   Did the CHA make any changes to the
4 additions that the developer proposed at Parkside?
5    A.   No.
6    Q.   Okay.  Did the CHA make any adjustments
7 to the lease that was proposed at Parkside?
8    A.   No.
9    Q.   Yesterday we discussed the review that
10 the CHA does of proposed leases, and I believe you
11 said that they review to ensure that they comply
12 with federal and city requirements; is that
13 correct?
14    A.   Yes.
15    Q.   Does the CHA do any other review other
16 than for those two bases?
17    A.   No.
18    Q.   How do you know that?
19    A.   Because I have worked with legal to do
20 the review.
21    Q.   Are they -- and why do they only look at
22 those two bases?
23    A.   I do not know.
24    Q.   Would you know if legal was assessing

1 for other requirements?
2    MR. MENDENHALL:  Object to asked and answered.
3 BY MS. SHELEY:
4    Q.   You can answer.
5    A.   I do not know.
6    Q.   Can you turn to page 14, please?
7    MR. GILBERT:  Still on Plaintiff's Exhibit 23?
8    MS. SHELEY:  Yes, we are.
9 BY MS. SHELEY:
10    Q.   Exhibit 23, page 14.  Can you please
11 read Part (a) on this page and tell me when you are
12 finished.
13    MR. MENDENHALL:  And I would just ask the
14 witness, could you read the question on the
15 previous page, so you understand the context of the
16 answer.
17    MS. SHELEY:  I believe --
18    MR. MENDENHALL:  Can you repeat the question,
19 Madam Court Reporter.
20    MS. SHELEY:  I just asked her to take a look
21 at that and tell me when she's finished.
22    MR. MENDENHALL:  Okay.
23    MS. SHELEY:  Can you please allow the witness
24 to read the document, Mr. Mendenhall.



1     MR. MENDENHALL:  There's no question pending,
2  Counsel.
3     MS. SHELEY:  The time to prepare your witness
4  was before the deposition.  I believe you are
5  impeding the deposition.  I would like that for the
6  record.  He's continuing to discuss this with the
7  witness.
8     MR. MENDENHALL:  Let me put on the record what
9  I was discussing with the witness.  The Question
10 6(a) relates to the community-wide wait list.
11 Those are nonresidents.  Those are not CHA
12 residents, so I'm instructing the witness not to
13 answer questions as to non-CHA residents.
14     We are here for the deposition of --
15 regarding Mr. Peery's right and his claim of a
16 constitutional violation regarding a preliminary --
17     MS. SHELEY:  Mr. Mendenhall.
18     MR. MENDENHALL:  I'm establishing my record,
19 Counsel.
20     We are here pursuant to Judge Coleman's
21 December 13, 2013, order that all class discovery
22 is put on hold.  We are here for the preliminary
23 injunction hearing of Mr. Peery.
24     MS. SHELEY:  Mr. Mendenhall, you are impeding

1  our ability to continue with this deposition.
2     MR. MENDENHALL:  Ms. Sheley, please let me
3  finish my record.
4     The community-wide wait list relates to
5  applicants who are not even CHA residents.  That is
6  the basis for my instruction to the witness, not to
7  answer questions about the community-wide wait
8  list.
9     MS. SHELEY:  If you are going to make
10 objections to the witness and instruct her to not
11 answer my questions, I would prefer that you --
12 wait until I ask the question and make that
13 instruction on the record clearly instead of
14 whispering in her ear so that we can have those
15 issues resolved by the Court.
16     MR. MENDENHALL:  Counsel, there was no
17 question pending.  I have a right to talk to my
18 witness, just as you've conferred with Adam
19 numerous times throughout this deposition.
20     MS. SHELEY:  I'm not giving testimony.
21     MR. MENDENHALL:  And I'm not giving testimony.
22 Use your time wisely.  Ask your next question,
23 Counsel.
24

1  BY MS. SHELEY:
2     Q.   Are you finished reading Part (a)?
3     A.   Yes.
4     Q.   What is the RRC list that is it
5  referenced in Part (a)?
6     A.   Residents who lived at CHA on 10/1/99.
7     Q.   Could you speak up?  I couldn't hear
8  that.
9     A.   Residents that lived in CHA housing
10 10/1/99 that were lease compliant.
11    Q.   When you say "10/1/99," you are
12 referring to the date?
13    A.   Yes.
14    Q.   So this says that Mr. Peery was part of
15 the Cabrini lottery and RRC lists; is that right?
16    A.   Yes, that is what it states.
17    Q.   What are the rules that apply to those
18 lists?
19    MR. MENDENHALL:  Object to the form of the
20 question, vague.
21 BY THE WITNESS:
22    A.   I need clarification.
23 BY MS. SHELEY:
24    Q.   Are there documents that outline the

1  rights of the people who are on those lists?
2     A.   The consent decree tells the rights
3  under the Cabrini lottery list and the relocation
4  rights contract, tells the rights for that list.
5     Q.   So the -- does the relocation rights
6  contract then apply to Mr. Peery?
7     A.   I do not know Mr. Peery's status.
8     Q.   Okay.  Does the relocation rights
9  contract apply to people who are on the RRC list?
10    A.   Yes.
11    Q.   Does ACOP apply to people who are on
12 these lists?
13    A.   Yes.
14    Q.   Okay.  In the last sentence, it says,
15 "It is inferred, not stated, that removed
16 individuals may reapply when the wait list is
17 reopened."  Where is it inferred?
18    MR. MENDENHALL:  Object to the form of the
19 question, instruct the witness not to answer any
20 questions about the community-wide wait list.
21 BY MS. SHELEY:
22    Q.   You can answer, or there's an
23 instruction -- is there an instruction not to
24 answer?  Will you answer?



Page 214

1     A.   No.
2         MR. MENDENHALL:  Can you repeat my instruction
3  to the witness?
4              (WHEREUPON, the record was read by
5              the reporter.)
6  BY MS. SHELEY:
7     Q.   Is this sentence about the
8  community-wide wait list?
9     A.   Are you asking me that?
10    Q.   Yes.
11    A.   I don't know what that sentence is in
12 reference to.
13    Q.   Okay.
14    A.   It's not clear.
15    Q.   Okay.  Can you tell me where it's
16 inferred then?
17        MR. MENDENHALL:  Same instruction.
18        MS. SHELEY:  Okay.  Could we mark this as an
19 exhibit, please.
20             (WHEREUPON, a certain document was
21             marked Deposition Exhibit No. 24,
22             for identification.)
23 BY MS. SHELEY:
24    Q.   You have been handed what has been

Page 215

1  marked as Exhibit 24.  The Bates range is
2  CHA_PEER 1 through 87.  Its titled the FY2011
3  Admissions and Continued Occupancy Policy or the
4  ACOP.  Do you recognize this document?
5     A.   Yes.
6     Q.   Is this the document that you were
7  referring to earlier as the ACOP?
8     A.   That you referred to, yes.
9     Q.   Okay.  Could you turn to page 27 --
10 Bates stamped page 27, please.  I would like to
11 turn your attention -- does Part F -- and it
12 carries on to the next page.
13        Does Part F control the admission and
14 the wait list for people who are interested in
15 living in mixed-income development units?
16        MR. MENDENHALL:  One second.  Counsel, that is
17 two separate questions, so object to the form of
18 the question, compound.  I would ask if we could
19 break them down one at a time.
20        MS. SHELEY:  Could you please not make
21 speaking objections, Mr. Mendenhall?
22        MR. MENDENHALL:  Could you repeat the
23 question?
24        MS. SHELEY:  You know, I'm happy to -- I would

Page 216

1  prefer not to delay the deposition.  You can answer
2  the question.
3         MR. MENDENHALL:  Can you repeat the question?
4              (WHEREUPON, the record was read by
5              the reporter.)
6         MR. MENDENHALL:  She also asked about the wait
7  list.  You didn't get down the entire --
8         THE REPORTER:  I just said "wait list."
9         MR. MENDENHALL:  Can you repeat it one more
10 time for me, please.
11        MS. SHELEY:  Can we just continue, please.
12        MR. MENDENHALL:  Repeat the question one more
13 time, please.
14             (WHEREUPON, the record was read by
15             the reporter.)
16        MR. MENDENHALL:  Object to the form, compound.
17 BY MS. SHELEY:
18    Q.   You can answer.
19    A.   Just give me one second to read this.
20        MR. MENDENHALL:  I'm instructing the witness
21 not to answer as to the community-wide wait list
22 questions.
23        MS. SHELEY:  Mr. Mendenhall, please make your
24 objections when the questions are pending?

Page 217

1         MR. MENDENHALL:  And I instruct the witness
2  not to answer as to the community-wide wait list.
3  Now, Ms. Sheley, I will allow her to answer as to
4  admissions.
5         MS. SHELEY:  Mr. Mendenhall, you are impeding
6  the course of this deposition.  Can you please
7  allow me to ask questions and make appropriate
8  objections.
9         MS. JONES:  No question was pending.
10        MR. MENDENHALL:  Ms. Sheley, you asked about
11 admissions and the community-wide wait list.  I
12 instructed my witness not answer as to
13 community-wide wait list.  I am letting you know
14 she will answer as to admissions to mixed incomes
15 involving Mr. Peery.  It's up to you to do what you
16 want with that information.  You asked two
17 questions, which was compound.  I'm not allowing
18 her to answer the community-wide wait list.  I am
19 letting you know she will answer as to admissions.
20 Feel free to do whatever you would like with that
21 information, Ms. Sheley.
22 BY MS. SHELEY:
23    Q.   Ms. Brown, can you answer?
24    A.   I need the question repeated, please.



Page 218

1    Q.    Ms. Brown, why don't we start over, and
2  we'll see how many objections we get in the next
3  round.
4          So what does Part F apply to?
5    A.    Individuals that are applying for public
6  housing and how they would be offered units.
7    Q.    Does it apply to people who are
8  currently on wait lists?
9    A.    You would have to be more specific to
10  what wait list.
11    Q.    What wait list would it apply to?
12    A.    Applicants applying to be members of
13  public housing, to get public housing, not current
14  residents.
15    Q.    Did this -- did Part F apply to
16  Mr. Peery?
17    A.    No.
18    Q.    Did Part F apply to the Cabrini-Green
19  wait list?
20    A.    No.
21    Q.    Did it apply to the -- what wait list
22  did it apply to?
23    A.    The community wait list to get public
24  housing.

Page 219

1    Q.    Okay.  Under this policy, if someone
2  refused to -- if someone was being evaluated at a
3  mixed-income development and did not want to take a
4  drug test, would they fall within Parts 3(a)(i) and
5  (ii) because of their refusal?
6    MR. MENDENHALL:  Object to the form of the
7  question, instruct the witness not to answer.
8  Beyond the scope.
9  BY MS. SHELEY:
10    Q.    Could I take the document back, please.
11        (WHEREUPON, a certain document was
12        marked Deposition Exhibit No. 25,
13        for identification.)
14  BY MS. SHELEY:
15    Q.    You have been handed -- what number are
16  we on?  Exhibit 25.  For the record, it's
17  CHA-PEER 00120 through 149.  It's titled at the
18  top, Chicago Housing Authority, Revised CHA
19  Leaseholder Housing Choice and Relocation Rights
20  Contract.  Do you recognize this document?
21    A.    Yes.
22    Q.    Is this -- did this document apply to
23  Mr. Peery?
24    A.    One moment, please.  I do not know.  I

Page 220

1  would have to know when he moved in and he lived
2  there.
3    Q.    Does the CHA know whether this document
4  applied to Mr. Peery?
5    A.    Yes, I would have to see files.
6    MS. SHELEY:  Mr. Mendenhall, please don't
7  speak with the witness.
8    MR. MENDENHALL:  Counsel, the question was not
9  pending.  You were conferring with Mr. Schwartz.  I
10  was conferring with the witness.  No question was
11  pending, so again --
12    MS. SHELEY:  Were you giving the witness
13  instructions on how to answer questions in the
14  deposition?
15    MR. MENDENHALL:  Counsel, I was not giving her
16  instructions on how to answer a question in a
17  deposition, but let me be clear.  I will not be
18  addressing any conversations I have with the
19  witness without a question pending with you.  That
20  is not your right, so please do not ask me that
21  again, Counsel.  Use your time wisely.
22    MS. SHELEY:  Okay.
23    MR. MENDENHALL:  And there's other people with
24  questions pending.

Page 221

1  BY MS. SHELEY:
2    Q.    Ms. Brown, if Mr. Peery moved out of the
3  Cabrini high rises in 2005, would this contract
4  apply to him?
5    A.    It would depend on when his occupancy
6  began.
7    Q.    Is there a particular year cutoff?  What
8  year would it depend on?
9    A.    If he would have became a resident after
10  10/1/99.
11    Q.    Would it apply to him if he became a
12  resident after 10/1/99?
13    A.    No.
14    Q.    If he became a resident before 10/1/99,
15  would it apply to him?
16    A.    Portions, depending on which buildings
17  he lived in.
18    Q.    Can you turn to page 125, the Bates
19  stamp page 125.  Now, in Part 4(a) and (b), without
20  looking at the document, do you understand the
21  process of what happens when people are trying to
22  identify housing based on this contract?
23    A.    Generally, yes.
24    Q.    Okay.  Are residents -- or are people



1 who are on the wait list allowed to select their
2 preferred housing?
3    MR. MENDENHALL:  Let me object to questions
4 about the wait list again.
5 BY THE WITNESS:
6    A.  It depends on which wait list you are
7 speaking to.
8 BY MS. SHELEY:
9    Q.  For people who lived in Cabrini prior to
10 '99, the date that you said in '99 and who left in
11 2005, what wait list is that?
12    A.  It depends on which buildings he lived
13 in.
14    Q.  Okay.  And why does it depend on which
15 buildings?
16    A.  Because he could possibly fall under the
17 consent decree if he lived at Extension North,
18 which determines a priority in your options.
19    Q.  And if he did not live at Extension
20 North, what is the --
21    A.  If he lived at another Cabrini site, it
22 was determined if he signed up to be on the
23 lottery, Cabrini lottery list.
24    Q.  Assuming that he -- if he was in the

1 Extension North, would this document apply?  Would
2 Section F apply -- I'm sorry.  Would Section 4
3 apply?
4    A.  I do not know.  I would have to see the
5 consent decree.
6    Q.  Okay.  If someone signed up for the
7 Cabrini lottery list, would this section apply?
8    A.  Yes.
9    Q.  Assuming that he signed up for the
10 Cabrini lottery list and this section applies, then
11 would he have been allowed to select three
12 replacement housing choices in order of preference?
13    MR. MENDENHALL:  Object to the form of the
14 question.  You can answer.
15 BY THE WITNESS:
16    A.  If this section applied, yes.
17 BY MS. SHELEY:
18    Q.  Okay.  But he was not guaranteed housing
19 at those three locations; is that right?
20    A.  That's correct.
21    Q.  And if he was offered a different
22 location, he had the opportunity to reject it; is
23 that correct?
24    A.  Yes.

1    Q.  If he rejected that offer and a second
2 offer, then he would lose his right of return; is
3 that correct?
4    MR. MENDENHALL:  I'm going to object to the
5 form of the question.  The document speaks for
6 itself.
7 BY THE WITNESS:
8    A.  Under the Cabrini lottery list, no.
9 BY MS. SHELEY:
10    Q.  Assuming that he's under the -- why not
11 under the Cabrini lottery list?
12    A.  There is no exhaustion of options under
13 that lottery list.
14    Q.  If he was under the consent decree, was
15 there an exhaustion of options?
16    A.  No.
17    Q.  Does paragraph (c)(2) not apply?
18    A.  Not under the lottery list, no.
19    Q.  Okay.  So what does (c)(2) apply to?
20    A.  Residents who are on the HOP list.
21    Q.  Does it apply to anyone else?
22    MR. MENDENHALL:  I'm going to object again,
23 the document speaks for itself.  You can answer.
24

1 BY THE WITNESS:
2    A.  No.  Residents under the HOP list.
3 BY MS. SHELEY:
4    Q.  And what is hot (sic) list?
5    A.  The housing offer process list.
6 Residents who were compliant on 10/1/99.
7    Q.  And where do they have to live?
8    A.  In public housing.
9    Q.  And the Cabrini list, the consent decree
10 and the Cabrini lottery list, are there any other
11 lists associated with Cabrini for the residents at
12 Cabrini?
13    A.  Possibly the HOP list, depending on
14 where they lived.
15    Q.  And is there a separate relocation
16 rights list from the hot (sic) list?
17    A.  Yes.
18    Q.  What is the relocation rights list?
19    A.  It's the HOP list.
20    Q.  Is the relocation list different than
21 the hot (sic) list?
22    A.  No.
23    Q.  So they are the same list?
24    A.  They are the same.



Page 226

1    Q.   Is there -- are there other lists other
2  than the relocation rights list and the Cabrini
3  list?
4      MS. SHELEY:  Mr. Mendenhall --
5      THE WITNESS:  HOP.
6      MS. SHELEY:  -- you are writing a note to the
7  witness.  Can you please stop.
8      MR. MENDENHALL:  I asked her, is it HOP or
9  hot.  You are saying "hot."  She said it's HOP.
10  Just so you guys are saying the same thing, so I
11  want to make sure that you are asking the right
12  question, Ms. Sheley.
13     MS. SHELEY:  Could you reask my last question.
14     MR. MENDENHALL:  You are saying hot, she's
15  saying HOP.
16     MS. SHELEY:  Mr. Mendenhall, please.
17        (WHEREUPON, the record was read by
18            the reporter.)
19  BY THE WITNESS:
20     A.   The CHA wait list.
21  BY MS. SHELEY:
22     Q.   What is the CHA wait list?
23     A.   Residents who were trying -- who were
24  applying for public housing.

Page 227

1    Q.   So other than the relocation of rights
2  list, the Cabrini lottery list, the consent decree
3  list for Cabrini, and the CHA wait list, are there
4  any other lists that the CHA maintains?
5      A.   No.  Not that I'm aware of, no.
6      Q.   And which -- and just to be clear, the
7  relocation right rights list and the HOP list that we
8  have been discussing are the same?
9      A.   Yes.
10     Q.   Can you turn to page 129 and 130.  Do
11  the priority list -- does page 130 lay out the
12  priority of people who are on the lists that this
13  document controls?
14     A.   One moment.  Okay.  Could you repeat the
15  question?
16     MS. SHELEY:  Could you repeat the question,
17  please.
18        (WHEREUPON, the record was read by
19            the reporter.)
20  BY THE WITNESS:
21     A.   Yes.
22  BY MS. SHELEY:
23     Q.   Does it apply to people who are on the
24  Cabrini list?

Page 228

1    A.   No.
2    Q.   Does it apply to people who are under
3  the consent decree?
4    A.   No.
5    Q.   Does it apply to the general community
6  list?
7      MR. MENDENHALL:  She has a clarification, I
8  think, Ms. Sheley.
9  BY MS. SHELEY:
10     Q.   What is your clarification?
11     A.   The lottery list depends on what
12  building they lived in.
13     Q.   So if they fall under the relocation
14  rights contract, then it would apply?
15     A.   Yes.  If they are relocated to a site
16  under that program, yes.
17     Q.   Okay.  The phrase -- if you look at
18  No. 1 on 130, the phrase "meet property specific
19  requirements appears."  Do you see that?
20     A.   Yes, I see it.
21     Q.   If someone is unwilling to take a drug
22  test, does that mean that they don't meet property
23  specific requirements at a mixed-income
24  development?

Page 229

1    A.   Yes, if that is that site's
2  requirements.
3    Q.   So does that impact where they -- their
4  priority on their wait list?
5    A.   No.
6    Q.   Why not?
7    A.   Under the Cabrini lottery list and even
8  on the HOP list, their priority remains the same.
9    Q.   And does it affect where people are on
10  the priority list who are controlled by this
11  section of the relocation rights contract, this
12  page 130?
13     A.   It depends on how many offers they have
14  rejected.
15     Q.   Why is that?
16     A.   Under this program, you get three
17  options, three choices/times to reject the offer.
18     Q.   So it would affect then if they
19  rejected -- made multiple rejections, it would
20  affect where they are on the wait list?
21     MR. MENDENHALL:  Object.  Misstates her prior
22  testimony.
23  BY MS. SHELEY:
24     Q.   You can answer.



Page 230

1    A.    On the HOP list.
2    Q.    So on HOP list, if they rejected
3 multiple mixed-income developments, it would affect
4 their priority on the list; is that correct?
5        MR. MENDENHALL:  Same objection.
6 BY THE WITNESS:
7    A.    Yes.
8 BY MS. SHELEY:
9    Q.    Would it affect people who are on the
10 Cabrini list?
11    A.    No.
12    Q.    Would it affect people who are on the
13 CHA wait list?
14        MR. MENDENHALL:  I'm going to object and
15 instruct you not to answer as to the CHA wait list.
16 BY MS. SHELEY:
17    Q.    Will you not answer?
18    A.    No.
19    Q.    Would it affect people who were on the
20 Cabrini list?
21    A.    No.
22    Q.    Why did the CHA approve the inclusion of
23 drug testing as a screen for admission and
24 occupancy at Parkside?

Page 231

1    A.    That was the developer's requirement.
2    Q.    Why did the CHA approve?
3    A.    That was the developer's requirement for
4 the site, and it did not discriminate against our
5 residents.
6    Q.    Why else did it approve it?
7    A.    That was the developer's requirement.
8    Q.    Is there any other reason that the CHA
9 approved the drug testing requirement at -- for
10 admission and occupancy at Parkside?
11        MR. MENDENHALL:  Object, asked and answered
12 three times, Counsel.  If you have anything else to
13 add, please add it.
14        MS. SHELEY:  Please, Mr. Mendenhall.
15 BY MS. SHELEY:
16    Q.    Are there any other reasons that the CHA
17 approved the drug testing screening for occupancy
18 and admission at Parkside?
19    A.    The CHA did not approve nor deny.  That
20 was a developer requirement.  We review the
21 documents to make sure they don't discriminate and
22 they are compliant with HUD regulations.
23    Q.    What would happen if CHA concluded that
24 it did violate federal rules?

Page 232

1        MR. MENDENHALL:  Object to the form of the
2 question, calls for speculation.
3 BY MS. SHELEY:
4    Q.    You can answer.
5    A.    Yeah, I do not know.
6    Q.    Okay.  Does the CHA believe that drug
7 testing improves public safety at Parkside?
8    A.    We do not have an opinion one way or the
9 other.
10    Q.    Does the CHA believe that drug testing
11 promotes a drug-free Parkside?
12    A.    We don't have an opinion one way or the
13 other.
14    Q.    Does the CHA believe that drug testing
15 protects youth at Parkside?
16        MR. MENDENHALL:  Let me just state for the
17 record, Ms. Sheley --
18        MS. SHELEY:  Please don't impede this
19 deposition.
20        MR. MENDENHALL:  Ms. Sheley, this witness is
21 not being offered as to special needs, so that is
22 what I want to say.  So if we are going down this
23 path, we can save some time.  CHA will make another
24 30(b)(6) witness available in that regard.

Page 233

1        MS. SHELEY:  Our 30(b)(6) notice lists special
2 needs, and we asked you to give us the name of your
3 deponent seven days prior to the deposition.  You
4 provided Ms. Brown.  I'm going to continue to ask
5 the questions.
6        MR. MENDENHALL:  Okay.  And I'm going to
7 instruct you not to answer any questions as to
8 special needs.  We will provide another witness.
9 So you can go through the questions --
10        MS. SHELEY:  What is the basis of your
11 instruction not to answer the questions?
12        MR. MENDENHALL:  This witness does not have
13 the knowledge.  I want to provide you a witness
14 with the knowledge to answer the questions.  I
15 would think that is in your interest, Ms. Sheley.
16 If you wanted her to answer them and she says she
17 doesn't know to all of them, feel free and go
18 ahead.
19        We will provide you a witness who can
20 answer your questions.  I would hope that is in
21 your interest, but you decide.
22 BY MS. SHELEY:
23    Q.    Does the CHA believe that drug testing
24 protects youth at Parkside?



Page 234

1    MR. MENDENHALL: And I instruct you not to
2  answer. We will provide a 30(b)(6) witness that
3  can answer those questions.
4  BY MS. SHELEY:
5    Q.   Do you know in your personal capacity?
6    A.   No.
7    Q.   Does the CHA believe -- does the CHA
8  believe that drug testing serves the special and
9  compelling economic, social, and community
10  development goals of Parkside?
11    MR. MENDENHALL: Again, I instruct you not to
12  answer. We will provide a 30(b)(6) witness to
13  address that.
14  BY THE WITNESS:
15    A.   I cannot answer.
16  BY MS. SHELEY:
17    Q.   Do you know in your personal capacity?
18    A.   No.
19    Q.   Do you know what social, economic,
20  and -- the social, economic, and community
21  development goals are at Parkside?
22    MR. MENDENHALL: Same instruction.
23  BY THE WITNESS:
24    A.   I cannot answer.

Page 235

1  BY MS. SHELEY:
2    Q.   And, in general, do you know what the
3  social goals are at Parkside?
4    A.   No.
5    Q.   Do you know what the economic goals are
6  at Parkside?
7    A.   No.
8    Q.   Do you know what the community goals are
9  at Parkside?
10    A.   No.
11    Q.   What is your title?
12    A.   Project manager.
13    Q.   Okay. Does the CHA have any evidence
14  regarding drug testing and improving public safety
15  at Parkside?
16    MR. MENDENHALL: Again, I instruct you not to
17  answer. You are not being offered for that either.
18  BY THE WITNESS:
19    A.   I cannot answer.
20    MS. LISKOW: Mr. Mendenhall, could you please
21  speak up? I can't hear your objections.
22    MR. MENDENHALL: There are some seats close,
23  Ms. Liskow.
24    MS. LISKOW: You are talking -- I am asking

Page 236

1  you to speak up so we can all hear your objections.
2  Thank you.
3  BY MS. SHELEY:
4    Q.   Are you instructing the witness not to
5  answer?
6    MR. MENDENHALL: Can you repeat the question?
7       (WHEREUPON, the record was read by
8       the reporter.)
9    MR. MENDENHALL: Can you repeat my objection?
10       (WHEREUPON, the record was read by
11       the reporter.)
12  BY MS. SHELEY:
13    Q.   Do you know in your personal capacity
14  whether the CHA has any evidence that drug testing
15  improves public safety at Parkside?
16    A.   No.
17    Q.   Can you speak up a little?
18    A.   No.
19    Q.   Does the CHA have any evidence that drug
20  testing promotes a drug-free Parkside?
21    MR. MENDENHALL: Same objection. Instruct you
22  not to answer.
23    MS. JONES: Also, asked and answered.
24    MR. MENDENHALL: And asked and answered.

Page 237

1    MS. SHELEY: I don't think so.
2    MS. JONES: I wrote it down. That's
3  100 percent a question that you asked already.
4  BY MS. SHELEY:
5    Q.   Do you know in your personal capacity
6  whether the CHA has any evidence that drug testing
7  promotes a drug-free Parkside?
8    A.   No.
9    Q.   Does the CHA have any evidence that drug
10  testing protects youth at Parkside?
11    MR. MENDENHALL: Same objection.
12    MS. JONES: And asked and answered.
13  BY MS. SHELEY:
14    Q.   Do you know in your personal capacity
15  whether the CHA has any evidence that drug testing
16  protects youth at Parkside?
17    A.   No.
18    Q.   Does the CHA have any evidence that drug
19  testing serves special and compelling social,
20  economic, and community development goals at
21  Parkside?
22    MR. MENDENHALL: Same instruction.
23  BY MS. SHELEY:
24    Q.   Will you answer?



1    A.    No.
2    Q.    Do you know in your personal capacity
3    whether drug testing -- whether the CHA has any
4    evidence that drug testing serves special and
5    compelling social, economic, and community
6    development goals at Parkside?
7    A.    No.
8    Q.    How many departments are there at the
9    CHA that work on mixed-income developments?
10   A.    I do not know.
11   Q.    Can you name the departments that you
12   know that work on mixed-income developments?
13   A.    That I'm aware of, Resident Services,
14   Asset Management, Occupancy, Development
15   Management, Legal.
16   Q.    Any others?
17   A.    Not that I can think of.
18   Q.    What does Resident Services do with
19   mixed-income developments?
20   A.    Have contracts with the developer for
21   social services.
22   Q.    What does Asset Management do?
23   A.    Depending on if our property managers
24   are managing the units, they work with the property

1    managers.
2    Q.    At mixed-income developments, what do
3    asset managers do?
4    A.    Depending on the property, they work
5    with -- if it's CHA property managers, they oversee
6    the property managers.
7    Q.    What do they do at Parkside?
8    A.    They review the developer operating
9    budget and provide operating subsidy.
10   Q.    What do they do as part of the review of
11   the budget?
12   A.    I do not have that detailed information.
13   Q.    What does Occupancy Services do with
14   mixed-income developments?
15   A.    Review compliance, lease compliance for
16   residents so that names can be provided.
17   Q.    What does that mean?
18   A.    They review to make sure that residents
19   are lease compliant, and they provide the names to
20   the developer for occupancy.
21   Q.    Is this in reference to the wait lists?
22   A.    The lottery list and the HOP list, if
23   that applies.
24   Q.    Do they continue to review leases and

1    lease compliance once the CHA tenants are in the
2    building?
3    A.    That is the developer's responsibility.
4    Q.    What does Development Management do?
5    A.    Work with the developers to build
6    mixed-income communities.
7    Q.    What is legal's role with the
8    mixed-income developments?
9    MR. MENDENHALL:  Don't get into any legal
10   discussions.  If you can give her a general
11   overview of the group.
12   MS. LISKOW:  Ma'am, could you repeat back
13   Mr. Mendenhall's objection.
14            (WHEREUPON, the record was read by
15            the reporter.)
16   MS. LISKOW:  Thank you.
17   BY THE WITNESS:
18   A.    Any necessary documents for CHA, they
19   provide and work on that with the developer.
20   BY MS. SHELEY:
21   Q.    Has a developer ever proposed using drug
22   testing as a condition of admission and occupancy
23   and the CHA rejected it?
24   A.    In reference to Parkside, no.

1    Q.    In reference to any other mixed-income
2    development?
3    A.    I do not know.
4    Q.    Does the CHA know?
5    A.    Yes.
6    MS. SHELEY:  Why don't we take a short break.
7            (WHEREUPON, a recess was had.)
8    BY MS. SHELEY:
9    Q.    Ms. Brown, what does the HOP list stand
10   for?
11   A.    Housing Offer Process.
12   Q.    What does that mean?
13   A.    The housing offer process.
14   Q.    Can you explain why it's called that?
15   A.    No, I can't.  I did not come up with the
16   name.
17   Q.    In terms of occupancy services, you said
18   that it was the developer's responsibility to
19   ensure continued compliance with the lease.  What
20   role does the CHA play in that?
21   MR. MENDENHALL:  I'm going to object to asked
22   and answered.
23   BY THE WITNESS:
24   A.    The developer determines if the resident



Page 242

1 is lease compliant.
2 BY MS. SHELEY:
3 Q. Do they communicate with the CHA in
4 doing that?
5 A. Yes.
6 Q. What communications do they have with
7 the CHA?
8 A. I don't know their process.
9 Q. Does the CHA know the process?
10 A. Yes.
11 Q. Who at the CHA would know that process?
12 A. The occupancy department.
13 Q. Who is at the occupancy department?
14 A. I don't know.
15 Q. What would happen if a developer
16 proposed a lease that contained a racially
17 discriminatory provision within the lease for a
18 mixed-income development?
19 MR. MENDENHALL: I object to the form of the
20 question.
21 BY THE WITNESS:
22 A. I don't know.
23 MS. SHELEY: Now, I would like to say, Sam,
24 that I think it's clear that the witness was not

Page 243

1 prepared for this 30(b)(6) deposition. She doesn't
2 know the answers to many questions about CHA
3 processes and the occupancy lists and Mr. Peery's
4 position at the CHA, among others.
5 I would also like to note that we were
6 not informed that this witness would -- was not
7 prepared to testify as to special needs, and I
8 would also like to note that she had not even seen
9 the interrogatory answers. When I asked yesterday
10 what she had done to prepare for the deposition,
11 she told us that she had not reviewed any documents
12 and had not interviewed anyone. I do not believe
13 that we have had a prepared 30(b)(6) witness.
14 It's our position that we are entitled
15 to take additional depositions of 30(b)(6)
16 witnesses on these topics, and that we are entitled
17 to additional time in order to do so.
18 What is your position?
19 MR. MENDENHALL: Okay. My position is clear.
20 You get seven hours for a 30(b)(6) deposition under
21 Rule 30(d)(1). It was your decision to ask about
22 child care. You asked yesterday about child care.
23 You asked yesterday about residents turning 18.
24 You asked also about community-wide wait lists,

Page 244

1 which have nothing to do with the preliminary
2 injunction.
3 If you present to us valid questions
4 that should have been answered and this witness was
5 not available, we will provide somebody to answer
6 those questions on the remaining time that is
7 left as to your -- this witness was adequately
8 prepared. I trust it does not surprise you that
9 one person does not know everything. That was the
10 same case in Holsten's deposition.
11 You have a broad-ranging set of 30(b)(6)
12 topics. The witness did the best she could. The
13 witness was adequately prepared, so I strongly
14 object to that portion of your claim. Again, if
15 you present questions that you feel were not
16 adequately answered, we would be willing to
17 consider providing a witness with the remaining
18 additional time that is left.
19 MS. LISKOW: From the Stubenfield plaintiffs,
20 having observed this deposition, we agree with
21 Ms. Sheley, that the deponent was utterly
22 unprepared on, I would say, the majority of the
23 topics that Mr. Mendenhall even allowed Ms. Sheley
24 to go into, and there were a myriad of topics that

Page 245

1 we were lead to believe that she would be
2 testifying about that Mr. Mendenhall additionally
3 did not let her answer any questions about.
4 And I think that this deposition is --
5 should not count in any way toward the 30(b)(6)
6 topics that were identified by the plaintiff.
7 MR. MENDENHALL: Let me just respond to that.
8 And thank you, Ms. Liskow, but this is not even
9 your case, for starters, so what you think,
10 honestly, I'm not sure how that is relevant in this
11 case. But I thank you for pontificating on those
12 issues.
13 But I stand by my previous remarks to
14 Ms. Sheley.
15 MS. SHELEY: All right. Well, with the caveat
16 that we expect to be able to ask a separate witness
17 the questions that we need to ask and that we
18 disagree with you regarding the amount of time, if
19 other counsel have questions for the witness, we
20 will --
21 MR. GILBERT: I do, but I don't want to
22 necessarily be the first person.
23 MS. JONES: Well, I think you are the only one
24 here representing somebody in this case.



Page 246

1    MR. GILBERT:  That's true.
2             EXAMINATION
3    BY MR. GILBERT:
4        Q.    Does CHA have a policy regarding whether
5    leases with CHA tenants at mixed-income
6    developments require drug testing?
7        A.    We do not have a policy.
8        Q.    Do you know whether HUD has a policy
9    regarding whether leases with public housing
10   tenants at mixed-income developments require drug
11   testing?
12       A.    No, HUD does not have a policy.
13       Q.    Am I correct, then, that CHA does not
14   require that there be drug testing in leases of
15   mixed-income developments?
16       A.    That's correct.
17       Q.    And it doesn't prohibit either a
18   developer from having such policies in its lease?
19       A.    That's correct.
20       Q.    And would that also be true with regard
21   to HUD, that it does not require drug testing in
22   leases?
23       A.    That's correct.
24       Q.    And it also does not prohibit drug

Page 247

1    testing in leases?
2        A.    Correct.
3        Q.    Are there some developments --
4    developers of mixed-income housing in Chicago that
5    do not require drug testing?
6        A.    Yes.
7        Q.    Do you know which mixed-income
8    developers in Chicago do and which ones do not
9    require drug test?
10       MR. MENDENHALL:  Object to the form.  I'm not
11   letting her get into class-wide discovery of that
12   basis.
13       MR. GILBERT:  Well, I don't intend this to
14   have anything to do with the class.  I just want to
15   understand CHA's policy.
16       MR. MENDENHALL:  Subject to that, you can
17   answer.  But I stand on my objection, but you can
18   answer.
19       MS. SHELEY:  I would like to note that we
20   weren't allowed to ask these questions during the
21   deposition, but please continue.
22       MR. MENDENHALL:  I just made a specific
23   objection, the same objection that I made with you.
24

Page 248

1    BY MR. GILBERT:
2        Q.    Do you know which mixed-income
3    developers in Chicago do and which ones do not
4    require drug testing?
5        MR. MENDENHALL:  And I'm not going to allow
6    that question.  And, again, we are not allowing any
7    class discovery, Mr. Gilbert.
8        MR. GILBERT:  Okay.  Again, I'm not trying to
9    get at any question of class, but if you are
10   instructing her not to answer.
11       MR. MENDENHALL:  Yes.  She can answer as to
12   Parkside, but I'm not allowing her to answer
13   class-wide discovery.  The judge made clear in her
14   December 13, 2013, order that class-wide discovery
15   is not allowed.
16   BY MR. GILBERT:
17       Q.    Well, could you tell us which developers
18   in Chicago do not require drug testing?
19       MR. MENDENHALL:  I'm not allowing her to get
20   into class-wide discovery, Mr. Gilbert.
21       MR. GILBERT:  I take it that is an instruction
22   not to answer?
23       MR. MENDENHALL:  Yes.
24

Page 249

1    BY MR. GILBERT:
2        Q.    Does CHA have a policy as to a developer
3    that owns more than one development, as to whether
4    they can have drug testing at one development and
5    not at another?
6        A.    CHA does not have a policy.
7        Q.    And, to your knowledge, does HUD have
8    any policy as to whether a developer that has more
9    than one project could have drug testing at one and
10   not at another?
11       A.    HUD does not have a drug testing policy.
12       MR. GILBERT:  I have no further questions.
13       MS. SHELEY:  Thank you.
14       MR. MENDENHALL:  A couple of things that I
15   would like to do.  I would like to have this marked
16   as the next exhibit in the case.
17            (WHEREUPON, a certain document was
18            marked Deposition Exhibit No. 26,
19            for identification.)
20       MS. SHELEY:  Could I have a copy of the
21   document, please.
22       MR. MENDENHALL:  I sure will.  And I am not
23   going to hand this to the witness, but I just would
24   like it as an exhibit and a brief statement.



Page 250

1    Exhibit 26 is a copy of CHA's objections
2 to the 30(b)(6) that we previously served on Peery
3 counsel.
4    MS. SHELEY:  I would like to note that this
5 was served after hours the night before the
6 deposition started, Wednesday evening.
7    MR. MENDENHALL:  So noted.
8         EXAMINATION
9 BY MR. MENDENHALL:
10    Q.   Ms. Brown, counsel's -- I believe you
11 misspoke earlier, at the beginning of the
12 deposition.
13    Counsel asked you if you reviewed any
14 documents in preparation for your deposition.  Did
15 you review documents?
16    A.   Yes.
17    MR. MENDENHALL:  Okay.  No further questions.
18         FURTHER EXAMINATION
19 BY MS. SHELEY:
20    Q.   What documents did you review?
21    A.   I do not know the exact documents.  I
22 know I reviewed documents.
23    Q.   Would anything refresh -- did you review
24 any of the documents that we looked at during the

Page 251

1 course of the deposition?
2    A.   I do not recall.
3    Q.   Okay.  When did you review them?
4    A.   Tuesday.
5    Q.   How much time did you spend reviewing
6 them?
7    A.   Not much time.
8    Q.   Can you tell me the amount of time?
9    A.   No, I can't give you an exact amount of
10 time.
11    Q.   Was it less than an hour?
12    A.   Looking at documents, yes.
13    Q.   How many pages of documents were there?
14    A.   I do not know.
15    Q.   How thick was the pile of documents?
16    A.   I do not know.  There was not a pile of
17 documents.
18    Q.   How many -- were there more than five
19 documents?
20    A.   I do not recall.
21    Q.   Did you spend less than a half hour
22 looking at documents?
23    MR. MENDENHALL:  Objection, misstates her
24 prior testimony.

Page 252

1 BY THE WITNESS:
2    A.   I do not know the amount of time.
3    MS. SHELEY:  Okay.
4    MR. MENDENHALL:  We'll reserve signature.
5         FURTHER DEPONENT SAITH NOT.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 253

1 STATE OF ILLINOIS )
2                  ) SS:
3 COUNTY OF C O O K )
4         I, KRISTIN C. BRAJKOVICH, a Certified
5 Shorthand Reporter of said state, do hereby
6 certify:
7         That previous to the commencement of the
8 examination of the witness, the witness was duly
9 sworn to testify the whole truth concerning the
10 matters herein;
11         That the foregoing deposition transcript
12 was reported stenographically by me,
13 was thereafter reduced to typewriting under my
14 personal direction and constitutes a true record
15 of the testimony given and the proceedings had;
16         That the said deposition was taken
17 before me at the time and place specified;
18         That I am not a relative or employee
19 or attorney or counsel, nor a relative or
20 employee of such attorney or counsel for any of
21 the parties hereto, nor interested directly or
22 indirectly in the outcome of this action.
23         IN WITNESS WHEREOF, I do hereunto set my
24 hand and affix my seal of office at Chicago,



Page 254

1  Illinois, this 17th day of February, 2014.
2
3
4
5
6
7  *Kristin Brajkovich*
   C.S.R. Certificate No. 84-3810.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 255

1                    I N D E X
2  WITNESS                    EXAMINATION
3  SHARNETTE BROWN
4      By Ms. Sheley            175, 250
5      By Mr. Gilbert           246
6      By Mr. Mendenhall        250
7
8
9             E X H I B I T S
10  NUMBER                          PAGE
11  Deposition Exhibit
12    No. 23                        202
13    No. 24                        214
14    No. 25                        219
15    No. 26                        249
16
17
18
19
20
21
22
23
24

Page 256

1              DEPOSITION ERRATA SHEET
2
3  Our Assignment Nos. 88376 and 88384
4  Case Caption:  Joseph Peery, et al., vs.
5              Chicago Housing Authority, et al.
6
7        DECLARATION UNDER PENALTY OF PERJURY
8
9        I declare under penalty of perjury that
10  I have read the entire transcript of my deposition
11  taken in the captioned matter or the same has been
12  read to me, and the same is true and accurate, save
13  and except for changes and/or corrections, if any,
14  as indicated by me on the DEPOSITION ERRATA SHEET
15  hereof, with the understanding that I offer these
16  changes as if still under oath.
17
18        Signed on the _____ day of
19  _____, 20_____.
20
21
22
23  _____
24        SHARNETTE BROWN

Page 257

1              DEPOSITION ERRATA SHEET
2
3  Page No. _____Line No._____Change To:_____
4  Reason for Change:_____
5  Page No. _____Line No._____Change To:_____
6  Reason for Change:_____
7  Page No. _____Line No._____Change To:_____
8  Reason for Change:_____
9  Page No. _____Line No._____Change To:_____
10  Reason for Change:_____
11  Page No. _____Line No._____Change To:_____
12  Reason for Change:_____
13  Page No. _____Line No._____Change To:_____
14  Reason for Change:_____
15  Page No. _____Line No._____Change To:_____
16  Reason for Change:_____
17  Page No. _____Line No._____Change To:_____
18  Reason for Change:_____
19  Page No. _____Line No._____Change To:_____
20  Reason for Change:_____
21  Page No. _____Line No._____Change To:_____
22  Reason for Change:_____
23  SIGNATURE:_____DATE:_____
24        SHARNETTE BROWN



Page 258

```
1              DEPOSITION ERRATA SHEET
2
3    Page No. _____Line No._____Change To:_____
4    Reason for Change:_____
5    Page No. _____Line No._____Change To:_____
6    Reason for Change:_____
7    Page No. _____Line No._____Change To:_____
8    Reason for Change:_____
9    Page No. _____Line No._____Change To:_____
10   Reason for Change:_____
11   Page No. _____Line No._____Change To:_____
12   Reason for Change:_____
13   Page No. _____Line No._____Change To:_____
14   Reason for Change:_____
15   Page No. _____Line No._____Change To:_____
16   Reason for Change:_____
17   Page No. _____Line No._____Change To:_____
18   Reason for Change:_____
19   Page No. _____Line No._____Change To:_____
20   Reason for Change:_____
21   Page No. _____Line No._____Change To:_____
22   Reason for Change:_____
23   SIGNATURE:_____DATE:_____
24              SHARNETTE BROWN
```



# Exhibit 12

Kaitlin Towner

| | |
|---|---|
| **From:** | Adam Schwartz |
| **Sent:** | Monday, February 17, 2014 5:00 PM |
| **To:** | Mendenhall, Samuel (SMendenh@winston.com); TJohnson@jjsgd.com; Jeff Gilbert; Samantha Liskow (samantha@loevy.com) (samantha@loevy.com); rachel@loevy.com; sjones@fslegal.com |
| **Cc:** | Adam Schwartz; Karen Sheley |
| **Subject:** | Peery/Stubenfield - disclosure of witness names |

Dear counsel:

Per Magistrate Judge Keys' order of January 24 (Dkt. #89), plaintiff Peery herein discloses the names of two expert witnesses that he intends to call at the preliminary injunction hearing. Plaintiff will call these two witnesses to respond to defendants' showing that there is a "special need" for testing, and that the testing is "reasonable." These two witnesses are:

(1) James Ginger. He will respond to defendants' justification of testing based on the alleged relationship of drug testing to public safety, promotion of drug-free housing, and protection of youth.

(2) Niranjan Karnik. He will respond to defendants' justification of testing based on the alleged relationship of drug testing to promotion of drug-free housing.

Defendants have the burden to establish a "special need." See Dkt. #63 at p. 7. While defendants have indicated their intent to assert various special needs and interests, substantial discovery remains regarding what particular witnesses, documents, and other evidence defendants will proffer in support of such assertions. We propose that the parties agree to a schedule that allows for reports and deposition of experts in an orderly fashion. Plaintiff suggests that March 17 would be an appropriate deadline for disclosure of initial written reports of any experts. That date is 90 days before our June 16 hearing date, and Rule 26(a)(2)(D)(i) of the Federal Rules of Civil Procedure requires disclosure of expert testimony 90 days before trial. The interval between this March 17 disclosure date and the April 11 close of discovery would provide sufficient time for depositions of experts. Plaintiffs suggest that all parties disclose any special needs evidence well before the time for disclosure of expert reports. If not, then any experts might need to prepare and serve supplemental reports based on such evidence. If any defendant intends to call any expert witnesses at the preliminary injunction hearing, plaintiff expects that such experts will be disclosed today.

Finally, plaintiff herein incorporates by reference his Rule 26(a)(1) initial disclosures of January 10, 2014.

If you have any questions, please do not hesitate to call me at 312/201-9740-x316.

Sincerely,

Adam

Adam Schwartz
Senior Staff Counsel
ACLU of Illinois
180 N. Michigan Ave. #2300
Chicago, IL 60601
(312) 201-9740

This message and any files or text attached to it are intended only for the recipients named above, and contain information that may be confidential or privileged. If you are not an intended recipient, you must not read, copy, use or disclose this communication. Please also notify the sender by replying to this message, and then delete all copies of it from your system. Thank you.